**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

ANTHONY HINES,                                    )
                                                  )
    Petitioner,                                )
                                                  )         Case No. 3:05-0002
                                                  )         Judge Haynes
v.                                                )
                                                  )
WAYNE CARPENTER, Warden,                          )
                                                  )
    Respondent.                                )

**MEMORANDUM**

1

# TABLE OF CONTENTS

A. Request for An Evidentiary Hearing...................................................9

   1. Petitioner's New Medical Proof...................................................16

   2. Petitioner's DNA and Fingerprint Proof...................................................23

   3. Petitioner's Other Suspects Proof...................................................34

   4. Petitioner's Trial and Post Conviction Counsel Declarations...................................................39

B. Review of the State Record...................................................40

   1. Procedural History...................................................40

   2. State Courts' Findings of Fact...................................................41

C. Conclusions of Law...................................................44

   1. Petitioner's Undisputed Exhausted Claims...................................................47

     a. Sufficiency of the Evidence and Related Claims...................................................47

     b. Ineffective Assistance of Counsel Claims...................................................52

       1. Ineffectiveness of Trial Counsel...................................................53

          i. Competency of Trial Counsel...................................................54

          ii. Failure to Challenge the Jury Panel...................................................60

          iii. Ineffective Cross Examination of Jones...................................................64

          iv. Failure to Acquire Forensic Evidence...................................................69

          v. Failure to Discover Impeachment and Exculpatory Evidence...................................................70

          vi. Failure to Make Closing Argument...................................................76

       2. Counsel's Ineffectiveness on Direct Appeal...................................................81

3. Ineffectiveness of Counsel at Resentencing............................................82

c. Aggravating Circumstances Claims..................................................96

d. Trial Court's Failure to Recuse.........................................................104

2. Procedurally Defaulted Claims...............................................................105

a. Martinez Claims...............................................................................105

b. Brady and Giglio Claims.................................................................109

c. Remaining Defaulted Claims...........................................................116

1. Noncompliance with Applicable State Rules............................................118

2. "Firmly Established" and "Regularly Followed" State Rules..............119

3. Independent and Adequate State Rule.................................................120

4. The Cause and Prejudice Requirement................................................122

i. Cause.......................................................................................122

ii. Prejudice...............................................................................123

D. Conclusion............................................................................................124

E. Appendix of Defaulted Claims .............................................................125

Petitioner, Anthony Hines, filed this pro se action under 28 U.S.C. § 2254 seeking the writ of habeas corpus to set aside his conviction of first degree murder for which Petitioner received the death sentence. Petitioner moved for appointment of counsel and the Court granted that motion. Petitioner's counsel filed two amended petitions (Docket Entry Nos. 14 and 23). In his last amended petition, Petitioner asserts the following core claims[1]:

9.     In violation of the Sixth, Eighth, and Fourteenth Amendments, Darrell Hines was denied his rights to due process, equal protection, and to juries selected free from discrimination and from a fair cross-section of the community, given discrimination against women in the selection of the petit jury, the grand jury, and the grand jury foreperson[.]

10.     In violation of the Sixth, Eighth, and Fourteenth Amendments and Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), and in order to convict Darrell Hines and sentence him to death, the prosecution knowingly presented false testimony and withheld exculpatory evidence which was material to both the conviction and the imposition of the death sentence.

11.     Counsel was ineffective at the guilt phase of the proceedings, and absent counsel's failures, there is a reasonable probability that Darrell Hines would not have been convicted and/or sentenced to death. Counsel was ineffective for the following reasons[.]

12.     In violation of the Eighth and Fourteenth Amendments, Darrell Hines is actually innocent of the offense for which he has been convicted. He was erroneously convicted based on, for example, the withholding of evidence, false testimony, ineffectiveness of trial counsel, prosecutorial misconduct, and other errors and failures that occurred at the trial which led to an erroneous conviction[.]

---

[1]Petitioner filed two amended petitions. (Docket Entry Nos. 14 and 23). Rule 15 of the Federal Rules of Civil Procedure applies to a habeas proceeding. Mayle v. Felix, 545 U.S. 644, 649 (2005); Rule 6(a), Rules Governing Section 2254 Cases. Under Fed. R. Civ. P. 15 (a), the filing of an amended complaint supersedes the prior complaint. Clark v. Tarrant County, 798 F.2d 736, 740-41 (5th Cir. 1986). Thus, the Court deems the last amended petition to supersede the pro se and first amended petitions and the claims therein. Unless adopted and supported by legal memorandum, the Court deems the claims in the pro se and first amended petition to be waived. In addition, the claims quoted above are characterized as core claims because each claim has numerous subparts.

13. In violation of the Sixth, Eighth, and Fourteenth Amendments, counsel was ineffective at the re-sentencing proceedings, and absent counsel's failures, there is a reasonable probability that Petitioner would not have been sentenced to death.

14. Counsel was ineffective on appeal, and absent counsel's failures, there is a reasonable probability that Darrell Hines would have received relief on direct appeal.

15. In violation of the Sixth, Eighth, and Fourteenth Amendments, Darrell Hines' death sentence was based on a felony-murder aggravating circumstance which duplicated the jury's guilt finding and failed to meaningfully narrow the class of persons eligible for the death penalty. See Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441 (1990); State v. Middlebrooks, 840 S.W.2d 317 (Tenn 1992).

16. In violation of the Sixth, Eighth, and Fourteenth Amendments, the jury weighed an unconstitutional "heinous, atrocious, or cruel" aggravating circumstance when imposing the death sentence.

17. In violation of the Sixth, Eighth, and Fourteenth Amendments, Darrell Hines' 1989 death sentence was unconstitutional because the 1981 first-degree assault conviction which served as a prior violent felony aggravating circumstance under Tenn. Code Ann. § 39-2-203(i)(2) was void, invalid, and unonstitutional.

18. At re-sentencing, Darrell Hines' jury was misled into believing that mitigating circumstances had to be found unanimously, in violation of the Eighth and Fourteenth Amendments.

19. In violation of the Sixth, Eighth, and Fourteenth Amendments, jury instructions lessened the prosecution's burden of proof at the guilt and re-sentencing stages[.]

20. In violation of the Sixth, Eighth, and Fourteenth Amendments, the prosecution introduced inflammatory statements at the guilt/innocence trial which were irrelevant to the issue of guilt[.]

21. In violation of the Sixth, Eighth, and Fourteenth Amendments, the prosecution made improper arguments during closing statements at the guilt/innocence trial, including arguments which undermined the presumption of innocence and lessened the prosecution's burden of proof. This misconduct rendered Darrell Hines' trial fundamentally unfair.

(Docket Entry No. 23 at 4, 9, 13, 25; Docket Entry No. 23-1 at 16-17, 18, 19, 25, 27, 28 and 30).

22.     In violation of the Sixth, Eighth, and Fourteenth Amendments, at the re-sentencing trial, the prosecution made misleading, unconstitutional, and fundamentally unfair statements to the jury which violated Darrell Hines' constitutional rights.

23.     In violation of the Sixth, Eighth, and Fourteenth Amendments, Darrell Hines' death sentence is arbitrary under United States v. Jackson, 390 U.S. 570,88 S. Ct 1209 (1968), and unconstitutional.

25.     In violation of the Sixth, Eighth, and Fourteenth Amendments, the judge was and appeared to be biased, and should have been recused because of lack of impartiality.

26.     In violation of the Sixth, Eighth, and Fourteenth Amendments, prior to the re-sentencing trial, the court failed to grant a continuance when the prosecution failed to provide timely notice of aggravating circumstances, and where Darrell Hines was prevented from securing attendance of necessary out of state witnesses.

27.     In violation of the Sixth, Eighth, and Fourteenth Amendments, Darrell Hines' conviction and death sentence is unconstitutional because the empaneling of the jury at both the guilt/innocence trial and at the re-sentencing trial was improper.

30.     In violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments and Miranda v. Arizona, 384 US. 436, 86 S.Ct. 1602 (1966), the introduction of Darrell Hines' post-arrest statements at the 1986 guilt/innocence trial and the 1989 re-sentencing trial was unconstitutional.

31.     In violation of the Sixth, Eighth, and Fourteenth Amendments, Darrell Hines was denied his right to compulsory process and due process by the trial court's failure to have witnesses Norman Johnson and Bill Andrews produced to testify at the re-sentencing hearing. This likewise violated Darrell Hines' rights to present any and all available mitigating evidence in support of a sentence less than death.

32.     In violation of the Sixth, Eighth, and Fourteenth Amendments, the evidence was insufficient to support Darrell Hines' conviction and death sentence. Jackson v. Virginia, 443 US. 307, 99 S.Ct. 2781 (1979).

33.     In violation of the Fifth, Sixth, Eighth and Fourteenth Amendments, and International Law, the death penalty is unconstitutional.

34.     In violation of the Eighth and Fourteenth Amendments, execution by lethal injection constitutes cruel and unusual punishment, is torturous, and violates contemporary standards of decency, as it involves unnecessary, conscious suffering.

35.     In violation of the Sixth, Eighth, and Fourteenth Amendments, Darrell Hines' 1986 first-degree murder conviction and 1989 death sentence are unconstitutional because Tennessee's murder and death penalty statutes (Tenn. Code Ann. § 39-2-202 through § 39-2-205) are constitutionally defective.

37.     In violation of due process and equal protection under the Eighth and Fourteenth Amendments, the death sentence is unconstitutional because there were no standards for the decision to choose to seek (or impose) the death sentence (both within Cheatham County, and throughout the entire state of Tennessee), nor are there any consistent and objective standards for proportionality review. As a result of these ailings, especially in a case where the prosecution has recognized that Darrell Hines ought to be sentenced to life in prison, the death sentence in this case (which impinges upon the fundamental right to life) violates rudimentary notions of due process and equal protection. See Bush v. Gore, 531 U.S. 98, 121 S.Ct. 525 (2000).

38.     In violation of the Eighth and Fourteenth Amendments, Darrell Hines' death sentence is unconstitutional, as a result of the length of time (20 years) he has been incarcerated under sentence of death following the offense for which he was convicted. The death sentence is therefore unconstitutionally cruel and unusual. See Lackey v. Texas, 514 U.S. 1045, 115 S.Ct. 1421 (1995)(Stevens, J., respecting denial of certiorari).

39.     In violation of the Eighth and Fourteenth Amendments, Darrell Hines is not competent to be executed. Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595 (1986). Mr. Hines acknowledges that such claim is not ripe, as execution is not imminent, but he raises this claim in accordance with Stewart v. Martinez-Villareal, 52.3 U.S. 637, 118 S.Ct. 1618 (1998), which holds that it is proper to raise the claim in the initial habeas petition and then to litigate the claim if it ever becomes ripe, i.e., once an execution date is imminent.

40.     The cumulative effect of the errors at trial and sentencing, including all errors cited in this petition, denied Darrell Hines due process of law under the Fourteenth Amendment.

(Docket Entry No. 23-2 at 3-4, 7, 9, 11, 12, 17, 18, 19, 20 22 and 27-28). As noted earlier, within

the above quoted claims include numerous subparts.

The Court administratively closed this action twice. The first closure was on November 3,

2005, when the Court granted Respondent's motion to hold this action in abeyance pending

7

completion of Petitioner's state court post-conviction proceeding, asserting Eighth and Fourteenth Amendments claims for deoxyribonucleic acid (DNA) testing of certain evidence at his trial. (Docket Entry No. 44). On December 8, 2008, the Tennessee Supreme Court denied Petitioner's application for permission to appeal the Tennessee Court of Criminal Appeals decision denying his claims. On January 14, 2009, Respondent moved to reopen this action and the Court granted that motion on February 2, 2009. (Docket Entry Nos. 53 and 56). In subsequent proceedings, the Court granted Petitioner's motion for DNA testing under an Agreed Protocol with the State. (Docket Entry Nos. 79, 83 and 85). The Court set a status conference on September 30, 2011. Throughout 2011 and 2012, Petitioner and Respondent filed numerous motions for extensions of the Court's deadlines for discovery and to file the joint statement of the relevant state record, the parties' claims defenses and the necessity for an evidentiary hearing. (Docket Entry Nos. 89, 90, 94, 95, 99, 100, 102, 103, 104, 105, 107 and 108).

The second closure was on February 3, 2013, after the United States Supreme Court granted certiorari in Trevino v. Thaler, 449 Fed. Appx. 415 (5th Cir. 2011), cert. granted 568 U.S._ (Oct. 29, 2012) (U.S. No. 11-10189), addressing the applicability of Martinez v. Ryan, 566 U.S._ (2012). (Docket Entry No. 110). Given the numerosity of claims and the extensive factual record, the Court closed this action pending the Trevino decision. On January 16, 2014, the Court reopened this action and ordered the parties to submit an agreed order for the proceedings. (Docket Entry No. 113). The parties filed their schedule, but the Court shortened the schedule given the length of the pendency of this action.

Before the Court is the Respondent's motion for summary judgment (Docket Entry No. 118) contending, in sum, that most of Petitioner's claims were never presented to the State courts and are

procedurally defaulted. For Petitioner's exhausted claims, Respondent argues that the State courts reasonably determined those claims under clearly established federal law. In his 191 page response with extensive evidentiary submissions and citations to Trevino and Martinez, Petitioner argues that he is actually innocent and his claims for ineffective assistance of his post conviction counsel will establish cause and prejudice for his unexhausted claims and procedural defaults. Petitioner contends that the State courts' decisions on his exhausted claims are erroneous and unreasonable applications of federal law. Respondent filed a six page reply to Petitioner's response.

Before addressing Petitioner's contentions, the Court must evaluate Petitioner's request for an evidentiary hearing.

## A. Request for An Evidentiary Hearing

In the Joint Statement of the Case ordered by the Court, Petitioner requests an evidentiary hearing on his claims under Trevino and Martinez as well as his claim of actual innocence. (Docket Entry No. 109 at 1-43). Respondent argues that Petitioner has not met his burden of proof under 28 U.S.C. § 2254(e)(2) and that Supreme Court precedent limits this Court's review to the State court record. Id. at 43-4. Since that submission, Petitioner has presented extensive evidence (Docket Entry Nos. 124-1 through 129) that Petitioner contends warrants an evidentiary hearing.

To decide this issue, the Court considers the State court record that exceeds 7400 pages with a trial, sentencing hearing, a resentencing hearing and a post conviction hearing. (Addendum Nos. 1 through 28). The post conviction hearing included depositions of experts as well as extensive publications on trial and sentencing issues in a death penalty case. (Addendum No. 20, Vols. 1 through 4). As a proxy for the extensiveness of the post conviction evidentiary hearing, in his post conviction appeal, Petitioner's lead brief is 172 pages of which 93 pages are devoted to a recitation

9

of the evidence. The Tennessee appellate court's opinion reflects that the post conviction hearing

contains the testimony from several witnesses, including a statistician on the issue of discrimination

in the selection of the grand jury, grand jury foreperson and petit jury as well as testimony of a juror.

Hines, 2004 WL 1567120 at * 6, 20-21. Seven psychiatrists/psychologists testified at the second

sentencing hearing on Petitioner's personal history and mental status. Id. at *14-18. See also Hines

v. State, 919 S.W.2d 573, 577 (Tenn. 1995). Two doctors testified on the victim's stab wounds.

Hines, 2004 WL 1567120 at *19. In addition, the witnesses who are cited as giving false testimony

testified at the post conviction hearing, as well as witnesses whom Petitioner's counsel was cited for

failing to call as witnesses at trial. Id. at * 4-6, 8.

For an evidentiary hearing in a habeas action, in the AEDPA, Congress redefined the

standards:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that - (A) the claims relies on - (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) **a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense**.

28 U.S.C.§ 2254(e)(2) (emphasis added).

In Williams v. Taylor, 529 U.S. 420 (2000), the Supreme Court explained that if the

petitioner demonstrated diligence, then the inquiry ends, but if there is an issue of diligence the focus

is on whether the petitioner or his counsel knew of the matters at issue and failed to pursue the

matter:

> The question is not whether the facts could have been discovered but instead whether

the prisoner was diligent in his effort . . . **Diligence for purposes of the opening clause [on Section 2254(e)(2)] depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court;** it does not depend, as the Commonwealth would have it, upon whether those efforts could have been successful.

\* \* \*

**For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error. If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met. Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.**

\* \* \*

Given knowledge of the report's existence and potential importance, a diligent attorney would have done more. Counsel's failure to investigate these references in anything but a cursory manner triggers the opening clause of § 2254(e)(2).

**As we hold there was a failure to develop the factual basis of this Brady claim in state court, we must determine if the requirements in the balance of § 2254(e)(2) are satisfied so that petitioner's failure is excused . . . upon a showing, by clear and convincing evidence, that no reasonable factfinder would have found petitioner guilty of capital murder but for the alleged constitutional error.**

Id. at 435, 437, 439-440.

Independent of § 2254(e)(2), the Court also has the inherent authority to set an evidentiary hearing in a habeas action. Abdur' Rahman v. Bell, 226 F.3d 696, 705-06 (6th Cir. 2000). "[A] district court does have the inherent authority to order an evidentiary hearing even if the factors requiring an evidentiary hearing are absent." Id. at 705. Such hearings are set "to settle disputed issues of material fact." Id. at 706. Yet, "if [the court] concludes that the habeas applicant was

afforded a full and fair hearing by the state court resulting in reliable findings, [the court] may, and ordinarily should accept the facts as found in the hearing. But [the court] need not. In every case [the court] has the power, constrained only by [its] sound discretion, to receive evidence bearing upon the applicant's constitutional claim." Id. at 705 (quoting Townsend v. Sain, 372 U.S. 293, 318 (1963)). This authority extends to determine factual issues or if an inadequate record exists to resolve the petitioner's claims, on a procedural default controversy. Alcorn v. Smith, 781 F.2d 58, 60 (6th Cir. 1986).

Even prior to AEDPA, a habeas petitioner had to show cause for his failure to develop the state record or that "a fundamental miscarriage of justice would result from failure to hold a federal evidentiary hearing," Kenney v. Tamayo-Reyes, 504 U.S. 1, 11-12 (1992). In a word, the distinction between § 2254(e)(2) and the Court's inherent authority to order a hearing is "when a petitioner is entitled to a hearing [under § 2254(e)(2)] . . . versus whether a district court has the inherent discretion to order a hearing is still intact following Williams." Abdur' Rahman, 226 F.3d at 706. Evidentiary hearings have been held to be appropriately denied where the habeas petitioner "has not shown that his . . . claims would result in no reasonable factfinder finding him guilty of the underlying offenses . . . We therefore conclude that the district court did not abuse its discretion by declining to conduct an evidentiary hearing." Abdus-Samad v. Bell, 420 F.3d 614, 626-27 (6th Cir. 2005).

More recently, in Cullen v. Pinholster, __ U.S. __, 131 S. Ct 1388 (2011), the Supreme Court expressly stated that the federal habeas review is limited to the state court record:

**We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.** Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a

decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time i.e., the record before the state court.

This understanding of the text is compelled by "the broader context of the statute as a whole," which demonstrates Congress' intent to channel prisoners' claims first to the state courts. Robinson v. Shell Oil Co., 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). "The federal habeas scheme leaves primary responsibility with the state courts ...." Visciotti, supra, at 27, 123 S.Ct. 357. Section 2254(b) requires that prisoners must ordinarily exhaust state remedies before filing for federal habeas relief. It would be contrary to that purpose to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively de novo.

Limiting § 2254(d)(1) review to the state-court record is consistent with our precedents interpreting that statutory provision. Our cases emphasize that review under § 2254(d)(1) focuses on what a state court knew and did. State-court decisions are measured against this Court's precedents as of "the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). To determine whether a particular decision is "contrary to" then-established law, a federal court must consider whether the decision "applies a rule that contradicts [such] law" and how the decision "confronts [the] set of facts" that were before the state court. Williams v. Taylor, 529 U.S. 362, 405, 406, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (Terry Williams). If the state-court decision "identifies the correct governing legal principle" in existence at the time, a federal court must assess whether the decision "unreasonably applies that principle to the facts of the prisoner's case." Id., at 413, 120 S.Ct. 1495. It would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court.

Our recent decision in Schriro v. Landrigan, 550 U.S. 465, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007), is consistent as well with our holding here. We explained that "[b]ecause the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." Id., at 474, 127 S.Ct. 1933. In practical effect, we went on to note, this means that when the state-court record "precludes habeas relief" under the limitations of § 2254(d), a district court is "not required to hold an evidentiary hearing." Id., at 474, 127 S.Ct. 1933 (citing with approval the Ninth Circuit's recognition that "an evidentiary hearing is not required on issues that can be resolved by reference to the state court record" (internal quotation marks omitted)).

Id. at 1398-99 (footnote omitted). Yet, the Sixth Circuit has since explained that Pinholster "was not a wholesale bar on federal evidentiary hearings", "such as when the State court decision was not an adjudication on the merits". McClellan v. Rapelje. 703 F.3d 344, 356 (6ᵗʰ Cir. 2013).

As to Petitioner's reliance upon Martinez for an evidentiary hearing on his post-conviction counsel's alleged deficiencies[2], there, the Supreme Court created an equitable exception to procedural default that "qualifies Coleman by recognizing a narrow exception: Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 132 S. Ct. at 1315. The Supreme Court defined "initial-review collateral proceedings" as proceedings "which provide the first occasion to raise a claim of ineffective assistance at trial." Id. In Martinez, the Supreme Court expressly recognized that "[d]irect appeals, without evidentiary hearings, may not be as effective as other proceedings for developing the factual basis for the [ineffective assistance of trial counsel] claim." Id. at 1318. In Trevino v. Thaler, __ U.S.__, 133 S. Ct. 1911 (2013), the Supreme Court extended the Martinez exception where State law "does not expressly *require* the defendant to raise a claim of ineffective assistance of trial counsel in an initial *collateral review* proceeding....[but the State] law on its face appears to permit (but not require) the defendant to raise the claim on *direct appeal*." Id. at 1918 (emphasis in the original).

Based upon its analysis of Tennessee's system, this member of the Court concluded, consistent with Trevino, that Tennessee's system by "'design and operation makes it **highly unlikely**

---

[2]Petitioner's challenges to the effectiveness of his post conviction counsel are not in his second amended petition, but in his request for an evidentiary hearing. (Docket Entry No. 109 at 1-43). In any event, those challenges are addressed in the procedural default section of this Memorandum, infra.

in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal.'" Morrow v. Brandon, No. 3:06–0955, 2014 WL 49817 at *9 (M. D. Tenn. Jan. 7, 2014) (quoting Trevino, 133 S. Ct. at 1921and citing Fenton v. Colson, No. 3:09cv1057, 2013 WL 704317 at *13 (M. D. Tenn. Feb. 25, 2013) (emphasis in Brandon). In Sutton v. Carpenter, 745 F.3d 787 (6thCir. 2014), the Sixth Circuit ruled that "ineffective assistance of post-conviction counsel can establish cause to excuse a Tennessee defendant's procedural default of a substantial claim of ineffective assistance at trial." Id. at 795-96 (analyzing Trevino, 133 S. Ct. 1918-21 and citing Martinez, 132 S.Ct. at 1320).

Yet, "[t]o be successful under Trevino . . . [the habeas petitioner] must show a 'substantial' claim of ineffective assistance, and this requirement applies as well to the prejudice portion of the ineffective assistance claim." McGuire v. Warden, Chillicothe Correctional Inst., 738 F.3d 741, 752 (6th Cir. 2013) (citing Trevino, 133 S.Ct. at 1918). Although Petitioner's claims about his post conviction counsel may be raised under Martinez, the necessity of an evidentiary hearing on Petitioner's claims about his counsel is a separate issue.

In assessing an evidentiary hearing based upon Martinez, the Court considers the factual state record in its entirety: the trial, two sentencing hearings and an extensive post-conviction hearing. Of the issues that Petitioner identifies for an evidentiary hearing (Docket Entry No. 109 at 1-43), virtually all of the facts related to those issues were part of the trial record, the sentencing or resentencing hearings, or the post conviction evidentiary hearing that was quite extensive. As stated earlier, Petitioner's post conviction hearing reflects proof from several witnesses, including a statistician on the issue of discrimination in the selection of the grand jury, grand jury foreperson and petit jury, as well as testimony of a juror. Seven psychiatrists/psychologists testified at the second

15

sentencing hearing on Petitioner's personal and medical history. Two doctors testified on the victim's stab wounds. In addition, the witnesses who are cited as giving false testimony testified at the post conviction hearing, as well as witnesses whom Petitioner's counsel was cited for failing to call as witnesses at trial. Witnesses whom Petitioner asserts gave false testimony testified at the post conviction hearing.

Yet, the Court must evaluate the evidence submitted by Petitioner and whether such proof warrants an evidentiary hearing.

### 1. Petitioner's Medical Proof

Petitioner's new proof on his mental condition includes Dr. Stacey Wood, a clinical neuropsychologist who performed a battery of tests for an "intellectual and neuropsychological" evaluation" of Petitioner. (Docket Entry No. 125-2 at 1-4). Dr. George W. Woods, Jr., a neuropsychiatrist, who interviewed Petitioner on three occasions and reviewed the reports of Drs. David Lisak, Paul Moberg, Stacey Wood, Ruben Gur, and Pamela Auble, opined as follows:

> Darrell has multiple neurological and neuropsychiatric symptoms, including affective dysregulation, impaired regisration, defective problem initiation, impaired judgment, clinical perservation [sic], poor problem sequencing, grandiosity, irritability, agitation, flight of ideas, and circumstantiality. These symptoms are associated with disorders that are genetic/familial (Bipolar Disorder), environmentally derived (Post Traumatic Stress Disorder), and neurodevelopmental (FASD and dysexecutive syndrome). The etiology of these disorders is complex and interconnected, creating a depth of impaired functioning and disruptive behavior greater than would be predicted from any one disorder independently. The multiplicity of symptoms explains Darrell's atypical presentation and behavioral dysfunction.
>
> Moreover, Darrell's symptoms are interrelated in a cognitive synergy that rendered Darrell unable to function effectively as both an adolescent and an adult. At the time of his trial, Darrell was affectively labile, unable to tell his story coherently, unable to gather related facts and form an incisive conclusion, and impaired in effective decision making skills – symptoms that could have been presented to the triers of fact as mitigation.

(Docket Entry No. 125-1 at 1, 8-19).

Dr. Ruben Gur, Ph.D., director of the Brain Behavior Laboratory and Center for Neuroimaging in Psychiatry, provided a report that, in essence, found as follows:

> **Results of neuropsychological testing show abnormalities indicating brain damage.** These abnormalities are in regions that are very important for regulating behavior and executive functioning, and often result in a lack of inhibition, difficulty reading social cues, perseveration, viscosity, and grandiosity, as well as the inability to weigh and deliberate. The opinions I express with regard to the neuropsychological findings meet standards of scientific certainty.

(Docket Entry No. 125-3, p. 2 of 2) (citing Dr. Stacey Wood's testing with emphasis added).

In addition, Dr. David Lisak, Ph.D., a clinical psychologist and assistant professor of psychology at the University of Massachusetts and forensic consultant, interviewed Petitioner and his two siblings; reviewed Petitioner's medical school and institutional records including the prior evaluation by Dr. Kenner and draft report of Dr. Richart; and reviewed the affidavits of Victoria Hines, Petitioner's sister, and David Miles. In sum, Dr. Lisak concluded that:

> There is overwhelming evidence that Darrel Hines suffered extremely severe childhood trauma. He was subjected to pervasive neglect, and to years of violent physical abuse that left him literally and physically scarred for life. However, the most damaging trauma was very likely the sexual abuse that he suffered at the hands of multiple perpetrators over the course of his childhood, including older women and, almost certainly, his step-father, Bill Hines.

> This sexual abuse is directly linked to the very severe dissociative symptoms that Darrell displayed as a child, symptoms that were witnessed by and attested to by his siblings. These severe dissociative symptoms underscore the severity of the traumas that Darrell was subjected to, and they are also markers of severe and lifelong PTSD. The PTSD, in turn, is associated with Darrell's chronic emotional dysregulation, a vulnerability that has left him intensely reactive to stress and unable to de-escalate normally when he does react.

(Docket Entry No. 125-4, at ¶¶ 65-66).

Petitioner's medical proof in this action reflects mental evaluations almost three decades after

17

the crime that was committed in 1985. Although some experts opine that Petitioner's condition existed from his youth, with an evidentiary hearing, this medical testimony on Petitioner's mental condition would be almost thirty years after the offense. As the Sixth Circuit stated:

> In his federal habeas petition, Strouth seeks to "supplement[ ]" the record with "expert evaluations of his longstanding mental illness." Br. at 99–100. But in reviewing the state court's resolution of Strouth's claim, federal courts must "limit[ ]" themselves to "the record that was before the state court." Cullen v. Pinholster, 563 U.S. ——, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011). The new mental-health evidence has no bearing on whether AEDPA permits us to grant him habeas relief on this claim. And because that is the only ground on which Strouth seeks relief with respect to this claim, the claim necessarily fails. Even if that were not the case, the district court's reasoning on this score independently suffices to reject this claim: **recent mental evaluations offer little insight into Strouth's state of mind twenty-five-plus years ago, as the state courts reasonably concluded in finding no prejudice.**

Strouth v. Colson, 680 F.3d 596, 603 (6th Cir. 2012) (emphasis added).

In addition, the state court record includes evidence of Petitioner's personal history and abuse

and his Post Traumatic Stress Disorder ("PTSD") and brain damage and lack of executive control.

> Dr. William Kenner, a psychiatrist, testified that the petitioner suffered from post-traumatic stress disorder ("PTSD"), antisocial personality disorder, status post-head injury, and inhalant abuse. He said that the petitioner was sexually abused by both his stepfather and a maternal uncle and physically abused by his stepfather, opining that the abuse caused the petitioner's PTSD. The physical abuse inflicted upon the petitioner by his stepfather included hitting him in the head with a tobacco stick, whipping him with car radio antennas, throwing him into a pond although he could not swim, and shooting the family dog and her puppies in front of him and his siblings. The petitioner's mother was also a victim of Bill Hines's abuse, and the petitioner often tried to protect her. At the age of eight or nine, the petitioner sustained a head injury when he fell off a wagon of hay and was knocked unconscious. The petitioner did not receive any medical treatment for this injury.

> Explaining how PTSD affects the brain, Dr. Kenner said that a person with PTSD repeats or replays traumatic events throughout life and that PTSD can alter a person's character and change his or her behavior. Dr. Kenner testified that in the petitioner, PTSD created a paranoid quality. Dr. Kenner opined that the head injuries the petitioner suffered throughout his life could have caused organic personality

syndrome, which made him even more volatile and difficult to manage. The petitioner's abuse of inhalants such as glue and gasoline also caused damage to his brain. Dr. Kenner concluded that the petitioner's choosing a woman for his victim was inconsistent with the petitioner's personal history, as there was no indication that he had hard feelings toward women.

On cross-examination, Dr. Kenner acknowledged that the petitioner had been in and out of jail since the age of fifteen. He further acknowledged that a report prepared by the Middle Tennessee Health Institute and the Harriet Comb Mental Health Center indicated that the petitioner experienced difficulty in relationships with women, as the result of problems with girlfriends and family interference, exhibited a preoccupation with thoughts of violence, and displayed extreme prejudice toward African–Americans. Additionally, a report prepared by the Tennessee Department of Correction stated that the petitioner, once confined on death row, acknowledged to security personnel that he hated both women and African–Americans. Dr. Kenner testified that although the petitioner said that he hated women, he did not believe him because his behavior indicated differently. He said he had much more information concerning the petitioner than Dr. Charvat did prior to preparing her report for the resentencing. He believed that Dr. Charvat should have interviewed the petitioner's sisters and mother in order to get a true picture of "how bad things were for [the petitioner] growing up."

Dr. Murry Wilton Smith, a specialist in addiction medicine, testified that the petitioner is a Type II alcoholic. He explained that Type II alcoholism, a primary medical illness based in brain chemistry, is inherited and involves rapid early onset of alcoholism, usually between the ages of nine and twelve, and is associated with antisocial behavior and early legal trouble. Dr. Smith also testified that the petitioner had used inhalant solvents and marijuana. He was aware of the petitioner's low levels of serotonin, which is associated with violent behavior and Type II alcoholism. He said that current treatment for Type II alcoholism, which was not available in 1989, consisted of alcohol and drug treatment, intensive physiotherapy with a counselor, and medication to improve the serotonin level. On recross examination, Dr. Smith acknowledged that although medications to increase serotonin levels were available in 1986, there was not a routine to monitor. He also stated that a characteristic of Type II alcoholics is a lack of motivation to follow instructions or a schedule.

Dr. Paul Rossby, an expert in molecular neurobiology and the study of serotonin, testified that, as a molecular biologist, he studies the chemistry of the brain and the biological basis of behavior. According to Dr. Rossby, serotonin blocks pain and orchestrates inhibition within the brain. Dr. Rossby testified that research of serotonin dated back to at least the 1970s. He further said that there would have been a "tremendous amount" of literature available on serotonin at the time of the petitioner's resentencing in 1989 and a "great deal" of literature available at the time

19

of the petitioner's trial in 1986. He said that low levels of serotonin have been associated with impulsive behavior, but none of the studies has indicated that it causes violence.

Dr. Rossby had a spinal tap performed on the petitioner to determine his serotonin levels, which were "at the extreme low level" of the normal male population. He opined that the petitioner's serotonin levels, coupled with his Type II alcoholism, resulted in the petitioner's being organically impaired and said that the petitioner does not have the biological capacity to control his impulsive behavior. Dr. Rossby said that in a person with low levels of serotonin, once an impulse is triggered, there is no ability to control the impulse. He acknowledged that he did not testify on the issue of serotonin levels until 1999. He first worked on a case involving a serotonin defense in approximately 1992, and was not aware of any expert who had testified on the issue of serotonin prior to the time he was involved with his first case.

Dr. Henry Cellini, an educational psychologist who was offered as a rebuttal witness on behalf of the State, testified that serotonin research began in the 1970s but had only been fully developed in the last fifteen to twenty years. With regard to the petitioner's case, Dr. Cellini testified that the practical application of serotonin levels to behavior was in its "infancy" in the mid-1980s. He said that research indicates that the two primary factors of antisocial personality disorder are impulsive aggression and psychopathic tendencies or thinking.

Two witnesses were presented as to the claims regarding the Green River Boys Camp in Kentucky and its alleged effects on the petitioner. Tammy Kennedy, an investigator with the post-conviction defender's office, said that she interviewed former residents and staff members. The former residents told her that, when they arrived at camp, they were immediately subjected to grouping, which consisted of several boys surrounding the new resident and physically and verbally abusing him. She said that the former residents told her at times they had sewage detail, which involved two boys holding a resident by the legs and dumping him into the sewage. They were forced to scrub the pavement until their brushes were gone and their hands were blistered. A juvenile specialist who had visited Green River advised Ms. Kennedy that schooling was minimal and that there were reports of physical, sexual, and verbal abuse of the residents. Ms. Kennedy said that several other death row inmates were former residents of Green River

Hines v. State, No. M2002–01352–CCA–R3–PD, 2004 WL 112876 at *15-17 (Tenn. Ct. Crim. App. Jan. 23, 2004).

In the state court proceedings, Dr. S. Paul Rossby, Ph.D. at the Vanderbilt University

Department of Psychiatry and Division of Molecular Neurobiology, cited Petitioner's "extremely low" serotonin level that "**is essential for self-control**." (Docket Entry No. 29, Addendum 20, Vol. 1, at 5193, 5198, 5199 (emphasis in the original). Dr. Rossby cited the impact of low serotonin on other psychiatric disorders. Id. Petitioner's "extremely low" serotonin level also impacts his amygdala, an inhibitory part of Petitioner's brain, id. at 5198, 5202, but "low serotonin activity does not in itself produce violent behavior, it simply reduces or in the case of Anthony Darrell Hines (and many other men) virtually eliminates one's capacity to control it after it has been triggered." Id. at 5202. Dr. Rossby reviewed Petitioner's medical records, institutional records and interviewed Vicki Hines, Petitioner's sister. Id. at 5201-02.

There are other such evaluations prior to Petitioner's trial. A 1977 psychological evaluation of Petitioner by Dr. Hecht S. Lackey, Ph.D and Danny Johnson, M.A., psychologist, found "no significant indication of organic brain damage or visual motor impairment." Id., Vol. 4 at 6518. In addition, in September and October 1985, Petitioner underwent a psychological testing evaluation and was found to be "rational, coherent, relevant, organized and devoid of circumstantiality, tangentiality, looseness of associations, ideas of reference, paranoid ideation, delusional content, and other evidence of thought disorder." Id.; Vol. 2 at 5230. Yet, on occasion, Petitioner was "hostile, uncooperative, and virtually nonverbal." Id. at 5228.

Dr. Robert F. Heap, Ph.D, a clinical psychologist, and Julie Maddox, M.A., a psychological examiner, concluded that "at the time of the offense Mr. Hines was exhibiting Continuous Alcohol Abuse and Anti-Social Personality Disorder." Id. at 5231. Petitioner was found competent to proceed to trial. Id. at 5232. In November, 1985, another evaluation was performed by Dr. John P. Filley, M.D. with the same assessment and observations. Id. at 5250-51, 5333. In 1997 and 998,

21

Petitioner was administered fifteen (15) psychological tests. Id. at 4890-95. Dr. Pamela Auble performed an extensive evaluation of Petitioner. Id. at 4890-4895. Dr. Auble concluded Petitioner was an "angry man with poor self-esteem." Id. at 4894.

Federal habeas relief has been awarded where the habeas petitioner's counsel presented essentially no expert proof. Powell v. Collins, 332 F.3d 376, 400 (6th Cir. 2003) ("We found that counsel should have found a different psychiatric expert for trial of the penalty phase, and that this deficient performance resulted in presentation of essentially no mitigating evidence at all, especially on the one topic which may have convinced jury that the death sentence was not justified-the defendant's mild mental retardation and his diminished mental capacity.") (citing Skaggs v. Parker, 235 F.3d 261 (6th Cir. 2000)).

In addition, proof of brain damage does not entitle a habeas petitioner convicted of murder to federal habeas relief where, as here, Petitioner challenged his guilt to this offense. Bowling v. Haeberlin, No. 03-28-ART, 2012 WL 4498647, at * 63-67 (E.D. Ky. Sept. 28, 2012); see also Hill v. Mitchell, No.1:98-cv-452, 2013 WL 1345831, at *59 (S. D. Ohio March 29, 2013) (where claim based on "organic brain damage" held to be defaulted barring review). In addition, under Tennessee law, evidence of brain damage does not preclude conviction of first degree murder nor imposition of the death sentence. State v. Howell, 868 S.W.2d 238 (Tenn. 1993) (defendant convicted of murder and sentenced to death despite evidence of brain damage, learning disabilities and an eighth grade education).

From the Court's review, Petitioner's trial and post conviction counsel pursued Petitioner's brain condition and mental health condition and those facts are in the state record, as reflected above. Hines, 2004 WL 112876 at *23-39. The Court concludes that Petitioner's medical proof does not

warrant an evidentiary hearing. Moreover, Petitioner's trial counsel secured a reversal and a new sentencing hearing. As discussed in more detail infra, the Court does not deem Petitioner's cited bases for a hearing to justify another evidentiary hearing. McGuire,738 F.3d at 752. The legality of the State's execution protocol in the petition has been abandoned and Petitioner has not presented this claim about the State's new protocol in the State courts.[3]

In sum, to the extent Petitioner presents new expert medical proof, such proof is not probative as a matter of law. The expert proof in the state record is ample to evaluate any omission of Petitioner's trial and post conviction counsel. An evidentiary hearing for such witnesses is unnecessary given the extensive State court record. Petitioner's counsel seeks to expand these medical issues into claims about trial and state post conviction counsel. Petitioner's counsel's strategy is as if he were Petitioner's trial and post conviction counsel, but that is not the standard for setting an evidentiary hearing under 28 U.S.C.§ 2254(e)(2). Thus, the Court concludes that Petitioner's request for an evidentiary hearing, based on Martinez, should be denied, but the Court will consider Petitioner's proof on whether Petitioner has satisfied the standard for actual innocence to excuse his procedural defaults.

### 2. Petitioner's DNA and Fingerprint Proof

Petitioner next cites his forensic proof that Petitioner contends establishes his actual innocence and thereby excuses his procedural defaults.

> As a general rule, claims forfeited under state law may support federal habeas relief only if the prisoner demonstrates cause for the default and prejudice from the asserted error. The rule is based on the comity and respect that must be accorded to state-court

---

[3] The State's new death penalty protocol is the subject of an action before the State courts by another prisoner.

> judgments. The bar is not, however, unqualified. In an effort to "balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case,"the Court has recognized a miscarriage-of-justice exception.

House v. Bell, 547 U.S. 518, 536 (2006) (quoting Schlup v. Delo,, 513 U.S. 298, 324 (1995) (citations omitted)). This doctrine "recognize[s] a narrow exception to the general rule [of a procedural bar] when the habeas applicant can demonstrate that the alleged constitutional error has resulted in the conviction of one who is actually innocent of the underlying offense." Dretke v. Haley, 541 U.S. 386, 388 (2004). The "actual innocence 'does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty.'" Cleveland v. Bradshaw, 693 F.3d 626, 633 (6th Cir. 2012) (quoting Schlup, 513 U.S. at 329).

In this context, "'actual innocence' means factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623 (1998). "[A] credible claim of actual innocence is extremely rare," Souter v. Jones, 395 F.3d 577, 600 (6th Cir. 2005), and "the actual innocence exception should 'remain rare' and 'only be applied in the extraordinary case.'" Id. at 590 (quoting Schlup, 513 U.S. at 321) (internal quotation marks omitted). Examples of "new reliable evidence" are "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Schlup, 513 U.S. at 324. "This 'gateway actual innocence claim' does not require the granting of the writ, but instead permits the petitioner to present his original habeas petition as if he had not filed it late." Perkins v. McQuiggin, 670 F.3d 665, 670 (6th Cir. 2012). In assessing such proof, "the habeas court must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under

'rules of admissibility that would govern at trial.'" House, 547 U.S. at 538 (quoting Schlup, 513 U.S. at 327–28) (internal quotation marks omitted); Bell v. Howes, 703 F.3d 848, 855 (6th 2012).

Petitioner principally cites the results of DNA testing by Gary Harmor, a forensic serologist, who analyzed a stain from the victim's underwear employing two different types of DNA analysis. Harmor used the Identifiler™ and Minifiler™ typing systems - that is called autosomal DNA. This testing identifies Short Tandem Repeats markers (or STRs) that are in every person's DNA. Harmor also used the Yfiler™ system that identifies DNA from the Y chromosome (or Y-STRs) exclusive to males, who alone have a Y chromosome. (Docket Entry No. 124-1, Exhibit 1, Harmo Affidavit at 1, 3-4). Applying these systems, Harmor concluded that the male DNA on the victim's underwear is not Petitioner's DNA. Id. at 4.

> The autosomal genetic marker result from the bloodstain from the crotch hem of the victim's panties (item 6-1) is a mixture of DNA from at least three individuals. The victim, Catherine Jenkins (item 7-1) could be a contributor to the mixture of types. Anthony Darrell Hines (item 14-1) is not a contributor to the genetic marker profile obtained from item 6-1.

Id. (emphasis in original). Using Y-STR analysis, Harmor determined that the underwear stain (6-1) contains a mixture of male DNA from two separate sources that does not include Petitioner. Id.

Petitioner argues that such DNA evidence would have led to his acquittal because DNA evidence is reliable evidence. Petitioner cites as examples homicide cases, including those involving sexual assault. Petitioner also contends this DNA evidence proves that Dr. Charles Harlan testified falsely that there was not any semen on the victim. Petitioner presents a Tennessee Bureau of Investigation record that the various swabs from the victim tested positive for semen. Respondent contends that the State courts found that the semen was on the victim's underwear that was torn to pieces and found away from the victim's body, citing State v. Hines, 758 S.W.2d 515,

517 (Tenn. 1988).

On this issue, the Tennessee appellate court upheld the trial court's denial of DNA testing

and found that even if DNA test were provided and exculpatory, the evidence would not exonerate

Petitioner:

> The State's evidence against the Petitioner consisted of accounts of the Petitioner driving away from the motel in the victim's car and accounts of the Petitioner carrying a large hunting knife. Additionally, the Petitioner had $20 in spending money, and a $20 bill was left under the victim's watchband. Witnesses saw dried blood on the Petitioner's shirt, and, when he arrived in Kentucky, he explained how he had stabbed a male motel operator who attacked him. The Petitioner also explained to his sister that he obtained the victim's car by grabbing the steering wheel and keys after an unidentified driver attempted to rob him. When taken into custody, before the arresting officer explained that the victim had been killed, the Petitioner admitted taking the victim's car but denied killing the victim. The victim's wallet was found a short distance from where her car was found abandoned. When questioned by police, the Petitioner stated that, if they could guarantee the death penalty, he would tell them all they wanted to know.

> As we are required to presume the tests would be exculpatory, the question is whether these exculpatory results would form a reasonable probability that the Petitioner would not have been prosecuted or convicted-for mandatory testing-or that there is a reasonable probability that the Petitioner's verdict or sentence would have been more favorable-for discretionary testing. We conclude that the post-conviction court did not abuse its discretion in determining that, even if the DNA evidence were found to be exculpatory, the Petitioner would have still been prosecuted and convicted, and his sentence and verdict would not be any more favorable.

> Initially, **there does not appear to be any evidence that this was a rape where sperm might be present on the victim. The victim was raped with a knife. However, even if sperm could be found on the victim's underwear, dress, and slip, and that sperm was identified with another man, that discovery does not preclude the prosecution and conviction of the Petitioner. It may simply mean the Petitioner was assisted by another man in the murder. Further, the Petitioner points to a cigarette butt, a spray bottle, a $20 bill, and a bloody bank bag. Again, even if all these items contained the DNA of another person, we still cannot find an abuse of discretion on the part of the post-conviction court. The State's theory might slightly change, but we are confident that the Petitioner would still have been prosecuted for the victim's murder.**

**The Petitioner may have a right to testing if the existence of exculpatory DNA evidence raises a reasonable probability that he would not have received the death penalty or been convicted of first-degree murder, as opposed to a lesser crime. However, again we cannot find an abuse of discretion by the post-conviction court. At best, if all this evidence were tested, and every piece of evidence revealed the presence of another person's DNA, the State might seek out another individual who likely assisted the Petitioner in the murder of the victim. In our view, the jury would have still convicted the Petitioner of first-degree murder.**

We also note that the State contests the post-conviction court's determination that many of the objects have met requirement (2), that "[t]he evidence is still in existence and in such a condition that DNA analysis may be conducted." T.C.A. § 40-30-304(2), -305(2). The Petitioner has not made any showing that there is any semen on the victim's dress, underwear, or slip. The Petitioner only cites to his own *request* for a toxicology report in support of his contention. We find no evidence to support a contention that semen is "in existence." In fact, the State presented evidence at a sentencing hearing that there was no semen found at the scene. When these three pieces of evidence are removed from consideration, the Petitioner's "cumulative effect" argument become much weaker. The Petitioner is left to rely on the cigarette butt, the plastic spray bottle, the $20 bill, and the bloody bank bag. In our view, there is not a reasonable probability that another person's DNA on these four pieces of evidence would have changed the outcome of the trial or the Petitioner's sentence. The Petitioner is not entitled to relief on this issue.

Hines v. State, No. M2006-02447-CCA-R3-PC, 2008 WL 271941 at *5-6 (Tenn. Crim. App. Jan. 29, 2008) (emphasis in original and added).

If this murder involved sexual intercourse, the Court would be inclined to agree with Petitioner about this DNA evidence warranting an evidentiary hearing. Yet, the victim's death was caused by multiple and deep knife wounds to her chest area including her heart, lungs and diaphragm. (Docket Entry No. 29, Addendum 2, Vol. 3 at 948). The victim's multiple stab wounds were inflicted with a hunting type knife that pierced the victim's vagina to the extent of entering her intestinal area. Contrary to Petitioner's assertion, at trial, Dr. Charles Harlan only performed the autopsy on the victim's body, that is, "[a] visual inspection was performed" of the victim's body. Id.; Addendum 9, Vol. 1 at 2061. Dr. Harlan responded "correct" to the question that "Q. So you

didn't even observe anything indicating any type of sexual assault." Id. Dr. Harlan also testified that "I meant that there was no evidence of ejaculation; that is, there was no semen present." Id. at 2064. Dr. Harlan's report does not refer to his examination of clothing nor the swabs taken from the victim, id.; Addendum 2, Vol. 3 at 948-60 that were the subject of another state witness's testimony.

Daniel Michael Vansant, a TBI forensic serologist, testified that Dr. Harlan's office sent vaginal and rectal swabs as well as other items to the TBI laboratory. Id. at 644, 649, 962 Vansant testified that he examined a field jacket, blue shirt, blue vest, blue jeans, a pocket knife, knuckles attached to a knife, and the interior of the victim's vehicle. Id. at 645. There were not any other articles of the victim's clothing to examine. Id. at 648. Vansant did not testify to finding any semen. The victim's underwear, examined by Petitioner's DNA expert, had been removed and was found in a different part of the room where the victim was found. Given the State's proof against Petitioner, this Court concludes that Petitioner's DNA proof does not warrant a hearing or habeas relief. The State courts reached the same conclusion. See Hines, 2008 WL 271941, at *5-6.

Petitioner next submits the declaration of Max Jarrell, a certified latent print examiner, who is also a retired FBI fingerprint examiner. (Docket Entry No. 124-2). Jarrell examined "high resolution photographs" of the latent fingerprints and opines as follows:

> 7. To that end, on January 10, 2012, I accompanied Ms. Swift to the Tennessee Bureau of Investigation to examine the fingerprints in their custody and to determine whether it would be possible for me to conduct my examination using high resolution photographs of the prints.
>
> 8. After viewing the prints, I **concluded that high resolution photographs would be acceptable for my examination**.
>
> 9. On January 25, 2012, **I received from Ms. Swift, who had received from the TBI, high resolution photographs** of the following:

a.  Original Latent Fingerprints (#17) contained in one brown paper bag with several paper items recovered from the glovebox of the 1980 silver Volvo at the scene of the homicide of Catherine Jenkins on March 3, 1985;

b.  Original Latent Fingerprints and Palm Lifts (#18) contained in one brown paper bag recovered from the exterior of the 1980 silver Volvo, at the scene of the homicide of Catherine Jenkins on March 3, 1985;

c.  Original Latent Fingerprints (#19) contained on two (2) 8.5 x 11 sheets of plastic bearing finger impressions of the victim, Catherine Jenkins, including negatives and paper strips;

d.  Original Latent Fingerprints (#34), including One 3" x 5" card and one 6" x 6" lifter, recovered from the inside entrance door of Room #21 of the Ce Bon Motel at the scene of the homicide of Catherine Jenkins on March 3, 1985;

e.  Original Latent Fingerprints (#35) from one brown paper bag containing one tan Cheatham County State Bank deposit bag containing three registration cards, one ink pen, and $.20 in change received from Bob Doyle on March 4, 1985 at the Ce Bon Motel Office, which was at the scene of the homicide of Catherine Jenkins; and,

f.  Original Latent Fingerprints (#38) from one manila envelope containing one S.O. Ashland City, TN fingerprint card and one 8.5" x 11" sheet of paper bearing the inked finger and palm impressions of subject Anthony Darrell Dugard Hines, taken by Dorris Weakley, dated March 12, 1985.

10. Based upon my examination of these prints, I determined that none of the prints in question from the scene or on various pieces of evidence match either Mr. Hines or the victim, Catherine Jenkins.

11. On March 9, 2012, I accompanied Ms. Swift to Federal District Court to view and photograph the prints of Bobby Joe Hines, which had been received in chambers from the FBI. I examined the prints and determined that high resolution photographs of the prints would allow me to conduct my examination.

12. On March 13, 2012, I received from Ms. Swift the high resolution photographs of the prints of Bobby Joe Hines and thereafter conducted my examination of those prints by comparing them to prints at the scene or on various pieces of evidence.

Again, I did not identify a match.

13. In addition, as part of my examination, I was asked to determine if the prints from the scene or on various pieces of evidence were of the quality that they could be run through the Integrated Automated Fingerprint Information System to produce a possible match.

14. I determined based on my extensive experience with IAFIS and the criteria that are necessary for a print to be IAFIS quality, that four prints would be suitable for an IAFIS search. Those are:

    a.     Exhibit #17 - Two original latent fingerprints from Volvo papers and envelope recovered from the glovebox of the victim's 1980 silver Volvo;

    b     Exhibit #18 - One original latent fingerprint recovered from the exterior, passenger side of the Volvo;

    c.     Exhibit #35 - One original latent fingerprint recovered from a registration card from the Ce Bon Motel.

15. Because I am not employed by a local law enforcement agency, I am not authorized to perform and cannot conduct an IAFIS search.

(Docket Entry No. 124-2 at 1-3) (emphasis added).

First, as to Jarrell's utilization of digital photographs, such photographs are subject to enhancement and distortion. Thus, one court required an additional showing to establish reliability of fingerprint examination. Lorraine v. Markel American Ins. Co., 241 F.R.D. 534 (D. Md. 2007).

> Photographs have been authenticated for decades under Rule 901(b)(1) by the testimony of a witness familiar with the scene depicted in the photograph who testifies that the photograph fairly and accurately represents the scene. Calling the photographer or offering exert [sic] testimony about how a camera works almost never has been required for traditional film photographs. Today, however, the vast majority of photographs taken, and offered as exhibits at trial, are digital photographs, which are not made from film, but rather from images captured by a digital camera and loaded into a computer. Digital photographs present unique authentication problems because they are a form of electronically produced evidence that may be manipulated and altered. Indeed, unlike photographs made from film, digital photographs may be "enhanced." Digital image "enhancement consists of removing, inserting, or highlighting an aspect of the photograph that the technician wants to change." Edward J. Imwinkelried, Can this Photo be Trusted?, Trial, October 2005, at 48.

. . . .

For digitally converted images, authentication requires an explanation of the process by which a film photograph was converted to digital format. This would require testimony about the process used to do the conversion, requiring a witness with personal knowledge that the conversion process produces accurate and reliable images, Rules 901(b)(1) and 901(b)(9)-the later rule implicating expert testimony under Rule 702. Id. Alternatively, if there is a witness familiar with the scene depicted who can testify that the photo produced from the film when it was digitally converted, no testimony would be needed regarding the process of digital conversion. Id..

For digitally enhanced images, it is unlikely that there will be a witness who can testify how the original scene looked if, for example, a shadow was removed, or the colors were intensified. In such a case, there will need to be proof, permissible under Rule 901(b)(9), that the digital enhancement process produces reliable and accurate results, which gets into the realm of scientific or technical evidence under Rule 702. Id. Recently, one state court has given particular scrutiny to how this should be done.

. . . .

Because the process of computer enhancement involves a scientific or technical process, one commentator has suggested the following foundation as a means to authenticate digitally enhanced photographs under Rule 901(b)(9): (1) The witness is an expert in digital photography; (2) the witness testifies as to image enhancement technology, including the creation of the digital image consisting of pixels and the process by which the computer manipulates them; (3) the witness testifies that the processes used are valid; (4) the witness testifies that there has been "adequate research into the specific application of image enhancement technology involved in the case"; (5) the witness testifies that the software used was developed from the research; (6) the witness received a film photograph; (7) the witness digitized the film photograph using the proper procedure, then used the proper procedure to enhance the film photograph in the computer; (8) the witness can identify the trial exhibit as the product of the enchantment process he or she performed. Edward J. Imwinkelried, Can this Photo be Trusted?, Trial, October 2005 at 54. The author recognized that this is an "extensive foundation," and whether it will be adopted by courts in the future remains to be seen. Id. However, it is probable that courts will require authentication of digitally enhanced photographs by adequate testimony that it is the product of a system or process that produces accurate and reliable results. Fed.R.Evid. 901(b)(9).

Id. at 561-62; see also Sandy L. Zabell, Ph.D, "Fingerprint Evidence," 13 J. L. & POL'Y 143, 155-58

(2005).

Second, as a basis for habeas relief, if there is sufficient evidence of guilt, the Sixth Circuit has not awarded habeas relief based upon proof of the absence of the habeas petitioner's fingerprints at the crime or murder scene. Smith v. Romanowski, 341 Fed. Appx. 96, 99, 101-02 (6th Cir. 2009) ("Smith's challenge to the sufficiency of the convicting evidence in this case relies upon his contention that the prosecution failed to establish that he was in constructive possession of the gun found in the pocket on the back of the front passenger seat. According to Smith, no witness ever saw him with a firearm, **his fingerprints were not found on the weapon or its ammunition**, the vehicle in which the gun was found did not belong to Smith, the handgun was not in plain view of the driver, and another friend of the petitioner admitted owning the firearm. . . . Because Smith has thus failed to satisfy the substantial burden placed upon him by the provisions of AEDPA, the district court appropriately denied the petition for the writ of habeas corpus.") (emphasis added); see also Brooks v. Tennessee, 626 F.3d 878, 887-88 (6th Cir. 2010).

Given the compelling evidence of Petitioner's guilt, with the presence of other fingerprints at the murder scene (a public place) and the vehicle that belonged to the victim, the Court does not deem this proof fingerprint to warrant an evidentiary hearing except on one issue

The Court set an evidentiary hearing on a TBI laboratory report that was ambiguous on whether the swab taken from the victim tested positive for semen. (Docket Entry No. 131, Order, attaching report). At that hearing, Michael Turbeville, the TBI laboratory supervisor, testified that the document attached to the Court's Order was a request for testing for semen on the swabs and provided the actual results of that test, revealing that semen was not on any of the swabs. (Docket Entry No. 142, at 6-12; Respondent's Collective Exhibit 1). Petitioner submitted several other TBI

laboratory documents that revealed the presence of mold on one of the swabs that could not be tested for semen. Id. at 14, 15, 17, 28; Petitioner's Exhibit 3, 5 and 6. Petitioner submitted additional TBI documents revealing additional versions of the TBI laboratory test request with additional handwriting. (Petitioner's Exhibits 1 and 4). Petitioner notes that one of the laboratory work papers reflects that mold was found on one of the swabs and, thus, could not be tested. Petitioner cites that the condition of the molded swab was not noted on other TBI laboratory papers. Petitioner also cited delay in the testing. The request to test the swabs from the victim is shown as March 4, 1985, and the TBI testing began on March 22nd. (Exhibits 2-4; Docket Entry No. 131 at 2; Docket Entry No. 142 at 6-8, 24-25). Petitioner also proffered that if Petitioner's trial counsel had had access to the TBI laboratory's working papers about the mold on one of the swabs, he would have pursued testing and explored the prospect of another suspect given the proof of sperm on the victim's panties. Petitioner's trial counsel proffered that the state prosecutor told him that the murder did not involve a sexual assault, and Petitioner's current counsel described Dr. Harlan's trial testimony as false.

First, there is not any scientific evidence that the mold was caused by the timing of the TBI laboratory testing. The possibility of the mold impacting any semen is speculative. There is not any scientific proof that if Petitioner's trial counsel had seen the laboratory working papers about the molded swab that any testing could have been conducted. As discussed infra, Dr. Harlan's trial testimony was based upon his visual examination of the victim, not a laboratory test. At Petitioner's trial, a TBI laboratory technician testified about the testing of the victim's swabs. To date, the proof remains that the several swabs taken from the victim did not contain semen. Petitioner's tying of the inferences about another suspect was found by the State courts to be "farfetched" and this Court agrees. The cited suspect was not seen in the area at the time of the murder and the witness did not

testify that this suspect, described as a wild person, was going to the motel.

### 3. Petitioner's Other Suspects Proof

Coupled with his forensic proof , Petitioner identifies Tommy Sells and Ken Jones as possible murderers. According to Petitioner, Tommy Sells went throughout the country committing dozens of murders between 1980 and 1999 (including in Tennessee), before he was finally apprehended in Texas, and later executed. Sells was released from custody in February 1985 (Docket Entry No. 124-3, Tommy Sells Missouri Dept. of Corrections Records) and admitted to committing murder in Missouri in July 1985, months after the murder of Jenkins. (Docket Entry No.124-4, March 21, 2014 Article from the Branson Tri-Lake News).

For the Sells suspect theory, Petitioner cites the declarations of Norma Jean Rilling and Joe Nesbitt who worked across from the CeBon motel at the Hot Stop Market. Rilling purportedly identifies Sells as the person with whom Rilling had a confrontation the day of the murder, March 3,1985, because she would not let him pay with rolled coins. (Docket Entry No. 124-5). According to Rilling, after the confrontation, this man headed over to the CeBon, where the victim was found shortly afterwards. Id. Rilling testified at Petitioner's trial that this man walked in the "general direction of the CeBon" motel. (Docket Entry No. 29, Addendum 2, Vol. 3 at 663). In her 2014 declaration, almost 30 years after the encounter, Rilling states that the photograph shown to her by Petitioner's investigator "looks like" that same man. (Docket Entry No. 124-5 at ¶ 12). At trial, Rilling testified "we get a lot of weird people" at her shop and described another man who was "wild-eyed." (Docket Entry No. 29, Addendum 2, Vol. 3 at 662). Moreover, under Petitioner's view of the evidence, Petitioner opines that the murder occurred about 11:00 a.m. (Docket Entry No. 124, Petitioner's Memorandum at 11 n.7). At trial, Rilling testified that she saw this weird person about

34

1:30 to 2:30 p.m. (after the murder) and then saw him walking in the general direction of the CeBon motel, not to the CeBon motel. (Docket Entry No. 29. Addendum 2, Vol. 3 at 663, 665).

Petitioner also identifies Ken Jones who was at the motel for a tryst with Vernedith White and who testified falsely that he arrived at the motel about 12:30 p.m. the day of the murder. (Docket Entry No. 29, Addendum 2, Vol. 1 at 260, 266). Jones actually arrived there between 10:00 a.m. and 11:00 a.m. This issue about Jones as a murder suspect was explored at the evidentiary hearing on Petitioner's state court post conviction proceeding. Hines, 2004 WL 1567120 at * 4-7. For this theory, Petitioner also submits excerpts of unauthenticated medical records of Vernedith White, Jones's mistress, who was evaluated in 2000, 2001, 2008, 2009, 2010 and 2013 for psychiatric problems, including schizophrenia. (Docket Entry No. 129). These treatment notes cite White's use of drugs and that her baby was killed by her ex-husband twenty two years ago, as of July 2000. Id. at 2-3. By 2008, White's prognosis was good so long as she remained on her medications. Id. at 8. Yet, by 2010, White was smoking marijuana. Id. at 10.

The state courts considered this proof on this theory of Jones as the murderer of the victim:

> In his reply brief, the petitioner points to various portions of the testimony to establish that Ken Jones, himself, might have killed the victim. The petitioner explains how he might have gotten the keys to the victim's car without confronting her, surmising "because of the warmth on the day at issue, [the victim] was wearing only a very light weight summer shift" and that her maid's coat, where she kept her keys and wallet, "was most likely hanging on the cleaning cart, which gave [the petitioner] easy access." The petitioner argues that the statements of Jones and White that they neither saw nor heard anything "that was connected with the crime" are "unbelievable." The victim's schedule to clean the rooms, the petitioner asserts, was such that she would not have reached room 21, where she was killed, until "noon," resulting in Jones and White at least seeing her. The petitioner notes that, at the 1986 trial, Jones said he did not know whether the victim was male or female, yet he told Maxey Kittrell, another witness, that "a woman had been stabbed" and told White that "there was a dead woman in there." This testimony, according to the petitioner's argument, demonstrates "knowledge that no one but the perpetrator could have

known." The petitioner points to other discrepancies, including Jones's testimony that the "randomly selected key" which he picked up "just happened to open the lock on room 21, the murder room"; and the fact that White testified that she and Jones were at the motel from 9:00 am until the emergency call, which was made at 2:36 p.m., leaves two hours of Jones and White's activities "unaccounted for." This time period, according to the petitioner's theory, allowed Jones to drive White to Dickson and "to cleanse himself and his van of the victim's blood." The petitioner surmises that Jones then returned to the motel to determine whether the motel owners had come back and found the body, and discovered that this had not occurred. Finally, according to this argument, "by belatedly announcing that a woman had been stabbed to death, Jones successfully removed himself as a suspect and thereby, with the help of his friend the sheriff, was able to keep himself from being investigated by the defense and by the prosecution."

The post-conviction court concluded that the petitioner would not have benefitted from the claim that Ken Jones had killed the victim:

Petitioner insists that his trial counsel should have attempted to cast suspicion upon Ken Jones as a possible perpetrator of the crime and that counsel was ineffective in allowing Mr. Jones to "perjure" himself in hiding his true reason for being at the hotel. While counsel had brought out that there had been another stranger in the area of the CeBon Motel that morning, they did not develop any reason for the jury to consider that someone other than Petitioner committed the offense. Petitioner asserts that his trial counsel should have suggested that perhaps, Ms. Jenkins had thwarted Mr. Jones ['s] planned sexual liaison with Ms. White and that this was a motive to kill her. He further suggests that their theory might explain the twenty dollar bill under Ms. Jenkins's watch band [sic] and the careful insertion of the knife into her vagina. Trial counsel knew of the actual reason for Mr. Jones['s] presence at the motel, having learned it from the sheriff. Of course, they could have investigated further and learned the details of the encounter but the Court does not find that the information would have been particularly useful. To present such a farfetched theory with no supporting evidence would cause a loss of credibility by the defense at trial. Admittedly, if trial counsel had learned the exact details of the movements of Mr. Jones, Ms. White and the person(s) in the maroon or brown car, they could have "muddied the water" concerning the details of the discovery of the body. This would have been insufficient, however, to cast reasonable doubt on the guilt of Petitioner given the fact that Petitioner was shown by the proof to have taken the deceased's car keys, presumably from her billfold (in which she habitually kept them), and stolen her car. To accept Petitioner's argument that he didn't kill the deceased but merely took her car keys from her body (which was wrapped in a blanket) and stole her car would require the trial jury to depart from speculation and enter into fantasy.

Missing in the petitioner's theory, which the post-conviction court described as

36

"farfetched," is any motive or reason why Jones would want to kill the victim, except the petitioner's suggestion, recounted in the post-conviction's findings, that the victim was killed because she had "thwarted" the sexual liaison between Jones and White. In effect, the petitioner argues that fifty-one-year-old Ken Jones, accompanied by his twenty-one-year-old girlfriend, Vernedith White, following their normal Sunday morning routine and checking into the same motel where they had been together approximately 100 times before and were known by the staff, including the victim, stabbed the victim to death, with Jones driving White to another location, cleaning blood from himself and his vehicle, and then returning to the scene to report the crime and wait for law enforcement officers to arrive. We agree with the post-conviction court that, given the strength of proof against the petitioner, making the argument that Ken Jones was the actual killer would have been "farfetched" and could have resulted in a loss of credibility for the defense.

<u>Hines</u>, 2004 WL 112876 at *26-28.

The Court does not deem these facts about Jones and White long after the murder in 1985 to warrant an evidentiary hearing.

Petitioner next argues that his proof about other suspects, coupled with his DNA proof, renders his actual innocence claim similar to the claim in <u>House</u>. Yet, in <u>House</u>, the murder was tied to a sexual offense: "that the murder was committed in the course of a rape or kidnaping. The alleged sexual motivation relates to both those determinations. This is particularly so given that, at the sentencing phase, the jury was advised that House had a previous conviction for sexual assault." 547 U. S. at 541. Here, despite the substantial knife wound to the victim's vagina, the victim's murder was not committed in the context of a sexual act and the causes of death were multiple wounds to her chest. The Rilling testimony about a weird looking man on the day of the murder does not rise to the level of substantial proof of another murder suspect, as in <u>House</u> and as reflected in the jury's rejection of Rilling's trial testimony. The Court concludes that Petitioner's factual showing is insufficient to justify another evidentiary hearing, and given the proof found by the Tennessee courts tying the Petitioner to the victim, the Court concludes that Petitioner's other suspect proof does not

satisfy the standard for the actual innocence exception.

> Second, the proof of other murder suspects in House was significant:

>> Other testimony suggests Mr. Muncey had the opportunity to commit the crime. According to Dennis Wallace, a local law enforcement official who provided security at the dance on the night of the murder, Mr. Muncey left the dance "around 10:00, 10:30, 9:30 to 10:30." R274:56–57. Although Mr. Muncey told law enforcement officials just after the murder that he left the dance only briefly and returned, Wallace could not recall seeing him back there again. Later that evening, Wallace responded to Mr. Muncey's report that his wife was missing. Muncey denied he and his wife had been "a fussing or a fighting"; he claimed his wife had been "kidnapped." Id., at 58. Wallace did not recall seeing any blood, disarray, or knocked-over furniture, although he admitted he "didn't pay too much attention" to whether the floor appeared especially clean. According to Wallace, Mr. Muncey said "let's search for her" and then led Wallace out to search "in the weeds" around the home and the driveway (not out on the road where the body was found). Id., at 58, 60, 63.

>> In the habeas proceedings, then, **two different witnesses (Parker and Letner) described a confession by Mr. Muncey**; two more (Atkins and Lawson) described suspicious behavior (a fight and an attempt to construct a false alibi) around the time of the crime; and still other witnesses described a history of abuse.

Id. at 550-51. The factual circumstances in which the Supreme Court found a sufficient showing of actual innocence are materially different from this action were as follows: "[I]n direct contradiction of evidence presented at trial, DNA testing has established that the semen on Mrs. Muncey's nightgown and panties came from her husband, Mr. Muncey, not from House." Id. at 540.

> Here, the murder was not sexual rape. Second, in House:

>> the central forensic proof connecting House to the crime—the blood and the semen—has been called into question, and **House has put forward substantial evidence pointing to a different suspect.** Accordingly, and although the issue is close, we conclude that this is the rare case where—had the jury heard all the conflicting testimony—it is more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt.

Id. at 554 (emphasis added). Here, "When asked by a TBI agent to tell the truth about the death of

38

Katherine Jenkins [Petitioner] stated that if the officer could guarantee him the death penalty he would confess and tell him all about the murder and that he could tell him everything he wanted to know if he was of a mind to." Hines, 758 S.W.2d at 518. As quoted below, the State courts considered Petitioner's proof and theory of another suspect to be "far-fetched." Hines, 2004 WL 112876, at *27.

Petitioner next presents declarations of two emergency medical technicians who responded to the murder site and describe Sheriff Weakley as moving about the motel and moving or touching items of possible evidence. (Docket Entry Nos. 125-10 and 125-11, Ken and Mary Sizemore declarations). Mary Sizemore testified at Petitioner's trial and post conviction hearing, but never disclosed the Sheriff's conduct nor do the Sizemores describe any specific item of evidence lost. Petitioner's proof based upon the victim's cut panties suggests that critical proof was undisturbed or destroyed by the Sheriff. Sheriff Weakley testified as to what he did at the murder scene and through his testimony, numerous items of evidence were admitted, including the victim's torn panties. (Docket Entry No. 29, Addendum No. 2, Vol. 2 at 527-84; Docket Entry No. 29, Addendum 2, Vol. 3 at 917-941, Trial Exhibits 49 through 65). Given that Mary Sizemore testified at trial, but did not disclose her observations 27 years ago, coupled with the exhibits introduced through Weakley, lead the Court to conclude that an evidentiary hearing based on the Sizemore declarations is not warranted.

### 4. Petitioner's Trial and Post Conviction Counsel Declarations

As additional bases for an evidentiary hearing, Petitioner submits the declarations of his trial and post conviction counsel who describe their omissions. (Docket Entry Nos. 124-9 and 124-10). For Petitioner's trial counsel, the omissions in his declaration describe issues that were addressed

39

either in the extensive state post conviction proceedings or in Petitioner's medical proof about his brain damage. Post conviction counsel's declaration cites omissions on Petitioner's appeal, is based on Petitioner's medical and other proof cited for an evidentiary hearing in this action. In essence, for the reasons stated on Petitioner's proof for an evidentiary hearing in this action and in the state courts' decisions, the Court concludes Petitioner's declarations from his prior counsels do not warrant an evidentiary hearing. As discussed earlier, these declarations do not present substantial claims under Martinez.

For these collective reasons, the Court concludes that Petitioner's request for an evidentiary hearing is not justified and should be denied.

## B. Review of the State Record

### 1. Procedural History

Petitioner was charged with first degree murder and felony murder and on January 10, 1986, a jury convicted Petitioner of first degree murder and sentenced Petitioner to death. State v. Hines, 758 S.W.2d 515 (Tenn. 1988); (Docket Entry No. 299, Addendum 1, Vol. 1 at 77-84). On direct appeal, the Tennessee Supreme Court upheld his conviction, but remanded for a new sentencing hearing, citing the state trial court's failure to instruct the jury properly on the underlying felonies and the aggravating circumstances necessary for a death sentence. Id. at 524. At resentencing, the jury imposed the death penalty that was upheld on Petitioner's second appeal. State v. Hines, 919 S.W.2d 573 (Tenn. 1995). Although Petitioner's petition for rehearing was granted, the Tennessee Supreme Court denied relief. State v. Hines, 1996 Tenn. LEXIS 149 (Tenn. Mar. 11, 1996). The United States Supreme Court denied Petitioner's petition for the writ of certiorari. Hines v. Tennessee, 519 U.S. 847 (1996).

On March 4, 1997, Petitioner filed his state post-conviction petition, and with the assistance of counsel, Petitioner amended his petition twice. On May 9, 2002, after an extensive evidentiary hearing, the trial court denied relief and on appeal, the Tennessee Court of Criminal Appeals affirmed. Hines v. State, No. M2002-1352-CCA-R3-PD, 2004 WL 112876, at *1 (Tenn. Crim. App. Jan. 23, 2004). On June 28, 2004, the Tennessee Supreme Court granted Petitioner's application for permission to appeal and remanded the appeal to the Tennessee Court of Criminal Appeals to reconsider the issue of the aggravating circumstances instruction. Hines v. State, No. M2004-01610-CCA-RM-PD, 2004 WL 1567120 at *1 (Tenn. Crim. App. July 14, 2004). On July 14, 2004, The Tennessee Court of Criminal Appeals rendered its decision, concluding that the trial court correctly instructed the jury on aggravated circumstances. Id. On November 29, 2004, the Tennessee Supreme Court denied Petitioner's application for permission to appeal. Id. On January 3, 2005, Petitioner filed this action.

## 2. State Court's Findings of Fact[4]

In Petitioner's direct appeal, the Tennessee Supreme Court set forth the facts underlying Petitioner's conviction.

> Between 1:00 and 1:30 p.m. on 3 March 1985 the body of Katherine Jean Jenkins was discovered wrapped in a sheet in Room 21 of the CeBon Motel off Interstate 40 at Kingston Springs. The victim was a maid at the motel and had been in the process of cleaning the room when she was killed. Her outer clothing had been pulled up to her breasts. Her panties had been cut or torn in two pieces and were found in another area of the room. A $20 bill had been placed under the wrist band of her watch.
>
> The cause of death was multiple stab wounds to the chest. Four deep, penetrating wounds, ranging from 2.5 inches to 6.4 inches in depth, had been inflicted about the

---

[4]State appellate court opinion findings can constitute factual findings in a habeas action, Sumner v. Mata, 449 U.S. 539, 546-47 (1981), and have a statutory presumption of correctness. 28 U.S.C. § 2254(e).

victim's chest with a knife similar to a butcher knife or a hunting knife. Other superficial cuts were found in the area of the neck and clavicle. There was also a knife wound which penetrated through the upper portion of the vagina into the mesentery in the lower part of the abdominal cavity. Dr. Charles Harlan who performed the autopsy on the victim's body testified that in view of the small amount of blood in the vaginal vault it was his opinion the wound occurred at or about the time of death. The victim also had what he described as "defensive wounds" on her hands and arms.

Jenkins had been left in charge of the motel at about 9:30 a.m. At that time the occupants of Rooms 9, 21 and 24 had not yet checked out. When the manager left her in charge she was given a Cheatham County State Bank bag containing $100 in small bills to make change for motel guests as they paid. The bank bag, bloody and empty, was discovered in the room with her body. It was her established habit to lock her automobile at all times and to keep her keys and billfold on her person when she worked. Her car keys, billfold and her 1980 silver-colored Volvo were missing.

On 1 March 1985 defendant had departed by bus from Raleigh, North Carolina. He had been given a non-refundable ticket to Bowling Green, Kentucky and $20 in spending money. The traveling time from Raleigh, North Carolina to Nashville, Tennessee was approximately 17 hours. Prior to his departure he was observed by a witness to be carrying a hunting knife in a sheath which was concealed beneath his shirt. The witness admonished him that he could not carry a knife like that on the bus to which he responded "I never go anywhere naked." "I always have my blade." Sometime in the early morning hours of 3 March 1985 he checked in and was assigned to Room 9 at the CeBon Motel. He was wearing a green army-type fatigue jacket, fatigue pants and boots. He was next seen at approximately 9:30 a.m. walking in a direction from his room toward a drink machine. At that time he told the manager he was not yet ready to check out. He was also seen sometime prior to 9:30 purchasing a sandwich at a deli-restaurant across the street from the motel. The same witness who saw defendant also saw another stranger there somewhere between 1:30 and 2:30 who she described as taller than defendant with dark hair, kinky looking and wild-eyed. He departed the restaurant in the general direction of the CeBon Motel. The Cehatham County Sheriff testified that he responded to a call to the CeBon Motel at 2:37 p.m. When he arrived on the scene blood spots in the room were beginning to dry and the body was beginning to stiffen. Defendant was seen between 11:00 and 11:30 a.m. walking from the direction of the Interstate toward the CeBon Motel.

At 12:40 p.m. a witness saw the victim's Volvo automobile pulling out from the CeBon Motel driveway. It was being operated by a person who appeared to be a man with very short, light colored hair. The vehicle crossed over the Interstate and turned east on Interstate 40. She followed behind and endeavored to catch up but it sped off

toward Nashville at a high rate of speed. Defendant was next identified in possession of the car a few miles past Gallatin on Interstate 65, heading in the direction of Bowling Green, Kentucky. A group of young people first endeavored to help him start the stalled automobile and then gave him a ride to Bowling Green. During the trip to Bowling Green one of these witnesses observed some dried blood on the right shoulder of his shirt. He carried a jacket which he kept folded. After he arrived at his sister's home in Bowling Green defendant told her he had endeavored to pay another day's rent at a motel when he was attacked by the motel operator. He demonstrated to her how he had stabbed the man. He also related to her he had a sum of money. She could not remember whether he said $35,000 or $3,500. Defendant also told his sister's husband he had earned approximately $7,000 working as a mechanic in North Carolina. He displayed a set of keys to a Volvo automobile and explained that a man who had given him a ride attempted to rob him. Defendant purportedly grabbed the steering wheel and when the car ran off the road he grabbed the keys and ran. According to the witness he was wearing an army fatigue jacket which had something large, heavy and bulky in the pocket. The witness had previously seen defendant with a survival knife with a 6 1/2 to 7 inch blade hanging from his belt. When defendant was taken into custody he volunteered the statement that he had taken the woman's car but had not killed her. According to the arresting officer he had not advised the defendant that a woman had been killed prior to the volunteered statement. There was evidence however that defendant was aware he had been charged in Tennessee on a murder warrant. The victim's wallet was found wrapped in a thermal underwear shirt a short distance from where her car was found abandoned. The key to Room 9 of the CeBon Motel was found at the site where defendant had been camping out near Cave City, Kentucky. When asked by a TBI agent to tell the truth about the death of Katherine Jenkins defendant stated that if the officer could guarantee him the death penalty he would confess and tell him all about the murder and that he could tell him everything he wanted to know if he was of a mind to. There were marks on the wall of Room 9 at the CeBon Motel apparently made by someone stabbing a knife into the wall. When shown photographs of the marks on the wall defendant responded that they were knife marks. These marks were obviously made by a knife larger than two taken from defendant at the time of his arrest.

Hines, 758 S.W.2d at 517-19.

As to the facts underlying Petitioner's death sentence, on his appeal after his resentencing hearing, the Tennessee Supreme Court cited the following facts:

The State introduced proof that the defendant had previously been convicted of assault in the first degree. A detective who had investigated the case testified that the defendant had inflicted serious physical harm to the victim in this prior case. The State also presented proof that the defendant had stabbed the victim in the present

case multiple times with a sharp instrument, probably a knife. Three of these wounds were lethal and had penetrated the victim's chest five to six inches. The pathologist who had performed the autopsy of the victim testified that all the lethal wounds were inflicted at about the same time and that death would have occurred within four to six minutes, most of which time the victim would have remained conscious. Defensive wounds were found on the victim's hands. Her clothing had been pulled up and her panties had been cut in half and removed from her body. About the time of death, and shortly after the infliction of the lethal wounds to the chest, the defendant had inserted a flat object through the victim's vaginal orifice into the vaginal pouch until the instrument penetrated the vaginal dome and passed into the abdominal cavity. A twenty dollar bill had been placed under the victim's watchband. No semen or any other evidence of ejaculation was found.

At the time of her death, the victim had in her possession a bank bag containing approximately $100 in proceeds from the motel. The empty bag was discovered in the room where the victim's body was found. The victim's automobile was also missing. Around 12:40 p.m. the day of the murder, another employee of the motel saw the vehicle being driven out of the motel parking lot by someone other than the victim.

In mitigation, the defendant presented proof that, while in prison on this conviction, he had presented no serious disciplinary problems and posed no threat to the prison population. The defendant also presented proof of a troubled childhood. His father had abandoned the family when the defendant was young. His mother had an alcohol problem. In his teens the defendant became involved in sniffing gasoline and glue and began to abuse alcohol and drugs. He also exhibited self-destructive behavior. Dr. Pamela Auble, a clinical psychologist, testified that the defendant was suffering from a paranoid personality disorder and dysthymia, or chronic depression. According to Dr. Auble, the defendant would suppress his feelings until they "boiled up" under stress. In her opinion, the defendant, who had returned from turbulent visits with his parents and girlfriend shortly before he committed the murder, was under stress when he killed the victim. Dr. Ann Marie Charvat, a sociologist, also testified about the damaging effect of the circumstances of his childhood on the defendant.

Hines, 919 S.W.2d at 577. The state courts' other factual findings will be set forth in the analysis of the Petitioner's claims.

## C. Conclusions of Law

Petitioner's viable habeas claims, if timely, are governed by the provisions of the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). <u>Lindh v. Murphy</u>, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In <u>Williams v. Taylor</u>, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." In such instances, the Supreme Court held that a federal habeas court may grant a writ. <u>Id.</u> The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States"as referring to "holdings, as opposed to dicta" of its decisions "as of the time of the relevant state-court decision." <u>Id.</u> at 412. Moreover, the relevant analysis is "to apply a rule of law that was clearly established at the time [the Petitioner's] state-court conviction became final." <u>Id.</u> at 390; <u>accord</u>, <u>Joshua v. DeWitt</u>, 341 F.3d 430, 436 (6th Cir. 2003). In <u>Bell v. Cone</u>, 535 U.S. 685, 693 (2002), the Court reiterated that the AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under the law."

Under the "unreasonable application" clause, the Supreme Court stated that a state court

judgment results in an "unreasonable application" of clearly established federal law "if the state court correctly identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. The district court "must presume that all determinations of factual issues made by the state court are correct unless the defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 737-38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)).

The Supreme Court explained that a state court's application of clearly established federal law must be "objectively unreasonable," and a district court may not grant habeas relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411. A state court's application of federal law is unreasonable and habeas relief may be granted if the "'state court decision is so clearly incorrect that it would not be debatable among reasonable jurists.'" Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996)).

In reaching this decision, the Supreme Court reiterated that the claims were to be decided on the record before the state court:

> In this and related contexts we have made clear that whether a state court's decision was unreasonable must be assessed in light of the record the court had before it. See Yarborough v. Gentry, 540 U.S. 1, 6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam) 124 S.Ct., at 4 (denying relief where state court's application of federal law was "supported by the record"); Miller-El v. Cockrell, 537 U.S. 322, 348, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (reasonableness of state court's factual finding assessed "in light of the record before the court"); cf. Bell v. Cone, 535 U.S. 685, 697, n. 4, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).

Holland v. Jackson, 542 U.S. 649, 652 (2004) (emphasis added). The district court also "must

presume that all determinations of factual issues made by the state court are correct unless the defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 737-38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). This presumption includes credibility findings of the state courts. Skaggs v. Parker, 235 F.3d 261, 266 (6th Cir. 2001).

## 1. Petitioner's Undisputed Exhausted Claims

For resolution of the Petitioner's claims, the Court addresses first the undisputed exhausted claims. These undisputed claims are grouped to include closely related claims, albeit under a different legal theory. Thereafter, the analysis turns to Petitioner's claims that Respondent contends are procedurally defaulted.[5] For those claims, Petitioner appears to assert facts in exhausted claims for claims under new and distinct legal theories.

### a. Sufficiency of the Evidence and Related Claims

For this claim, Petitioner asserts that the State's proof was insufficient to support his guilt or his death sentence in violation of the Sixth, Eighth, and Fourteenth Amendments and Jackson v. Virginia, 443 U.S. 307 (1979). (Docket Entry No. 23-2, Amended petition at ¶ 32). Petitioner's related claims are that "[i]n violation of the Sixth, Eighth, and Fourteenth Amendments, Darrell Hines' death sentence was based on a felony-murder aggravating circumstance which duplicated the

---

[5]Respondent seeks judgment as a matter of law based upon Petitioner's procedurally defaulted s claims in Paragraphs 9, 10, 11(b), (e), (i), (l), (n)-(u), 13(b), (c), (t), (u), (w)-(ee), 14, 17, 19, 21(b), (d)-(f), portions of Paragraph 22, Paragraphs 23-24, 26-31, 33-34, portions of Paragraph 35, and Paragraphs 36-38 and 40 of the Second Amended Petition. (Docket Entry Nos. 23, 23-1 and 23-2). Respondent contends that these claims were not fairly presented to the state courts and the opportunity to present them under Tennessee law has passed. The Court adds Claim 11v that reads as follows: "Counsel failed to raise any and all challenges to the validity of Darrell Hines' conviction contained in this petition. See e.g., ¶¶ 9, 10, 12, 19, 20, 21, 27, 29, .30, 31, 32, incorporated by reference." (Docket Entry No. 23, Second Amended Petition at 25).

jury's guilt finding and failed to meaningfully narrow the class of persons eligible for the death penalty," citing Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441 (1990); State v. Middlebrooks, 840 S.W.2d 317 (Tenn 1992), and that "[i]In violation of the Sixth, Eighth, and Fourteenth Amendments, the jury weighed an unconstitutional 'heinous, atrocious, or cruel' aggravating circumstance when imposing the death sentence." Id. at ¶¶ 15-16.

Respondent contends that the Tennessee Supreme Court reasonably decided the sufficiency of the evidence claims and detailed the evidence against Petitioner, including that he was found in possession of the victim's car keys, was in possession of a large amount of money after the robbery and was seen with a blood stain on his arm, citing Hines, 758 S.W.2d at 515, 518. Respondent cites the victim's wallet that was found near the location of the vehicle that Petitioner admitted taking. Petitioner stayed at the hotel where the victim was found murdered by a knife, and Petitioner was seen carrying a knife shortly before the crime, and the hotel room in which he stayed had knife marks in the walls. Id. at 517-18. Petitioner offered to confess to the murder, if promised the death penalty. Id. Respondent also argues that the State courts' application of the harmless error doctrine was reasonable given the State's proof of alternative bases for Petitioner's conviction and death sentence.

From the Court's review, Petitioner's sufficiency challenges on direct appeal were "that the State's case was based wholly on circumstantial evidence which was insufficient to support the conviction. In argument defendant concedes the proof was sufficient to support a verdict of first degree murder but he insists it fails to establish beyond a reasonable doubt that the offense was committed by him to the exclusion of all others." 758 S.W.2d at 517. In addition, Petitioner argued that the State's proof on the depravity or torture element was insufficient to support his death sentence. Hines, 919 S.W.2d at 581.

For the former claim, the Tennessee Supreme Court decided that in addition to the proof quoted, 758 S.W.2d at 517-19, that "[t]here is additional evidence in the record incriminating defendant. That summarized above establishes guilt of the conviction offense. A criminal offense may be established exclusively by circumstantial evidence and the record in this case is abundantly sufficient for a rational trier of fact to find defendant's guilt beyond a reasonable doubt.... He concedes that the statements made by him to the effect that he would or could tell them all about the homicide were relevant because they raised a reasonable inference he knew of the facts and circumstances of the murder and was in some way involved with it." 758 S. W. 2d at 519.

The Tennessee Supreme Court decided the sufficiency claim on the death sentence after the resentencing hearing as follows:

> Defendant says Tenn.Code Ann. § 39-2-203(i)(5) (the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind) is unconstitutionally vague and was unconstitutionally applied in this case. He concedes that the Court has repeatedly rejected vagueness challenges to this section of the statute and asserts the issue is presented for purposes of preserving the issue for later review.

> Citing Shell v. Mississippi, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990), he submits that the definition of "depravity" in State v. Williams, 690 S.W.2d 517, 529 (Tenn.1985), cannot survive constitutional scrutiny absent proof of mutilation. The constitutionality of this aggravating circumstance has been previously upheld in State v. Barber, 753 S.W.2d 659, 670 (Tenn.1988). See also State v. Cazes, 875 S.W.2d 253, 267 (Tenn.1994); State v. Black, 815 S.W.2d 166, 171 (Tenn.1991). In Williams, we wrote that

>> 'Torture' means the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious. In proving that such torture occurred, the State, necessarily, also proves that the murder involved depravity of mind of the murderer, because the state of mind of one who willfully inflicts such severe physical or mental pain on the victim is depraved.

* * * * * *

> If acts occurring after the death of the victim are relied upon to show depravity of mind of the murderer, such acts must be shown to have occurred so close to the time of the victim's death, and must have been of such a nature, that the inference can be fairly drawn that the depraved state of mind of the murderer existed at the time the fatal blows were inflicted upon the victim.

690 S.W.2d at 529.

> When this case was originally considered on direct appeal, this Court commented that the evidence, equivalent to that presented at this sentencing hearing, was clearly sufficient to demonstrate that the murder was especially heinous, atrocious, or cruel. State v. Hines, 758 S.W.2d at 523. We continue to agree with this finding. **At resentencing, the pathologist testified that the stab wound to the victim's vagina was made around the time of death. The willful insertion of a sharp instrument into the vaginal cavity of a dying woman (or a woman who had just died) satisfies the requirements of Williams, supra. If committed prior to death, these acts constitute torture and thereby also support a finding of depravity. If they occurred close in time to the victim's death, they allow the drawing of an inference of the depraved state of mind of the murderer at the time the fatal blows were inflicted on the victim. The defendant also argues that to find that multiple stab wounds and defensive wounds constitute torture, there must be proof that the defendant specifically intended to inflict unnecessary pain and suffering. The evidence of the stab wound to the vagina was sufficient to support a finding that the wounds were intentionally inflicted and that the murder involved torture under Williams.**

919 S.W.2d at 581 (emphasis added).

For an insufficiency of the evidence claim, the Supreme Court in Jackson set forth the standard for this Court's review.

> [T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, **the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.** This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to

draw reasonable inferences from basic facts to ultimate facts. **Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution.** The criterion thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

443 U.S. at 318-19 (emphasis added with footnotes and citations omitted).

A presumption of correctness obtains in determining whether there exists sufficient evidence to support a conviction. If any rational finder of fact would accept the evidence as establishing each essential element of the crime, the Jackson standard of review is satisfied. Id. at 324. Circumstantial evidence, if sufficient to establish an element of the offense, satisfies constitutional requirement of due process, Wiley v. Sowders, 669 F.2d 386, 390 (6th Cir. 1982) (per curiam), and such evidence need not remove every reasonable hypothesis except that of guilt. Tilley v. McMackin, 989 F.2d 222, 225 (6th Cir. 1993); United States v. Vannerson, 786 F.2d 221, 225 (6th Cir.1986). Uncorroborated accomplice testimony is sufficient to support a conviction under the United States Constitution. Takacs v. Engle, 768 F.2d 122, 127 (6th Cir. 1985).

Applying the Jackson principles here, the State's proof, as quoted at 758 S.W.2d at 517-19, included facts that Petitioner was seen driving the victim's car, Petitioner told his sister that he had been in a fight at a motel with the manager, Petitioner was observed with blood on his clothes in the shoulder area. Petitioner admitted taking the victim's car, the motel key to Room 9, the site of the murder, was found in the area where the Petitioner had camped, and Petitioner was observed with a survival knife with a 6 ½ to 7 inch blade. Petitioner also made statements that he could tell the officers all the details of the murder. With this collective proof, this Court concludes that the state courts could reasonably conclude that the state's proof supported Petitioner's conviction of first

degree murder.

As to the merits of the State's proof for the death sentence, the Court concludes that given the nature of the victim's repeated hunting knife wounds to her vagina, the state court's decisions that Petitioner was guilty of torture are reasonable applications of federal law. As to the unconstitutionality of this statutory torture requirement, the Sixth Circuit observed that as in Bell v. Cone, 543 U.S. 447 (2005), "the Tennessee Supreme Court's rejection of petitioner's challenge to the 'heinous, atrocious, or cruel' ("HAC") aggravator was not contrary to clearly established federal law as determined by the United States Supreme Court." Payne v. Bell, 418 F.3d 644, 653 (6th Cir. 2005). For these reasons, the Court concludes that this claim does not warrant habeas relief.

As to Petitioner's reliance on Clemons, there, the Supreme Court held that the harmless error doctrine applied to a state appellate court's reweighing of the aggravating and mitigating factors and eliminating an improper aggravating factor considered by the jury. 494 U.S. at 741-46. The "[f]ederal Constitution does not prevent a state appellate court from upholding a death sentence that is based in part on an invalid or improperly defined aggravating circumstance either by reweighing of the aggravating and mitigating evidence or by harmless-error review." Id. at 741. Given the nature of the victim's wounds and the State's other proof, the jury and Tennessee Supreme Court had ample alternative bases, other than Petitioner's prior assault conviction and felony theft of the victim's automobile, to justify Petitioner's death penalty sentence. See Landrum v Mitchell, 625 F.3d 905, 926 (6th Cir 2010).

### b. Ineffective Assistance of Counsel Claims

Petitioner's ineffective assistance of counsel's claims are directed at the performances of his trial counsel and counsel at his resentencing and appeal. Those claims are addressed separately.

## 1. Ineffectiveness of Trial Counsel

Of Petitioner's claims on the ineffective assistance of his trial counsel, the undisputed

exhausted claims about his trial counsel[6] are that:

> 11.     Counsel was ineffective at the guilt phase of the proceedings, and absent
> counsel's failures, there is a reasonable probability that Darrell Hines would not have
> been convicted and/or sentenced to death. Counsel was ineffective for the following
> reasons, including:
>
>          a.     Counsel lacked the experience necessary to defend Darrell Hines
> (counsel had never tried a murder case), was unaware of the law applicable to Darrell
> Hines' case, was attempting to carry a full criminal practice while representing
> Darrell Hines, and was not properly compensated for his representation of Mr. Hines.
>
> *   *   *
>
>          c.     Counsel failed to properly pursue and inform Mr. Hines of possible
> terms and consequences of a plea bargain.
>
>          d      Counsel was ineffective for failing to allege that women were
> under-represented in the Cheatham County venire and to challenge women's
> under-representation on the petit jury, grand jury, and as forepersons of the grand
> jury. See ¶ 9, incorporated by reference.
>
> *   *   *
>
>          f.     Counsel failed to develop and pursue a comprehensive defense theory
> for the 1986 guilt/innocence phase of trial.

---

[6]Petitioner's challenges to the effectiveness of his post conviction counsel are not in his second amended petition, but in his request for an evidentiary hearing. (Docket Entry No. 109 at 1-43) In any event , those challenges are addressed in the procedural default section of this Memorandum, infra. In his post conviction appeal, the Tennessee appellate court described Petitioner's claims on appeal: "In his argument on appeal, the petitioner has set out five claims, three asserting that counsel were ineffective at his 1986 trial, his 1989 resentencing hearing, and on the direct appeal of his conviction, one asserting that he was prejudiced because of the exclusion of women from the jury panel, and one claiming that imposition of the death penalty violates various of his rights afforded by the federal and state constitutions." Hines, 2004 WL 1567120 at *22. This Court analyzes only claims that were actually presented to and decided by the state courts.

g.    Counsel was ineffective for failing to interview and effectively cross-examine Ken Jones to show that he was lying at the trial. Counsel knowingly allowed Jones to present false testimony (which resulted in part from a conflict of interest with the sheriff) about when and why he was at the CeBon motel on the day of the murder and what he observed while he was there.

\*    \*    \*

h.    Counsel had a conflict of interest that constructively denied Darrell Hines his right to counsel where counsel purposefully did not investigate and interview Ken Jones based upon instructions from the Sheriff who directed him not to talk to Ken Jones. Counsel's conflict created a bias whereupon counsel sided with Sheriff Weakley instead of diligently pursuing all avenues of defense for Darrell Hines.

\*    \*    \*

k    Counsel failed to properly identify, gather and examine necessary documents, records and physical evidence, including but not limited to: arrest reports, reports of forensic testing, any recorded or memorialized version of statements made by Mr. Hines and others, autopsy reports, physical  evidence seized by the prosecution, and prior criminal records of Mr. Hines and other witnesses. In addition, counsel failed to view the crime scene, and failed to fully investigate the forensic evidence collected at or from the crime scene or victim which was inconsistent with Darrell Hines' guilt and/or any testing done on such evidence, including, but not limited to, vacuumings from the room, a cigarette butt, an ashtray, clothing and fabrics and swabs, fingerprints, a bank bag, a $20 bill, a Pepsi bottle, a roll of Tums, and a chapstick (all found in room 21 where the victim was discovered). Had counsel investigated and analyzed this forensic evidence to establish the identity of any person(s) in the room, counsel would have established proof that Darrell Hines was not guilty and/or that someone else killed the victim.

\*    \*    \*

m.    Counsel was ineffective for failing to discover impeachment evidence which would have undermined the testimony of critical witnesses for the prosecution
. . . .

(Docket Entry Nos. 23-1, Seconded Amended Petition at 13, 15,18-19). Again, each claim has subparts that are discussed collectively infra.

### i. Competency of Trial Counsel

The Court groups several of these claims that are interrelated. The first group includes those claims 11 a, c, and f, that challenge the competency of Petitioner's trial counsel, namely that Petitioner's trial counsel lacked the experience of trying a death penalty case; that Petitioner's trial counsel could not represent Petitioner and maintain his practice; that Petitioner's trial counsel failed to pursue and advise Petitioner on a guilty plea; and that Petitioner's trial counsel failed to develop and pursue a comprehensive defense theory for the guilt/innocence phase of the trial. For these claims, Respondent argues that Petitioner's trial counsel's inexperience is not ground for habeas relief and that Petitioner fails to identify any particulars for his comprehensive defense claim.

As to the guilt state of the proceedings, the Tennessee appellate court found that five lawyers represented Petitioner at various stages of his trial and sentencing hearings:

Robert S. Wilson was the first attorney appointed to represent the petitioner, but his representation was short-lived because he was hired by the district attorney general's office approximately two months after his appointment. He said that he represented the petitioner from shortly after his arrest in March1985 to approximately late June 1985. He began employment with the district attorney general's office on August 16, 1985, and said that he never discussed the case with anyone at that office. He testified that he had recommended Steve Stack as his co-counsel, and Stack was appointed. He knew that Stack had no prior death penalty experience when he recommended him.

Steve Stack represented the petitioner at the 1986 trial and the 1989 resentencing. He had tried two cases to a jury in the twenty months that he had been practicing law prior to his appointment and did not believe he was qualified to serve as lead counsel on the case. Stack estimated that between 60 and 75% of his practice at the time was civil. William Wilkinson was appointed to assist Stack after Wilson was allowed to withdraw. Wilkinson had practiced with Wilson prior to the time he joined the district attorney general's office. Stack considered himself to be co-counsel in the case, although he performed many of the lead counsel's duties. He spent 38.9 in-court hours and 133.6 out-of-court hours on the petitioner's case. He believed he was paid, at the time of his representation of the petitioner at the trial, $20 an hour for out-of-court time and $30 an hour for in-court time. By contrast, in retained cases he charged between $60 and $75 per hour for his services. At the time of his representation of the petitioner, he did not have an office staff or an investigator.

Accordingly, he and Wilkinson did all of the investigation themselves. Although Stack was in private practice during the 1986 trial, he was employed at the public defender's office by the time the case was remanded by the supreme court for resentencing and, as a public defender, was appointed to represent the petitioner at the resentencing.

Stack testified that he obtained a mental evaluation for the petitioner to determine competency issues and whether an insanity defense would be available prior to the original trial, but these services did not cover any mitigation issues. He requested the services of an independent psychiatrist, a private investigator, and an independent mental evaluation, but these requests were denied.

Stack said that he had interviewed many of the witnesses who testified at trial, including the owners of the motel and Sheriff Weakley. He recalled traveling to Bowling Green, Kentucky, but could not remember the specific witnesses he interviewed there. He did not run a criminal background check on Daniel Blair and, therefore, did not know he had been convicted of theft of livestock, which might have been used for impeachment purposes. He also interviewed Bill Hines, the petitioner's stepfather; Bobby Joe Hines, the petitioner's half-brother; and possibly Barbara Hines, the petitioner's mother. Although he recalled traveling to the home of Victoria Hines Daniel, the petitioner's sister, he did not remember actually meeting with her. He acknowledged that he knew she would testify that she saw blood on the petitioner's clothing, but he did not obtain any information to impeach her testimony. He did not interview the petitioner's former girlfriend, Melanie Chandler, or her mother, Virginia Chandler, both of whom lived in North Carolina.

\* \* \*

Stack testified that he became an assistant public defender in 1988 and was appointed to represent the petitioner at resentencing, as were Shipp Weems, the public defender, and Phillip Maxey. As for the defense team's decision to delay their opening statement at resentencing until just prior to their proof, Stack testified that they discussed this issue, but he did not know why they decided to do so. He said that Maxey, who was the least experienced of the three, gave the opening statement for the defense, and both he and Weems had anticipated a different opening. He testified that the opening did not outline the proof they planned to present, but rather simply asked the jury to listen to their proof. He testified that the defense team made the tactical decision not to present a closing argument because it was their opinion that General Kirby had not "presented a very forceful argument," and they wanted to prevent General Atkins, who was "exceptional in his ability to ... bring emotions out in a jury," from making a rebuttal argument. Stack said that General Atkins had given a very impassioned closing argument at the original trial, and they wanted to keep him from doing so at the resentencing.

* * *

William G. Wilkinson, who had been practicing law since 1968, testified that he was appointed to assist Steve Stack, who had been in practice a "relatively short time." Wilkinson described his role as "kind of senior counsel" but said that Stack probably did more work on the case than he did. He said he had billed 59.5 out-of-court hours and 34.4 in-court hours on the petitioner's case, but those numbers were very conservative and did not include time he spent traveling to Bowling Green, Kentucky. Wilkinson testified that he believed he had sufficient time to prepare for the petitioner's trial, that he was adequately prepared for trial, and that none of his tactical decisions turned out to be erroneous.

Wilkinson knew that the petitioner's sister, Victoria Hines Daniel, had an alcohol and drug abuse problem and recalled examining her husband, Ernest Daniel, about her drinking problem. He was not aware of any sexual or physical abuse allegations of Mrs. Daniel but acknowledged that information as to this would have been useful. Wilkinson said that the petitioner "may" have told him about the abuse inflicted upon him by his stepfather. He had the petitioner examined by a psychiatrist who determined he was competent to stand trial.

Wilkinson said he did not interview the four people from Kentucky who gave the petitioner a ride and did not know before trial that one of them, Daniel Blair, was going to testify that he saw blood on the petitioner's shirt. Had he known of the substance of Blair's testimony, he would have checked Blair's criminal record for impeachment purposes. He recalled that Blair testified about his ability to recognize blood and about washing bloodstains out of fabric although he could not recall Blair's exact testimony. He acknowledged that, in hindsight, it would have been helpful to have had an expert refute Blair's testimony about washing out bloodstains.

Hines, 2004 WL 1567120 at *9-10.

Based upon these facts, the Tennessee appellate court ruled that "The petitioner contends both that his counsel were too inexperienced to try a capital case and failed to represent him zealously because the compensation provided appointed attorneys was too low. The court determined that these arguments were without merit, and the record supports this conclusion. We have previously held that inexperience of counsel alone does not equate to ineffective assistance of counsel." Hines, 2004 WL 1567120 at *30 (citing Anthony J. Robinson v. State, No.

02C01–9707–CR–00275, 1998 WL 538566, at *2 (Tenn.Crim.App. Aug.26, 1998) ("The petitioner claims counsel's lack of trial experience constituted ineffective assistance. The trial court noted the petitioner claimed, but presented no evidence, that his was the first trial that counsel conducted. Further, the trial court noted that inexperience, in itself, does not equate to ineffective assistance. We concur. The petitioner must identify specific acts and omissions to support the claim. The petitioner does not; therefore, this issue is without merit").

Under Strickland v. Washington, 466 U.S. 668, 687 (1984), to prevail on his claims of ineffective assistance of counsel, Petitioner must demonstrate that, under the totality of the circumstances, his trial counsel performed deficiently and that counsel's deficient performance resulted in prejudice. As the Supreme Court has explained:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id.

As to the "performance" inquiry, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id. at 688. Under Strickland, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. As to the duty to investigate:

> These standards require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case. As the Court of Appeals concluded, **strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In**

**other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.**

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. **Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.** For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And **when a defendant has given counsel reason to believe that pursing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.** In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Id. at 690-91 (emphasis added).

Here, these claims center on Stack, one of Petitioner's several trial counsel. Petitioner's second counsel, Wilkinson, was an experienced trial lawyer who felt himself prepared for trial. The Court concludes that the state courts could reasonably determine that this claim lacked factual support and legal merit. As to the alleged lack of an overall defense strategy, Petitioner does not identify any specifics of this claim that were not presented to the state courts. These contentions lack merit. As to the guilty aspect of this claim, where counsel elected not to consult with a defendant on a guilty plea and to focus only on sentencing, counsel was not ineffective. Florida v. Nixon, 543 U.S. 175 (2004). In any event, Petitioner reached a plea agreement with the State that the trial court rejected. See Hines, 919 S. W.2d at 578-79. Thus, in fact, Petitioner's trial counsel fully explored a guilty plea with Petitioner. This Court concludes that the state courts reasonably determined these

claims lack factual merit.

### ii. Failure to Challenge the Jury Panel

For this claim, Petitioner contends his trial counsel was ineffective for failing to allege that women were underrepresented in the Cheatham County venire for the petit jury, grand jury, and as forepersons of the grand jury. (Docket Entry No. 23 at ¶ 11d). Petitioner's related claim is that "[i]n violation of the Sixth, Eighth, and Fourteenth Amendments, Darrell Hines was denied his rights to due process, equal protection, and to juries selected free from discrimination and from a fair cross-section of the community, given discrimination against women in the selection of the petit jury, the grand jury, and the grand jury foreperson. Id at ¶ 9.

The Tennessee appellate court made findings on this claim on Petitioner's post conviction appeal and found this claim to lack factual support.

> James W. Kirby, a former assistant district attorney general and, at the time of the post-conviction hearing, the Executive Director of the Tennessee District Attorneys' General Conference, testified that he was involved in prosecuting the petitioner at the 1986 trial. .... Kirby also testified that in the 1980s most of the juries he was involved with in Cheatham County were dominated by men; however, he recalled one death penalty case where the jury had a female foreperson.
>
>        \*              \*              \*
>
> Stack also testified that the defense did not challenge the composition of the jury venire at either the 1986 trial or the 1989 resentencing, saying that it was not considered as an issue at the original trial. Although he was aware that it may have been an issue at the time of the resentencing, they did not have the necessary time to devote to pursuing it.
>
>        \*               \*              \*
>
> The proof at the post-conviction hearing on the issue of the jury venire consisted of five witnesses and a report prepared by a statistician, Dr. James M. O'Reilly, which concluded that there was an underrepresentation of women on the jury venire for Cheatham County for years 1979 to 1990. During the pertinent years, the female population of Cheatham County accounted for 50.6 to 50.7% of the total population.

By contrast, the percentage of women in the Cheatham County venire was between 10 and 22%.

Connie Westfall, of the post-conviction defender's office, testified that she had investigated the issue of the composition of the jury pool at the petitioner's 1986 trial as well as his resentencing. At the time of her investigation, only one of the three jury commissioners for the relevant time period, C.E. Dunn, was able to meet with her. Dorris Winters, one of the commissioners, was deceased; and the other, Martha Adkisson, was confined to a nursing home and unable to be interviewed because of her mental condition. Dunn provided Westfall with an affidavit because he had suffered a stroke and was unable to travel to court. Basically, his affidavit stated that they used the voter registration list as the exclusive source of obtaining people for the purpose of filling the jury box, and the jury commissioners met every two years to fill the jury box. Ms. Westfall testified that she also interviewed Delores Moulton, Lloyd Harris, the tax assessor, and trustees. She said that when she first spoke with Mr. Harris, he recalled using the voter registration list and later remembered that they may have used property lists and the telephone book.

Dorothy Jones, the Cheatham County Trustee, said that she had been the trustee for six years at the time of the post-conviction hearing and, prior to her service as trustee, her husband was the trustee. She had worked in the trustee's office since 1982. During her years of employment in that office, no one ever had been allowed to remove the tax roll books from the office. She acknowledged, however, that the tax records were public records and anyone could come into the office and review them.

Betty Balthrop, the Cheatham County Property Assessor, said that she had occupied that position since 1988 and had worked in the office since 1978. Ms. Balthrop testified that since her employment in the assessor's office, no one had physically removed the tax records for the purpose of copying them. She acknowledged that the tax records were public records which exist in Nashville and elsewhere in the state.

Delores Moulton was the Cheatham County Circuit Court Clerk from 1990 to 1998. Previously, she served as the deputy clerk, beginning in 1972. Her father, Lloyd Harris, was the Cheatham County Circuit Court Clerk prior to her tenure. Ms. Moulton testified that the jury commissioners met every two years to charge the jury box and that the voter registration list was their major source of obtaining names because they had more access to it. She stated that they started out "randomly, maybe, every sixteenth one or twentieth one down and wr [o]te the name and address on a little jury ticket." She explained that each of the jury commissioners took a different section of the list and worked independently. While they were charging the box, the only names taken out were the names of those known to be deceased. She further explained that at the end of the two years, the names in the box were not removed, but new names were added.

After the jury box was charged, they gathered the jury list as needed. Either a child under the age of ten or Ms. Moulton, wearing a blindfold, picked the names out of the box. Ms. Moulton testified that the jury commissioners sat together while compiling the names. Names of deceased persons were discarded. If school was in session, schoolteachers' names were set aside. Students away at college were omitted from the list. Also, at times, if they knew a woman had just had a baby, they removed her name. They compiled a list of 150 or more names, which made up the sheriff's venire. The sheriff summoned these persons to court where each was assigned a number. The judge then drew twelve numbers out of a box, and those persons comprised the grand jury. Ms. Moulton testified that Dorris Weakley was the sheriff in 1986 and 1989. During his administration, only thirty to fifty prospective jurors out of 150 actually appeared in court as summoned, but the percentages increased drastically under the next sheriff's administration.

**On cross-examination, Ms. Moulton testified that, in addition to the voter registration list, they also used the telephone book and tax records to randomly select names, although the voter registration list was the main source. She believed they followed the Tennessee statutes in gathering and preparing the jury venire. She said the commissioners "never discriminated anyone because of race, color, or nationality or men or women." She recalled that Martha Adkisson complained if she thought too many women were being put on the list; however, she believed Ms. Adkisson's reason for doing so was "to equal out ... the men and the women."**

Lloyd Harris, Delores Moulton's father, served as the Cheatham County Circuit Court Clerk prior to Ms. Moulton, occupying the position for twenty-four years. He testified that the three jury commissioners met every two to three months to select names, and he recalled Junior Dozier, the tax assessor, providing him with names from the tax lists. He used the telephone book for this purpose, although most of the names were taken from the voter registration list. He testified that Martha Adkisson was a schoolteacher and sometimes set aside the names of teachers because, at that time, there was a shortage of substitute teachers. He also recalled that, a few times during harvest season, a farmer's name was set aside, and, during the 1970s and 1980s, it was easy for women with young children to get out of serving on the jury, but that changed through the years. He stated that the jury box was charged about every two years. He testified that they went down the voter registration list, wrote down every twentieth or twenty-fifth name, placed it in the box, and tried not to discriminate against any class of potential jurors. Harris said that the voter registration list, the tax list provided by Dozier, and the telephone books were the only sources used in the jury selection at the time of the petitioner's 1986 trial and in 1989.

Hines, 2004 WL 1567120 at * 7, 8, 20-21 (emphasis added).

Based upon these facts, the state trial court found an unrebutted *prima facie* showing of discrimination against women in the petit and grand jury service, as well as in the grand jury foreperson, but did not find Petitioner to have suffered any prejudice due to his counsel's failure to raise this issue at trial. Id. at * 34-36. Citing federal law, the Tennessee appellate court reversed the trial court's finding of discrimination, but agreed about the lack of prejudice to Petitioner:

> We respectfully disagree with the post-conviction court's finding that the underrepresentation of women compels the conclusion that women were systematically excluded from the venire. While the petitioner argues on appeal that "the state offer[ed] no plausible explanation" for the disparity and, therefore, he is entitled, as matter of law, to prevail, we disagree with this claim. In fact, substantial proof is in the record as to how the panel of prospective jurors was selected; and neither the petitioner nor the post-conviction court has identified illegalities or deficiencies in the process. Rather, both simply relied upon percentages of women called to jury duty to conclude that women had been systematically excluded. In Truesdale v. Moore, 142 F.3d 749, 755 (4th Cir.1998), the court explained that a statistical disparity does not, by itself, establish systematic exclusion of a group from the jury pool:
>
>> Truesdale has not advanced any direct evidence of "systematic exclusion" of African Americans from the venire. Instead he seeks to rely on the bare assertion of substantial underrepresentation to prove that there was a structural or systemic impediment to voter registration by African Americans. We have consistently required more to make out a violation of the "fair cross-section" guarantee.... To allow Truesdale to substitute evidence of substantial underrepresentation for evidence of systematic exclusion would go a long way towards requiring perfect statistical correspondence between racial percentages in the venire and those in the community. Such a rule would exalt racial proportionality over neutral jury selection procedure.
>
> Accordingly, we conclude that the post-conviction court erred in finding that women had been systematically excluded from the venire.
>
> Regarding this issue as a post-conviction claim, the petitioner must prove that his counsel were ineffective under Strickland because counsel did not challenge the jury venire at trial and/or resentencing. Attorney Stack testified that he had no reason to suspect that women were underrepresented in the jury venire in 1986, and, in fact,

three women were on the petitioner's 1986 jury. Moreover, counsel testified that they did not use all of their peremptory challenges at the 1986 trial. Our supreme court has found that the presence of three women on the petit jury constitutes a "fair representation of women on the jury and that is all that is required by the Constitution of the United States." Strouth, 620 S.W.2d at 470. The record supports the post-conviction court's finding that the petitioner was not prejudiced because counsel did not challenge the 1986 venire.

Id. at *35-36.

Petitioner does not present any showing to challenge the state appellate court's ruling that the jury selection process was not discriminatory. Petitioner has not demonstrated that the rulings of the state trial and appellate courts erred in concluding that Petitioner was not prejudiced by his counsel's failure to raise this claim at trial. Moreover, whatever omission of Petitioner's trial counsel in this regard, the issue was fully explored during Petitioner's post conviction proceedings, including the facts alleged in the second amended petition. Accordingly, the Court concludes these facts preclude any showing of prejudice required by Strickland. Petitioner's freestanding claim on exclusion of women from the grand and petit juries, as well as grand jury foreperson, also lacks merit. Thus, Petitioner's claims 9 and 11 should be denied for lack of factual support.

### iii. Ineffective Cross Examination of Jones

In his post conviction appeal, Petitioner's claims about his trial counsel were "that trial counsel were ineffective in failing to interview and effectively cross-examine Ken Jones, to object to Sheriff Weakley's participating in the voir dire of prospective jurors, to discover impeachment evidence, and were ineffective as well because of their lack of experience and resources." Id. at *23. This claim focuses on the testimony of Ken Jones whom Petitioner now contends his counsel did not elicit on cross examination that Jones had lied about his presence at the motel, the scene of the murder.

64

According to Petitioner, his counsel did not investigate and cross-examine Ken Jones, even though he could have proved as false, Jones's testimony that he arrived at the CeBon motel at 12:30 p.m., left and went to Stuckey's, returned at 1:20 or 1:30 p.m, left a note at the motel office saying he was using the restroom in Room 21, went to Room 21 to use the restroom, found the victim about whom he did not have any knowledge, then returned the key to the office and called the Sheriff, and waited his arrival. Petitioner contends that the falsity of Jones's testimony was also known by Vernedith White, Jones's mistress. Petitioner contends that his trial counsel failed to cross-examine Jones thoroughly because Sheriff Weakley advised counsel not to talk to Jones, resulting in an alleged conflict for Petitioner's counsel. (Docket Entry No. 23 at ¶¶ 11g and h). According to Petitioner, his trial counsel impermissibly accepted the Sheriff's statement that Ken Jones was at the CeBon motel to rent a room with his lover, Vernedith White, and that during the time they were there, they did not see anything. Respondent asserts that the state courts reasonably determined that these claims lack proof of prejudice.

On this claim, the Tennessee appellate court made the following findings of fact in Petitioner's post conviction appeal:

> Stack said that he did not interview Ken Jones prior to the trial because he had been told by Sheriff Weakley that Jones was at the crime scene for only a very short period of time and did not know anything about the murder itself. Stack testified that he knew at the time of trial that part of Ken Jones's testimony was false or inaccurate. However, he explained that he held Sheriff Weakley in high regard and trusted what he had told him, saying: "I mean, I would take that man's word for anything in the world. He say[ ]s this hadn't got a dog in the hunt, don't embarrass the man. I wasn't going to embarrass the man." Stack acknowledged that the defense team should have interviewed Jones and that it was "ridiculous for [them] not to have gone to interview him." He said there were discrepancies in Jones's testimony regarding his timing of the events which should have been discovered and developed for the defense. Stack acknowledged that Jones testified at trial that he did not know the gender of the victim at the time of discovery because the victim's body was covered with a cloth

or sheet. However, the person who made the emergency call said that a woman had been stabbed.

           *                       *                       *

Wilkinson said that he discussed Ken Jones's situation with Sheriff Weakley and believed that Weakley had told him everything he knew. He did not interview Ken Jones, Vernedith White, or Virginia Chandler and, in hindsight, would liked to have had more time to inquire about why Jones and White sat in front of the CeBon Motel for over three hours on the day of the murder. As for Dr. Harlan's testimony, Wilkinson said that it may have been helpful to have had another pathologist review Harlan's findings.

           *                       *                       *

The petitioner argues that trial counsel sanctioned the perjured testimony of Ken Jones at the 1986 trial and failed, at the request of Sheriff Weakley, to effectively cross-examine Jones, these amounting to an actual conflict of interest for the trial attorneys. As we have set out, Ken Jones acknowledged at his deposition in 1999 that he was at the CeBon Motel on the day of the murder to rent a room to be with his paramour. However, at the petitioner's 1986 trial, Jones had testified that he was at the motel because he needed to use the restroom. Trial counsel Stack acknowledged that he knew Jones was at the motel to rent a room with his paramour, but did not cross-examine him on this fact. Sheriff Weakley did not want Jones to be embarrassed and had assured trial counsel that Jones knew nothing about the murder.

Id. at *8, 10, 23.

In response to Petitioner's reliance on Kyles v. Whitley, 514 U.S. 419, 434 (1995) and Jones

v. Kentucky, 97 F.2d 335 (6th Cir.1938), the Tennessee appellate court, citing other federal circuit

decisions, ruled that Petitioner's counsel did not have any conflict of interest and that Petitioner did

not suffer any prejudice on this omission of his trial counsel.

While trial counsel did not question Ken Jones as to why he was at the motel, this fact does not result in their representing the interests of Sheriff Weakley. Accordingly, to prevail on this claim, the petitioner must establish that he was prejudiced by trial counsel's not ascertaining and cross-examining Ken Jones's true reason for being at the motel, thus depriving the jurors of this knowledge in addition to missing the opportunity to cross-examine Vernedith White. We will review this argument along with the related claim, made at oral argument, that trial counsel could

have created residual doubt by properly dealing with Ken Jones.

In his reply brief, the petitioner points to various portions of the testimony to establish that Ken Jones, himself, might have killed the victim. The petitioner explains how he might have gotten the keys to the victim's car without confronting her, surmising "because of the warmth on the day at issue, [the victim] was wearing only a very light weight summer shift" and that her maid's coat, where she kept her keys and wallet, "was most likely hanging on the cleaning cart, which gave [the petitioner] easy access." The petitioner argues that the statements of Jones and White that they neither saw nor heard anything "that was connected with the crime" are "unbelievable." The victim's schedule to clean the rooms, the petitioner asserts, was such that she would not have reached room 21, where she was killed, until "noon," resulting in Jones and White at least seeing her. The petitioner notes that, at the 1986 trial, Jones said he did not know whether the victim was male or female, yet he told Maxey Kittrell, another witness, that "a woman had been stabbed" and told White that "there was a dead woman in there." This testimony, according to the petitioner's argument, demonstrates "knowledge that no one but the perpetrator could have known." The petitioner points to other discrepancies, including Jones's testimony that the "randomly selected key" which he picked up "just happened to open the lock on room 21, the murder room"; and the fact that White testified that she and Jones were at the motel from 9:00 am until the emergency call, which was made at 2:36 p.m., leaves two hours of Jones and White's activities "unaccounted for." This time period, according to the petitioner's theory, allowed Jones to drive White to Dickson and "to cleanse himself and his van of the victim's blood." The petitioner surmises that Jones then returned to the motel to determine whether the motel owners had come back and found the body, and discovered that this had not occurred. Finally, according to this argument, "by belatedly announcing that a woman had been stabbed to death, Jones successfully removed himself as a suspect and thereby, with the help of his friend the sheriff, was able to keep himself from being investigated by the defense and by the prosecution."

The post-conviction court concluded that the petitioner would not have benefitted from the claim that Ken Jones had killed the victim:

> Petitioner insists that his trial counsel should have attempted to cast suspicion upon Ken Jones as a possible perpetrator of the crime and that counsel was ineffective in allowing Mr. Jones to "perjure" himself in hiding his true reason for being at the hotel. While counsel had brought out that there had been another stranger in the area of the CeBon Motel that morning, they did not develop any reason for the jury to consider that someone other than Petitioner committed the offense. Petitioner asserts that his trial counsel should have suggested that perhaps, Ms. Jenkins had thwarted Mr. Jones ['s] planned sexual

liaison with Ms. White and that this was a motive to kill her. He further suggests that their theory might explain the twenty dollar bill under Ms. Jenkins's watch band [sic] and the careful insertion of the knife into her vagina. Trial counsel knew of the actual reason for Mr. Jones['s] presence at the motel, having learned it from the sheriff. Of course, they could have investigated further and learned the details of the encounter but the Court does not find that the information would have been particularly useful. To present such a farfetched theory with no supporting evidence would cause a loss of credibility by the defense at trial. Admittedly, if trial counsel had learned the exact details of the movements of Mr. Jones, Ms. White and the person(s) in the maroon or brown car, they could have "muddied the water" concerning the details of the discovery of the body. This would have been insufficient, however, to cast reasonable doubt on the guilt of Petitioner given the fact that Petitioner was shown by the proof to have taken the deceased's car keys, presumably from her billfold (in which she habitually kept them), and stolen her car. To accept Petitioner's argument that he didn't kill the deceased but merely took her car keys from her body (which was wrapped in a blanket) and stole her car would require the trial jury to depart from speculation and enter into fantasy.

Missing in the petitioner's theory, which the post-conviction court described as "farfetched," is any motive or reason why Jones would want to kill the victim, except the petitioner's suggestion, recounted in the post-conviction's findings, that the victim was killed because she had "thwarted" the sexual liaison between Jones and White. In effect, the petitioner argues that fifty-one-year-old Ken Jones, accompanied by his twenty-one-year-old girlfriend, Vernedith White, following their normal Sunday morning routine and checking into the same motel where they had been together approximately 100 times before and were known by the staff, including the victim, stabbed the victim to death, with Jones driving White to another location, cleaning blood from himself and his vehicle, and then returning to the scene to report the crime and wait for law enforcement officers to arrive. We agree with the post-conviction court that, given the strength of proof against the petitioner, making the argument that Ken Jones was the actual killer would have been "farfetched" and could have resulted in a loss of credibility for the defense.

Hines, 2004 WL 1567120 at *26-27.

Counsel's failure "'to conduct constitutionally adequate pretrial investigation into potential mitigation evidence'" can "'hamper[] [their] ability to make strategic choices.'" Harries v. Bell, 417

F.3d 631, 639 (6th Cir. 2005) (citation omitted); see also Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991) ("[O]ur case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.").

Yet, Petitioner has not presented any evidence to suggest that Jones could have been the murderer. Jones's motivation for being at the motel was undisputed. Given the State's proof and Petitioner's statement to the officers, the Court concludes that there is not any basis to suggest any other identifiable person as the perpetrator of this horrendous crime. The Court also concludes that Petitioner has not demonstrated any prejudice for this claim. Given the state courts' finding of the absence of prejudice required by Strickland, the Court concludes that this claim was reasonably decided by the state courts applying clearly established federal law.

### iv. Failure to Acquire Forensic Evidence

For this claim, Petitioner alleges that his counsel failed to view the crime scene and to have the forensic evidence collected at or from the crime scene or victim to be analyzed. Petitioner cites, vacuuming the motel room, a cigarette butt, an ashtray, clothing and fabrics and swabs, fingerprints, a bank bag, a $20 bill, a Pepsi bottle, a roll of Tums, and a chapstick that were found in room 21 where the victim was discovered. (Docket Entry No. 23, Second Amended Petition at ¶ 11k). Petitioner argues that if his trial counsel had acquired and analyzed this forensic evidence counsel would have found the presence of another person(s) in the room. Thus, Petitioner would have been found not guilty and/or that someone else killed the victim. Although Respondent does not challenge this claim as procedurally defaulted, the Court has not identified nor has Petitioner cited this claim as presented to the state Courts. This claim is governed by the Court's procedural default conclusions. In any event, for the reasons stated earlier on Petitioner's request for an evidentiary

69

hearing, the State courts reasonably rejected the facts cited for the other suspect claim and Petitioner fails to present any material and persuasive facts for this claim.

### v. Failure to Discover Impeachment and Exculpatory Evidence

For this claim, Petitioner alleges that "Counsel was ineffective for failing to discover impeachment evidence which would have undermined the testimony of critical witnesses for the prosecution." (Docket Entry No. 23, Second Amended Petition, at ¶11m). For particulars of this claim, Petitioner cites the probation status of Paul Blair; the serious drinking problem of Victoria Hines Daniel who saw blood on Petitioner's shirt; the testimony of Earnest Daniel who knew of his wife's drinking problem, but described her drinking as occasional; and Virginia Chandler, Petitioner's spurned girl friend who had a drinking problem and was motivated to get Petitioner. In a closely related claim, Petitioner alleges that his trial counsel failed to request material exculpatory evidence and cites Sheriff Weakley's information about Jones's arrival at the motel earlier in the morning for a tryst with Vernedith White. The exculpatory nature of this proof is that Jones was not at the motel to use the restroom. Id. at ¶ 11g.

On the latter claim, the state technical record reveals that Petitioner's counsel, in fact, filed a motion for, among other information, "All statements of confession or admission against interest in the possession of any law enforcement agency" as well as for any evidence that is "exculpatory in nature." (Docket Entry No.29, Addendum No. 1 at 9). As to the impeachment evidence claim, the Tennessee appellate court found the lack of materiality in this proof about Jones and the other cited witnesses.

> Stack said that he had interviewed many of the witnesses who testified at trial, including the owners of the motel and Sheriff Weakley. He recalled traveling to Bowling Green, Kentucky, but could not remember the specific witnesses he

70

interviewed there. He did not run a criminal background check on Daniel Blair and, therefore, did not know he had been convicted of theft of livestock, which might have been used for impeachment purposes. He also interviewed Bill Hines, the petitioner's stepfather; Bobby Joe Hines, the petitioner's half-brother; and possibly Barbara Hines, the petitioner's mother. Although he recalled traveling to the home of Victoria Hines Daniel, the petitioner's sister, he did not remember actually meeting with her. He acknowledged that he knew she would testify that she saw blood on the petitioner's clothing, but he did not obtain any information to impeach her testimony. He did not interview the petitioner's former girlfriend, Melanie Chandler, or her mother, Virginia Chandler, both of whom lived in North Carolina.

\* \* \*

Wilkinson knew that the petitioner's sister, Victoria Hines Daniel, had an alcohol and drug abuse problem and recalled examining her husband, Ernest Daniel, about her drinking problem. He was not aware of any sexual or physical abuse allegations of Mrs. Daniel but acknowledged that information as to this would have been useful. Wilkinson said that the petitioner "may" have told him about the abuse inflicted upon him by his stepfather. He had the petitioner examined by a psychiatrist who determined he was competent to stand trial.

Wilkinson said he did not interview the four people from Kentucky who gave the petitioner a ride and did not know before trial that one of them, Daniel Blair, was going to testify that he saw blood on the petitioner's shirt. Had he known of the substance of Blair's testimony, he would have checked Blair's criminal record for impeachment purposes. He recalled that Blair testified about his ability to recognize blood and about washing bloodstains out of fabric although he could not recall Blair's exact testimony. He acknowledged that, in hindsight, it would have been helpful to have had an expert refute Blair's testimony about washing out bloodstains.

\* \* \*

Daniel Blair, who testified at the petitioner's original trial, was one of the four people from Kentucky who picked up the petitioner on March 3, 1985, on Interstate 65, after they noticed his car was disabled, and drove him to Bowling Green, Kentucky. Blair was on probation at the time and was not supposed to have left the State of Kentucky, although he was never charged with violating his probation and was told by a Kentucky deputy sheriff that his leaving the state would not be a problem. At the post-conviction hearing, Blair testified that he had seen "what looked like blood" on the petitioner's shirt, although at the trial he had testified that it was blood.

Melanie Chandler, the former girlfriend of the petitioner and a friend of Victoria Hines Daniel, his sister, testified that she and the petitioner had a child, Anthony

Scott Hines, who was born January 1, 1981. The petitioner's mother adopted the child when he was two years old. She testified she had last seen the petitioner around February 1985 when he came to her house in North Carolina. When he arrived, he only had a few items with him, one of which was a small, folding knife she previously had given him. During his visit, they went to a party with some friends of hers, and, as they were returning home, the petitioner and the friend who was driving got into an argument. After the petitioner grabbed the friend who was driving the car, Chandler grabbed the petitioner, who accidentally struck her in the eye, causing bruising. She said that he had never before struck her but had always been protective. Chandler's mother, Virginia Chandler, called the police and forced the petitioner to leave. Later that night, the petitioner appeared at Melanie's window. She allowed him inside, and he hid in her closet for approximately one week before her mother discovered him. Her mother bought the petitioner a one-way bus ticket to Kentucky.

Chandler said that she knew her mother had testified at the petitioner's trial, but defense counsel never contacted her. She acknowledged knowing she was supposed to appear in court at the trial, but she had just had a baby and decided not to do so. She testified that she did not know that the petitioner was on trial for murder. She thought her mother lied at the trial when she stated that she had seen the petitioner sharpening his knife with a bootstrap. She said that her mother later told her that the petitioner had been found guilty of murder and had been executed. She believed the petitioner was dead until the post-conviction defender's office contacted her in 1997 or 1998. Since learning that the petitioner was alive and in prison, she had written him several letters and had visited him in prison.

Robert Ernest Daniel testified that he had been married to Victoria Hines, the petitioner's sister, for about two years. He met the petitioner while the petitioner was on parole in Kentucky and gave him a job doing construction work. The petitioner was a hard worker, and they were friends "[t]o a point." Daniel said that the petitioner carried a small pocketknife with him on the job and also had an "Army type survivor" knife with a fixed blade. He believed that the knife blade was approximately six inches long, with one end serrated and the other sharp. He recalled that the petitioner gave the knife to his brother, Bobby Joe, who kept it in a drawer at their home.

Daniel testified that on March 3, 1985, the petitioner appeared at his apartment, wearing blue jeans, a white t-shirt, an Army jacket, and white tennis shoes. Victoria's birthday was the day before or the day after the petitioner arrived, and the petitioner wanted to buy a grill for her. Daniel gave the petitioner some money because the petitioner did not have enough to purchase the grill. He then drove the petitioner to Park City or Cave City, Kentucky, and dropped him off. Later that night, the police came to his home and questioned him about the petitioner's whereabouts. At the time, he thought the police wanted to question the petitioner about a probation violation,

so he "acted stupid." When he later learned that the police wanted to question the petitioner in connection with a murder, he told the police where he had taken the petitioner.

On cross-examination, Daniel said that he testified at the original trial that Victoria only drank occasionally "because she was my wife at the time and I would be very protective of her." This testimony was inaccurate because Victoria drank heavily. He denied testifying that the petitioner had something bulky in his Army jacket and that he did not know when Victoria's birthday was. He denied remembering seeing the petitioner with a set of car keys or that he had asked the petitioner why he had a Volvo. During a recess, the court ordered Daniel to take a breath alcohol test. Daniel admitted that he had consumed "a couple of beers" before coming to testify at the post-conviction hearing, and the court found him to be in contempt, ordering him to serve twenty-four hours in the Cheatham County Jail.

Victoria Hines Daniel Furlong, the petitioner's sister, testified at both the original trial and the post-conviction proceeding. She said that her stepfather, Bill Hines, was abusive to her, her siblings, and her mother. Her stepfather used "tobacco sticks, belts, belt buckles ... anything that he could get a hold of to whoop us with." He also drank beer and liquor "all the time" which caused his attitude to change, and the "beatings got worse." She said that the petitioner often attempted to intervene to protect her and their sister, Debbie, which caused the petitioner to be beaten more severely. She recalled one incident where her stepfather knocked the petitioner into the corner of a fireplace, rendering him unconscious. However, medical attention was not sought for the petitioner. Often there was not much food in the house. In addition to the physical abuse, Bill Hines sexually abused her from the age of nine. She and the petitioner began drinking at the age of eleven or twelve. They both also smoked "dope," and the petitioner sniffed glue. She admitted that she drank heavily from the time she was twelve or thirteen and had only recently stopped drinking. She also said that she was married to Ernest Daniel for five years, during which time he often beat her severely.

Furlong said that her birthday was February 4 and that on March 3, 1985, the petitioner had given her a grill as a belated birthday gift. She said that, if she had testified at the original trial that she saw blood on the petitioner on March 3, 1985, when he arrived at her house, it was because she had been drinking. At the post-conviction proceeding, she testified that the petitioner had fallen in red clay mud prior to arriving at her house and that is what she saw on his clothes. She said she was not interviewed by the petitioner's attorneys prior to the resentencing, and the prosecutors had tricked her into talking to them prior to the original trial by telling her they were the petitioner's attorneys. She said she was drinking whiskey and water when they came to her house and asked questions. She thought they were tape-recording their conversation, but they denied it. She said she later saw a

recording device and ordered the men out of her home.

Furlong acknowledged that she was an alcoholic. She did not remember testifying that the petitioner had gotten into a struggle at the motel and did not believe that she had testified as the transcript of the original trial reflected. If the transcript were correct, then she was "[p]robably" lying in 1986 because of her drinking. She admitted that she had never reported any of the sexual abuse by her stepfather. It was her understanding that her stepfather had continued with his sexual abuse of young girls, including her niece, but she had never reported him to law enforcement officials.

Hines, 2004 WL 1567120 at * 8, 9-10, 11-13.

On these alleged omissions of Petitioner's trial counsel to secure the impeachment evidence concerning these witnesses, the Tennessee appellate court did not find any prejudice to Petitioner.

The petitioner contends that trial counsel were ineffective by failing to discover impeachment evidence that State's witness Daniel Blair, on the day that he had given the petitioner a ride, was on felony probation for theft of livestock; that State's witness Victoria Hines Daniel Furlong was an alcoholic and had been drinking the day she supposedly saw blood on the petitioner's shirt; that State's witness Ernest Daniel also was an alcoholic and had not testified completely truthfully about Furlong's drinking; and that Melanie Chandler would have contradicted her mother's testimony that the petitioner carried a knife which he had been seen sharpening. We will consider these claims.

As to Daniel Blair, trial counsel acknowledged that they did not investigate his criminal history. The petitioner submits that the combination of the impeachment evidence of Blair's felony, coupled with discrediting his testimony that he saw blood on the petitioner's shirt on the day of the murder, would have affected his credibility. **The State argues that Blair's being on probation made him more credible because, in admitting that he had been in Tennessee, he admitted also that he had violated his probation. The post-conviction court found that effectively impeaching this witness would have been unlikely. We agree the petitioner's claim is speculative that Blair successfully could have been impeached with this additional information and conclude, accordingly, that the record supports the post-conviction court's determination.**

The petitioner also contends that trial counsel were ineffective in failing to discover that **Victoria Hines Daniel Furlong** was an alcoholic and had been drinking on the day she testified at the petitioner's trial. **At the post-conviction proceeding, she contradicted much of her prior testimony, as we have previously set out. The**

**post-conviction court rejected Furlong's entire testimony as "incredible and worthless." The record supports this determination.**

Additionally, the petitioner contends that counsel were ineffective for failing to discover that Ernest Daniel, Victoria Furlong's husband at the time of the petitioner's trial, was not truthful regarding the amount and extent of his wife's drinking. **The post-conviction court found Daniel to be in contempt of court at the post-conviction proceeding because he had been drinking prior to testifying. The court found the only fact that it could determine with respect to Daniel's and Furlong's testimony was that they each lied under oath at either the trial or the post-conviction hearing. Given this fact, the court determined that interviewing either of these witnesses would not have benefitted counsel in impeaching them at trial. The record supports this conclusion.**

Counsel testified that they did not interview Melanie Chandler or Virginia Chandler prior to trial. Melanie Chandler testified at the hearing that her mother had animosity toward the petitioner and drank heavily. Melanie Chandler admitted that she was not on good terms with her mother. **The post-conviction court noted that Chandler "glance[d] affectionately" at the petitioner during the hearing, making it obvious that she still had feelings for him. In conclusion, the court found that the impeachment value of Melanie Chandler's testimony was "marginal, at best." We concur with this assessment. Accordingly, as to this claim, we agree with the conclusion of the post-conviction court that the petitioner failed to establish prejudice.**

Id. at * 29-30 (emphasis added).

As stated earlier, the statutory presumption of correctness applies to State courts' credibility determinations. Skaggs, 235 F.3d at 266. Here, the state courts deemed most of the cited witnesses' testimony as lacking credibility with the exception of Blair. As to Blair, the state court accepted the State's argument that for Petitioner's counsel to elicit Blair's probation status would have enhanced Blair's credibility, rather than diminish his testimony. Petitioner's trial counsel filed a motion for exculpatory information as well as all statements against interests in the possession of any law enforcement agency. With these findings, the Court concludes that the state courts reasonably determined this claim for which Petitioner has not shown the requisite prejudice under Strickland

to warrant any habeas relief.

### vi. Failure to Make Closing Argument

For this claim, Petitioner contends that his counsel was ineffective for not making a closing argument at resentencing. (Docket Entry No. 23, Second Amended Petition at ¶ 13p(2)). In a related claim, Petitioner contends that Petitioner's counsel failed to object to improper statements of the state prosecutor during opening and closing arguments. Id. at ¶11s(2). Another related claim is that the prosecutor engaged in improper closing argument. (Docket Entry No. 23-1at ¶ 21).

As to trial counsel's election not to make a closing argument, the Tennessee appellate court found the following facts:

> Stack testified that he became an assistant public defender in 1988 and was appointed to represent the petitioner at resentencing, as were Shipp Weems, the public defender, and Phillip Maxey. As for the defense team's decision to delay their opening statement at resentencing until just prior to their proof, Stack testified that they discussed this issue, but he did not know why they decided to do so. He said that Maxey, who was the least experienced of the three, gave the opening statement for the defense, and both he and Weems had anticipated a different opening. He testified that the opening did not outline the proof they planned to present, but rather simply asked the jury to listen to their proof. He testified that the defense team made the tactical decision not to present a closing argument because it was their opinion that General Kirby had not "presented a very forceful argument," and they wanted to prevent General Atkins, who was "exceptional in his ability to ... bring emotions out in a jury," from making a rebuttal argument. Stack said that General Atkins had given a very impassioned closing argument at the original trial, and they wanted to keep him from doing so at the resentencing.

> * * *

> Weems confirmed Stack's testimony that they agreed to waive closing argument at resentencing in order to prevent the prosecution from giving a rebuttal argument ...

> * * *

> Phillip Maxey ... appointed to represent the petitioner at resentencing....believed they had presented strong mitigation proof and said they waived closing argument in an

effort to prevent the State from making a rebuttal argument. They believed that the State would wait until rebuttal to "really throw it all" at the jury.

Hines, 2004 WL 1567120 at *9, 10 and 11.

In its rejection of this claim, the Tennessee appellate court reasoned as follows:

> The petitioner contends that his counsel were ineffective in not making a closing argument at resentencing. As to this claim, all three of the petitioner's resentencing counsel testified that their decision to waive closing argument was based on the fact that they did not want the State to present a rebuttal argument. The law is clear that this court may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. The post-conviction court concluded that trial counsel had made a tactical decision to waive closing argument to prevent the State's then being able to make a strong rebuttal argument. The record supports this conclusion.

Id. at *33 (citing Bell v. Cone, 535 U.S. 685 (2002); Hellard v. State, 629 S.W.2d 4, 9 (Tenn.1982); and State v. Menn, 668 S.W.2d 671, 673 (Tenn. Crim. App.1984)).

Counsel for the defendant has a right to make a closing argument under the Sixth and Fourteenth Amendments as part of the defendant's right to assistance of counsel. Herring v. New York, 422 U.S. 853, 857–58, 863 n. 15 (1975). Concurrently, the right to effective assistance of counsel extends to closing arguments. Yarborough v. Gentry, 540 U.S. 1, 5 (2003); Bell v. Cone, 535 U.S. 685, 701–02 (2002); Herring, 422 U.S. at 864-65. Yet, "counsel's tactical decisions in [the] closing presentation ... because of the broad range of legitimate defense strategy at that stage" is entitled to "deference" and, as a matter of law, to "wide latitude." Yarborough, 540 U.S. at 6. "Indeed, it might sometimes make sense to forgo closing argument altogether." Id. (citing Bell, 535 U.S. at 701–02) (holding that trial counsel's election to forgo the closing argument as a tactical decision at the end of the sentencing phase of a murder trial did not constitute ineffective assistance of counsel). Under these principles, this Court concludes that the state courts reasonably decided

these claims.

As to trial counsel's failure to object to the state prosecutor's alleged improper argument, as well as the related claim for the state prosecutor's improper closing argument, the Tennessee Supreme Court determined that these statements were neither improper nor unreasonable:

> Defendant poses an issue complaining of various purported improper arguments made by the State which he says was with the apparent purpose to inflame the jury against him. He refers to the State's argument regarding his statement that he wanted the death sentence and that his statements to his sister were a twisted confession of murder. He argues that the Attorney General misstated the facts and made statements based upon his own personal knowledge rather than facts in evidence.
>
> Here too, we find that defendant failed to make any contemporaneous objection to the allegedly improper argument. The record further reflects that he failed to preserve these complaints in his motion for new trial. Moreover, we do not find fault with the first part of the argument complained of. In reference to his statements to his sister, the Attorney General argued "that defendant would not admit to his sister he had killed a woman; he told her I killed a guy at a motel and robbed him." There is no question that he did tell his sister he stabbed a man at the motel and he also told her that he had a large sum of money. The trial judge admonished the jury to rely on their own recollection of the testimony and under the circumstances we do not find the Attorney General's comments to be the distorted misstatement of the testimony suggested in defendant's brief.
>
> We do not approve of the District Attorney's statement, "that presumption of innocence is gone because we have shown you the proof to connect him and show he committed the murder. There is no presumption of innocence anymore. We removed his presumption of innocence by the proof and you know that's true." This Court said in State v. Duncan, 698 S.W.2d 63, 70 (Tenn. 1985), "On its face this seems a misstatement of the position in Tennessee that the presumption of innocence remains with the defendant up until the verdict." (Citations omitted). However it becomes plain from reading the record that it was not the intent of the Attorney General to misstate the law. It is obvious he was carried away by his own rhetoric and in light of the failure of defense counsel to object coupled with the correct instruction by the court to the jury on the presumption of innocence, this statement was not plain error, nor in our opinion did it materially effect the verdict of the jury. State v. Duncan, supra.
>
> Defendant has also raised an issue in reference to the argument of the State at the penalty phase of the proceedings. He says that argument was improper and

inflammatory and encouraged the jury to consider defendant's statement that he would kill a guard if given a life sentence. He also complains that the District Attorney General characterized a life sentence as a reward rather than a penalty which he says is not supported by the record and is a mischaracterization which accrued to his prejudice. There is also an objection on the premise that the District Attorney General injected the matter of parole into his argument and argued that the jury would be recreant in its duty to society if the death sentence was not imposed.

Most of the objections to the State's argument are made in isolated context which, when considered in view of the argument as a whole, gives them an exaggerated significance. Once again, we observe there was no contemporaneous objection at trial to any of the statements which are now raised here as grounds for error. We do find one or two of these grounds asserted in the motion for new trial, contrary to the State's insistence.

We agree that defendant's remark to the police officers that he would kill a prison guard if sentenced to life was inappropriate as a sentencing consideration. However it was a matter which had been properly placed in evidence before the jury at the guilt phase of the proceeding and if the comments of State's counsel were improper, they could not have affected the jury's verdict at the sentencing phase of the trial. Defense counsel made an impassioned plea against the death penalty in which he dwelt at length on the vicissitudes of a life sentence. The District Attorney's argument in that phase of his closing remarks was in direct response to the defense argument and did not exceed the reasonable latitude allowed to counsel in arguing their respective positions.

It is difficult to tell where the District Attorney General was going in argument when he commented that defendant had been on parole. It was apparent that he was referring to defendant's prior conviction, as was defense counsel when he mentioned in argument that defendant had been on parole from Kentucky. Had he gone on to mention parole possibilities for defendant in this proceeding he certainly would have been treading on forbidden ground. See Smith v. State, 527 S.W.2d 737, 738 (Tenn.1975). However he was prevented from proceeding in that direction by the admonishment of the court to stay away from the subject of parole and we cannot see how the comments which were made could have adversely impacted upon the jury's determination as to sentencing.

The District Attorney General made some fanciful analogy to the frenzied conduct of wild cattle in a herd when exposed to the attack of a carnivore, and also called on the jury to do as he and the people of Tennessee asked them to do in following what the law called for in the case. We do not agree with the defense contention that the implication of these remarks was that the jury's responsibility was to impose the death sentence and not to weigh the aggravating and mitigating circumstances based

on the evidence. The contested argument did no more than articulate the prosecutor's intent that the jury return a death sentence in accordance with the law and their oath.

Defendant complains of other comments of the State's counsel to the effect that defendant had bragged about a murder and that he had killed someone and got a lot of money and words to the effect that some people get a high or are exhilarated by killing and will go brag about it. This was unquestionably a misstatement of the evidence. These comments in argument were not objected to when made and seem to be legitimate inferences to be drawn from the proof which the jury heard and certainly did not effect the outcome of the sentencing hearing. State v. Cone, 665 S.W.2d 87, 94 (Tenn.1984).

Hines, 758 S.W.2d at 519-21.

To be entitled to federal habeas corpus relief as a violation of a defendant's right to due process, prosecutorial misconduct must be so egregious as to deny Petitioner a fundamentally fair trial. Caldwell v. Mississippi, 472 U.S. 320, 335-36 (1985); United States v. Hastings, 461 U.S. 499, 509-12 (1983). In United States v. Young, 470 U.S. 1 (1985), the Supreme Court upheld the conviction and observed that even if "the prosecutor's remarks exceeded permissible bounds and defense counsel raised a timely objection, a reviewing court could reverse an otherwise proper conviction only after concluding that the error was not harmless." Id. at 13 n.10 (citation omitted). As to the factors to be considered, the Court stated:

Nevertheless, a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.

\* \* \*

[T]he remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly. In this context, defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant. . . . Courts of Appeals, applying these holdings, have refused to reverse convictions where prosecutors have

responded reasonably in closing argument to defense counsel's attacks, thus rendering it unlikely that the jury was led astray.

Id. at 11, 12.

Here, the Tennessee court considered the prosecutor's remarks and decided that for each challenged statement, the prosecutor's remarks were consistent with the proof at trial or were tied to Petitioner's statements. The Tennessee appellate court also evaluated the prosecutor's remarks in the context of the trial record and did not find any prejudice to Petitioner. After review, this Court concludes that the state courts' reasonably decided these claims.

### 2. Counsel's Ineffectiveness on Direct Appeal

As to the alleged ineffectiveness of his counsel on direct appeal, Petitioner asserts that appellate counsel's failures were: failure to preserve the claims in this habeas action in the motion for a new trial and the direct appeal; failure to obtain all necessary portions of the transcript and record for appeal, including the voir dire and the transcript of the motions hearings; failure to include in its brief to the Tennessee Supreme Court all issues raised in the Court of Criminal Appeals; failure to file an adequate petition to rehear before the Tennessee Supreme Court's adverse ruling on Petitioner's appeal; and failure to argue that the Tennessee Supreme Court erred when it concluded that "'in the instant case, a felony not underlying the felony murder conviction [was] used to support the felony murder aggravating circumstance .'" (Docket Entry No. 23-1, Second Amended Petition, at 46) (citing Hines, 919 S.W.2d at 583).

Under clearly established law on defense counsel's failure to raise a claim on appeal, the Supreme Court has observed that "[t]his process of `winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." Smith v. Murray, 477 U.S. 527, 536 (1986) (quoting Jones v.

Barnes, 463 U.S. 745, 751-52 (1983)). Moreover, Smith observed that:

> It will often be the case that even the most informed counsel will fail to anticipate a state appellate court's willingness to reconsider a prior holding or will underestimate the likelihood that a federal habeas court will repudiate an established state rule. But, as Strickland v. Washington made clear, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."

Id. (citation omitted).

Moreover, "the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for procedural default." Murray v. Carrier, 477 U.S. 478, 486-87 (1986).

As these principles are applied here, the Court concludes that Petitioner's appellate counsel cannot be second guessed as to issues to be raised on appeal. Petitioner's appellate counsel's assessments cannot be judged from the perspective of federal habeas counsel's review of the record decades later. Petitioner's appellate counsel successfully obtained a resentencing hearing. Any omissions of appellate counsel were cured by the extensive state post conviction petition and hearing at which Petitioner presented numerous claims with an extensive evidentiary record at the trial and on appeal. The Court concludes that these claims lack merit as a matter of law.

### 3. Ineffectiveness of Counsel at Resentencing

For this claim, Petitioner asserts that his counsel were ineffective at the re-sentencing proceeding and absent counsel's failures, a reasonable probability exists that Petitioner would not have been sentenced to death. For particulars, Petitioner cites his counsel's failures to challenge the lack of women representation on petit and grand juries as well as forepersons in Cheatham County; to present evidence of Petitioner's tragic personal history and his drug and alcohol abuse; and to

object to the prosecutors' failure to give notice of the aggravating circumstances as required by Tenn. R. Crim. P. 12.3(b) (Docket Entry Nos. 23 and 23-1, Second Amended petition, at 25-40). The facts about the women on grand and petit juries as well as serving as forepersons in Cheatham County are presented supra at 61-65. For the reasons stated earlier, the Court concludes that the state courts reasonably determined that this claim lacked any showing of prejudice.

As to the failure to present evidence of Petitioner's personal history at resentencing, on the post conviction appeal, the Tennessee appellate court first quoted findings in Petitioner's earlier appeal on the sentencing record:

> In mitigation, the defendant presented proof that, while in prison on this conviction, he had presented no serious disciplinary problems and posed no threat to the prison population. **The defendant also presented proof of a troubled childhood. His father had abandoned the family when the defendant was young. His mother had an alcohol problem. In his teens the defendant became involved in sniffing gasoline and glue and began to abuse alcohol and drugs. He also exhibited self-destructive behavior. Dr. Pamela Auble, a clinical psychologist, testified that the defendant was suffering from a paranoid personality disorder and dysthymia, or chronic depression. According to Dr. Auble, the defendant would suppress his feelings until they "boiled up" under stress. In her opinion, the defendant, who had returned from turbulent visits with his parents and girlfriend shortly before he committed the murder, was under stress when he killed the victim. Dr. Ann Marie Charvat, a sociologist, also testified about the damaging effect of the circumstances of his childhood on the defendant.**
>
> Hines, 919 S.W.2d at 577. The supreme court characterized the petitioner's mitigation proof as "extensive." Id. at 584.

Hines, 2004 WL 1567120 at *31 (emphasis added).

The Tennessee appellate court then analyzed the extensive expert and other proof on sentencing at the post conviction hearing:

> Stack testified that he obtained a mental evaluation for the petitioner to determine competency issues and whether an insanity defense would be available prior to the original trial, but these services did not cover any mitigation issues. He requested the

services of an independent psychiatrist, a private investigator, and an independent mental evaluation, but these requests were denied.

* * *

Stack acknowledged that he did not present all of the mitigation proof that the post-conviction defender had been able to assemble. He pointed out, however, that at the time of the trial and resentencing, he did not have the benefit, apparently referring to counsel representing the petitioner at the post-conviction hearing, of a three-year period of time to investigate the case as well as numerous attorneys and investigators to work on the mitigation proof. He testified that, as an appointed attorney, he did not have the benefit of working on the case as much as he would have liked because he could not afford to do so. However, he felt he had zealously represented the petitioner.

* * *

Stack recounted that at resentencing they called Dr. Pamela Auble and Dr. Ann Marie Charvat to testify for mitigation purposes. The two had been recommended by the Capital Case Resource Center, with whom defense counsel worked during the resentencing, and he believed they could explain how the petitioner had become the person he was. Dr. Charvat did not come across as well as they had hoped, and he did not believe the jury had grasped everything she said. Stack said that the defense team did not know the "extent and the nature of the types of abuse that [the petitioner] went through growing up" and that the resentencing jury never saw the background that the petitioner had. Stack ... concluded that the public defender's office did not have, and still does not have, the sufficient resources or the time to devote to a capital case."

* * *

Dr. Pamela Auble, a psychologist specializing in clinical neuropsychology, who had testified at the resentencing, testified also at the post-conviction hearing, saying she first evaluated the petitioner in May 1989. After meeting with the petitioner, she reviewed his social history, as well as his school records, prison records, and records from the Middle Tennessee Mental Health Institute which were provided by defense counsel. Her diagnosis of the petitioner was paranoid personality disorder and dystonia, which is depression.

Dr. Auble said that she did not have enough time prior to the resentencing hearing to develop a trusting relationship with the petitioner. She said she was only given a little over a month to work on the petitioner's case but that, in general, three to four months was optimal, depending on the case. It would have been helpful to have had

the petitioner evaluated by an expert in chemical dependency and to have had more information about his social history. She acknowledged that, at the time of resentencing, she knew little about the petitioner's alcohol abuse or the sexual abuse in his family. She testified that Steve Stack "didn't seem very confident in his own abilities," and she believed defense counsel did not have much understanding of the mental health issues in the case.

On cross-examination, Dr. Auble acknowledged that she knew the petitioner's parents drank when they were not at work, suspected that he had suffered physical abuse, and knew that he abused alcohol and drugs. She said she was not aware of the alcoholism in the petitioner's family or of the extent of the abuse suffered by the Hines children. She believed her diagnosis of the petitioner's emotional problems, of which she testified at the resentencing hearing, was correct. She said that she would liked to have referred the petitioner to an expert on the issue of addiction, such an expert being needed to determine the extent and nature of the alcoholism and drug abuse and the effects these had on the petitioner. She explained that the combination of the history of addiction in the petitioner's family that she now had knowledge of, together with his relatively normal neuropsychological testing, raised the issue that the petitioner may have a "chemical lack of neurotransmitter substance." Dr. Auble said that this was one area of her testimony that would have been different had she had additional time to work on the petitioner's case.

Dr. Ann Marie Charvat, a sociologist and a mitigation specialist, also testified at the petitioner's resentencing hearing and again at the post-conviction hearing, the former being the first capital case on which she had worked. Her first involvement with the petitioner's case was on May 10, 1989, "just a matter of days" after receiving her PhD. Dr. Charvat interviewed the petitioner, several of his family members, and several of his friends prior to the resentencing. She did not obtain any medical records on any of the family members. The petitioner told Dr. Charvat about the physical abuse he and his sisters endured, and she learned of the petitioner's alcohol and drug abuse. Dr. Charvat was not told about the sexual abuse, but she suspected that it had occurred. She said that information about the sexual abuse and the fact that the petitioner tried to be his sisters' protector were important for purposes of mitigation. Asked if she had overlooked anything in her evaluation of the petitioner, Dr. Charvat said that she had "failed to look at certain factors ... which include family history, medical records.... I would have collected more records. I believe that I did identify that his bond to society had suffered. I failed to tie it to the crime. There are a number of things to investigate that ... I hadn't."

Dr. Charvat testified, as she had done at resentencing, regarding the petitioner's confinement at Green River Boys Camp in Kentucky, where a method of behavior modification known as grouping was used. The groupings often became physically and verbally abusive. She explained that the bad behavior of one boy in the group

caused the entire group to lose privileges. Dr. Charvat testified at resentencing about one incident at Green River where the petitioner and another boy were pushed into sewage. She said that she was aware in 1989, the time of resentencing, that programs using grouping had extensive problems and that there was literature available on this issue. She explained that although the activities and potential abuse at Green River, as they related to the petitioner, could have been extremely important for mitigation purposes, she did not have enough time to further develop those issues.

Dr. Charvat said that she still agreed with the sociological conclusions that were presented to the jury at the resentencing. She believed the weakness was in the way they were presented to the jury and said that "there were many parts of [her testimony] that ... were not well articulated, not clear." It was also her opinion that the petitioner's background was not adequately distinguished from that of any other unruly child.

Dr. William Kenner, a psychiatrist, testified that the petitioner suffered from post-traumatic stress disorder ("PTSD"), antisocial personality disorder, status post-head injury, and inhalant abuse. He said that the petitioner was sexually abused by both his stepfather and a maternal uncle and physically abused by his stepfather, opining that the abuse caused the petitioner's PTSD. The physical abuse inflicted upon the petitioner by his stepfather included hitting him in the head with a tobacco stick, whipping him with car radio antennas, throwing him into a pond although he could not swim, and shooting the family dog and her puppies in front of him and his siblings. The petitioner's mother was also a victim of Bill Hines's abuse, and the petitioner often tried to protect her. At the age of eight or nine, the petitioner sustained a head injury when he fell off a wagon of hay and was knocked unconscious. The petitioner did not receive any medical treatment for this injury.

Explaining how PTSD affects the brain, Dr. Kenner said that a person with PTSD repeats or replays traumatic events throughout life and that PTSD can alter a person's character and change his or her behavior. Dr. Kenner testified that in the petitioner, PTSD created a paranoid quality. Dr. Kenner opined that the head injuries the petitioner suffered throughout his life could have caused organic personality syndrome, which made him even more volatile and difficult to manage. The petitioner's abuse of inhalants such as glue and gasoline also caused damage to his brain. Dr. Kenner concluded that the petitioner's choosing a woman for his victim was inconsistent with the petitioner's personal history, as there was no indication that he had hard feelings toward women.

On cross-examination, Dr. Kenner acknowledged that the petitioner had been in and out of jail since the age of fifteen. He further acknowledged that a report prepared by the Middle Tennessee Health Institute and the Harriet Comb Mental Health Center indicated that the petitioner experienced difficulty in relationships with women, as

the result of problems with girlfriends and family interference, exhibited a preoccupation with thoughts of violence, and displayed extreme prejudice toward African–Americans. Additionally, a report prepared by the Tennessee Department of Correction stated that the petitioner, once confined on death row, acknowledged to security personnel that he hated both women and African–Americans. Dr. Kenner testified that although the petitioner said that he hated women, he did not believe him because his behavior indicated differently. He said he had much more information concerning the petitioner than Dr. Charvat did prior to preparing her report for the resentencing. He believed that Dr. Charvat should have interviewed the petitioner's sisters and mother in order to get a true picture of "how bad things were for [the petitioner] growing up."

Dr. Murry Wilton Smith, a specialist in addiction medicine, testified that the petitioner is a Type II alcoholic. He explained that Type II alcoholism, a primary medical illness based in brain chemistry, is inherited and involves rapid early onset of alcoholism, usually between the ages of nine and twelve, and is associated with antisocial behavior and early legal trouble. Dr. Smith also testified that the petitioner had used inhalant solvents and marijuana. He was aware of the petitioner's low levels of serotonin, which is associated with violent behavior and Type II alcoholism. He said that current treatment for Type II alcoholism, which was not available in 1989, consisted of alcohol and drug treatment, intensive physiotherapy with a counselor, and medication to improve the serotonin level. On recross examination, Dr. Smith acknowledged that although medications to increase serotonin levels were available in 1986, there was not a routine to monitor. He also stated that a characteristic of Type II alcoholics is a lack of motivation to follow instructions or a schedule.

Dr. Paul Rossby, an expert in molecular neurobiology and the study of serotonin, testified that, as a molecular biologist, he studies the chemistry of the brain and the biological basis of behavior. According to Dr. Rossby, serotonin blocks pain and orchestrates inhibition within the brain. Dr. Rossby testified that research of serotonin dated back to at least the 1970s. He further said that there would have been a "tremendous amount" of literature available on serotonin at the time of the petitioner's resentencing in 1989 and a "great deal" of literature available at the time of the petitioner's trial in 1986. He said that low levels of serotonin have been associated with impulsive behavior, but none of the studies has indicated that it causes violence.

Dr. Rossby had a spinal tap performed on the petitioner to determine his serotonin levels, which were "at the extreme low level" of the normal male population. He opined that the petitioner's serotonin levels, coupled with his Type II alcoholism, resulted in the petitioner's being organically impaired and said that the petitioner does not have the biological capacity to control his impulsive behavior. Dr. Rossby said that in a person with low levels of serotonin, once an impulse is triggered, there is no

ability to control the impulse. He acknowledged that he did not testify on the issue of serotonin levels until 1999. He first worked on a case involving a serotonin defense in approximately 1992, and was not aware of any expert who had testified on the issue of serotonin prior to the time he was involved with his first case.

Dr. Henry Cellini, an educational psychologist who was offered as a rebuttal witness on behalf of the State, testified that serotonin research began in the 1970s but had only been fully developed in the last fifteen to twenty years. With regard to the petitioner's case, Dr. Cellini testified that the practical application of serotonin levels to behavior was in its "infancy" in the mid–1980s. He said that research indicates that the two primary factors of antisocial personality disorder are impulsive aggression and psychopathic tendencies or thinking.

Two witnesses were presented as to the claims regarding the Green River Boys Camp in Kentucky and its alleged effects on the petitioner. Tammy Kennedy, an investigator with the post-conviction defender's office, said that she interviewed former residents and staff members. The former residents told her that, when they arrived at camp, they were immediately subjected to grouping, which consisted of several boys surrounding the new resident and physically and verbally abusing him. She said that the former residents told her at times they had sewage detail, which involved two boys holding a resident by the legs and dumping him into the sewage. They were forced to scrub the pavement until their brushes were gone and their hands were blistered. A juvenile specialist who had visited Green River advised Ms. Kennedy that schooling was minimal and that there were reports of physical, sexual, and verbal abuse of the residents. Ms. Kennedy said that several other death row inmates were former residents of Green River.

Dr. David Richart, an expert in the operation of the juvenile justice system and residential treatment facilities in Kentucky, testified that he had investigated Green River in connection with his position as the Executive Director of Kentucky Youth Advocates, Inc. He said that the theory behind creating the juvenile camps was to take youthful offenders out of large, training school facilities and place them in smaller, community-like settings where they would both work and receive therapy consisting of guided group interaction, positive peer culture, and reality therapy. These theories of treatment were based on the fact that juveniles who committed crimes did so for peer-related reasons. The purpose of the therapy was "to turn something negative into something positive ." However, problems arose when the state reduced the number of employees, which resulted in the staff allowing the residents to discipline themselves. Dr. Richart's investigation also revealed that the staff had not received the essential training required for this type of "sophisticated treatment."

Dr. Richart testified that new residents at Green River were first greeted by a group

of fifty to sixty boys who encircled the new resident, screaming at and intimidating him. Because the group would surround the new resident so tightly that the staff could not see "what was going on below shoulder height," the new resident was often physically assaulted as well. Dr. Richart explained that residents at Green River were subjected to "grouping" for simple reasons, such as not having a good opinion of themselves or taking an extra packet of sugar at lunch. After becoming convinced that the residents were being harmed "as a result of using these very controversial emotionally and psychologically harassing techniques," Dr. Richart became concerned about the youths' psychological state and the damage that might occur. He recalled having to transport some youths to mental institutions because they experienced "psychotic breaks" while at camp. Dr. Richart said that Green River had compounded the youths' feelings of isolation and had done nothing to contribute to pro-social behavior, and he was not surprised to learn that many of them subsequently went to prison.

In Dr. Richart's opinion, the petitioner's six and one-half months at Green River intensified his criminal tendencies, exacerbated his antisocial tendencies, and made him see the world as a hostile place. Dr. Richart also believed that the petitioner was completely inappropriate for grouping, "because he just wasn't the kind of person that wanted to talk about his family." Referring to the treatment at Green River as "psychological torture," Dr. Richart opined that it was "probably the worst experience of [the petitioner's] life."

On cross-examination, Dr. Richart acknowledged that some juveniles may have benefitted from Green River and that residents, including the petitioner who had a substance abuse problem prior to going to Green River, would not have had access to drugs or alcohol while there. Dr. Richart read into evidence some of the staff's reports on the petitioner, which characterized him as easily agitated and having a bad temper but also as a capable person, a good worker, and "fairly consistent in his supportive leadership in the group."

Id. at * 8, 9, 14-18.

On the post conviction appeal, the Tennessee appellate court addressed the proof at resentencing and determined the following:

The petitioner argues that counsel should have called his family members to testify regarding the physical, sexual, and emotional abuse he suffered. Counsel did not call family members as witnesses at resentencing, presenting mitigation proof of the petitioner's abuse through two experts. The petitioner further contends that additional experts should have been employed, and additional proof regarding his treatment at Green River Boys Camp should have been presented. The post-conviction court

noted that the detailed mitigation evidence presented at the post-conviction hearing was prepared by two attorneys, three investigators, and several medical experts over a three-year period, stating that that period of time was "far in excess of the time which would have been allowed to prepare for even a capital trial." The court found the additional mitigation proof of the petitioner's family background and abuse, presented at the post-conviction hearing, was essentially the same as that presented at the resentencing, simply more in-depth. Accordingly, the court determined that even with the additional mitigation proof, the aggravating circumstances would have continued to outweigh the mitigating circumstances.

This court has stated that "[a]n investigation so inadequate as to fail to formulate an 'accurate life profile' of the defendant may be the basis for post-conviction relief. Yet the extent of investigation required is largely dependent upon information supplied by the defendant." Bates v. State, 973 S.W.2d 615, 633 (Tenn. Crim. App.1997) (citing Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir.1995); Burger v. Kemp, 483 U.S. 776, 795, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987)).

In Goad v. State, 938 S.W.2d 363 (Tenn.1996), our supreme court set out the relevant factors to consider when determining if prejudice had resulted from a trial attorney's failure to present mitigating evidence during the penalty phase of a capital trial. There, the court found that counsel's failure to investigate, explore, and prepare the proposed mitigating evidence was not " 'the result of reasonable professional judgment' and 'fell outside the wide range of professionally competent assistance.'" Id. at 371. If counsel's performance is deficient, the court must next determine if the petitioner has discharged the duty of proving that prejudice resulted from counsel's performance. Id. The court explained how this determination is made:

> [If the] alleged prejudice under Strickland involves counsel's failure to present mitigating evidence in the penalty phase of a capital trial, several factors are significant. First, courts have analyzed the nature and extent of the mitigating evidence that was available but not presented. Second, courts have considered whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings. Finally, the courts have considered whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination.

Id. (citations omitted).

In the present appeal, the post-conviction court found that counsel were not deficient in their representation of the petitioner, saying that "[i]n view of the overwhelming strength of the aggravating factors in Petitioner's case ... the mitigating factors would

not have affected the jury's determination. The jury would be required by logic and common sense to find that the aggravating circumstances outweighed the effect of the mitigating factors beyond a reasonable doubt." Accordingly, under the principles enunciated in Goad, the post-conviction court found that the petitioner was not prejudiced by the fact that counsel at the sentencing hearing had not presented mitigating evidence in the detail that was done at the post-conviction hearing. We conclude that the record supports this determination.FN2

> FN2. As supplemental authority, the petitioner relies on Wiggins v. Smith, 539 U.S. 510, 516, 123 S.Ct. 2527, 2532, 156 L.Ed.2d 471 (2003), where the petitioner had sought post-conviction relief from his capital conviction, alleging that trial counsel "had rendered constitutionally defective assistance by failing to investigate and present mitigating evidence of his dysfunctional background." Trial counsel utilized the defense that another person had killed the victim and did not present evidence they had showing the petitioner's "limited intellectual capacities and childlike emotional state ... and the absence of aggressive patterns in his behavior, his capacity for empathy, and his desire to function in the world[.]" Id. Counsel elected not to use specific information that the petitioner and his siblings were left "home alone for days, forcing them to beg for food and to eat paint chips and garbage," and that he had been "gang-raped" on more than one occasion. Id., 539 U.S. at 516–17, 123 S.Ct. at 2533. The court determined that trial counsel's decision not to utilize background information was one which "did not reflect reasonable professional judgment" and that the petitioner had been prejudiced as a result, there being a reasonable probability that the jury would have returned with a different sentence, had they known this information. Id., 539 U.S. at 534, 123 S.Ct. at 2541–42. In the present appeal, trial counsel presented substantial evidence at the sentencing hearing, although not to the extent that was done at the post-conviction hearing. We find that Wiggins is not applicable.

### b. Serotonin Defense

The petitioner contends that resentencing counsel were ineffective for failing to present evidence of his serotonin deficiency. As to this claim, the post-conviction court determined that, based upon the testimony of the witnesses at the hearing, the serotonin evidence was not reasonably available to the petitioner's resentencing counsel, since it was not known to them and could not have been discovered by the exercise of reasonable diligence.

Dr. Rossby acknowledged that he did not work on developing this issue in a criminal case until approximately 1992, three years after the petitioner's resentencing trial. Further, he said that he did not actually testify on the issue of serotonin until 1999,

ten years after the petitioner's resentencing trial, and he knew of no one who had testified on this issue prior to that. As the post-conviction court stated: "Petitioner's counsel at re-sentencing could not reasonably have been expected to search for experts on a subject which they did not know existed." The record supports this conclusion.

## C. Heinous, Atrocious, and Cruel Aggravating Circumstance

The petitioner argues that counsel were ineffective at resentencing because they did not challenge the testimony of Dr. Charles Harlan regarding the length of time the victim was conscious and could have lived or experienced pain following the stabbing. At resentencing, the petitioner offered the testimony of Dr. Chris Sperry who disagreed with Dr. Harlan's testimony regarding the victim's consciousness and amount of time she could have survived following the wound to the heart. Dr. Sperry opined that the victim would have been conscious only fifteen to thirty seconds following the stab wound to the heart, as opposed to Dr. Harlan's testimony that the victim lived four to five minutes following the wound to the heart and would have been conscious approximately 80% of that time.

The post-conviction court found counsel were deficient in failing to investigate and introduce testimony to refute Dr. Harlan's conclusions, determining, however, that the petitioner was not prejudiced by the lack of such testimony. The court found that the jury would have been much more persuaded by the testimony of the pathologist who performed the autopsy, as opposed to one who drew conclusions from the autopsy report and photographs. Accordingly, the court concluded that the testimony of Dr. Sperry would not have resulted in reasonable doubt that the victim was conscious during the apparently final wound to the vagina, both pathologists concluding that this wound occurred at or shortly after the time of death. Moreover, the court determined that even if the jury did have reasonable doubt in this regard and did not find this aggravating factor applied, the remaining two aggravating factors were still strong enough to outweigh the mitigating factors as presented at the post-conviction hearing.

As to this issue, the State also argued that even if the victim were unconscious at the time the vaginal wound was inflicted, the jury could have found that the nature and infliction of that wound constituted depravity of mind and that the depraved state of mind of the petitioner existed at the time the fatal blows were inflicted upon the victim. Our supreme court has held that depravity of mind of the murderer may be inferred from acts committed at or shortly after the time of death. See State v. Williams, 690 S.W.2d 517, 529–30 (Tenn.1985). The court explained that the nature of injuries to a victim may constitute depravity of mind under the holding in Williams:

> The willful insertion of a sharp instrument into the vaginal cavity of a dying woman (or a woman who had just died) satisfies the requirements of Williams, supra. If committed prior to death, these acts constitute torture and thereby also support a finding of depravity. If they occurred close in time to the victim's death, they allow the drawing of an inference of the depraved state of mind of the murderer at the time the fatal blows were inflicted on the victim.

Hines, 919 S.W.2d at 581. We conclude that the record supports the findings of the post-conviction court as to this issue.

Id. at *31-33

The prevailing constitutional requirement is that counsel who presents a defendant facing a death sentence, must "conduct a thorough investigation of the defendant's background." Williams, 529 U.S. at 396. The rationale is that "[e]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that Defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse . . ." Wiggins v. Smith, 539 U.S. 510, 535 (2003) (quoting Penry v. Lynaugh, 492 U.S. 302, 319 (1989) (internal quotation marks omitted)).

In Wiggins, the Supreme Court adopted the American Bar Association's 1989 standards for death penalty cases and stated that for mitigation evidence, counsel's duty is "to discover all reasonably available mitigating evidence," including, "medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." 539 U.S. at 524 (quoting ABA guidelines for Appointment and Performance of Counsel on Death Penalty Cases 11.4.1(C), 11.8.6 (1989) (emphasis omitted)). Where appropriate, this inquiry should include the Defendant's potential brain damage. Skaggs, 235 F.3d at 266-75. Although Wiggins adopted the 1989 ABA standards, in 1975,

the Tennessee Supreme Court adopted the earlier ABA standards. Baxter v. Rose, 523 S.W.2d 930, 939 (Tenn. 1975).

The Sixth Circuit held that "when a client faces the prospect of being put to death unless counsel obtains and presents something in mitigation, minimal standards require some investigation." Mapes v. Coyle, 171 F.3d 408, 426 (6th Cir. 1999) (emphasis on original); see also Austin v. Bell, 126 F.3d 843, 848-49 (6th Cir. 1997). This duty of inquiry now applies notwithstanding the defendant's preference or his family's information. Rompilla v. Beard, 545 U.S. 374, 377 (2005); Coleman v. Mitchell, 268 F.3d 417, 449-50 (6th Cir. 2001). For example, once counsel is aware that the defendant has a mental illness, and despite competency evaluations, where counsel, "declined to seek the assistance of a mental health expert or conduct a thorough investigation of [the defendant's] mental health," counsel's performance in a death penalty case was held to be constitutionally insufficient. Harries v. Bell, 417 F.3d 631, 638 (6th Cir. 2005). Likewise, counsel's failure to "adequately investigate [the defendant's] . . . troubled childhood" can be deficient performance and prejudicial. Id. at 638-641. As the Sixth Circuit has stated, "[o]ur circuit's precedent has distinguished between counsel's *complete* failure to conduct a mitigation investigation, where we are likely to find deficient performance, and counsel's failure to conduct an *adequate* investigation, where the presumption of reasonable performance is more difficult to overcome." Beuke v. Houk, 537 F.3d 618, 643 (6th Cir. 2008) (emphasis in original) (citing Campbell v. Coyle, 260 F.3d 531, 552 (6th Cir.2001), & Moore v. Parker, 425 F.3d 250, 255 (6th Cir.2005)).

As to judicial deference to Petitioner's trial counsel's strategic choices, Wiggins notes that "'strategic choices made after less than complete investigations are reasonable precisely to the extent

94

that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" 539 U.S. at 521 (citation omitted). Where the issue involves mitigation evidence in a death penalty case, the test to award habeas relief was stated as follows: "although we suppose it is possible that a jury could have heard [the mitigation evidence] and still have decided on the death penalty, that is not the test. . . . [T]he likelihood of a different result if the evidence had gone in is "'sufficient to undermine confidence in the outcome' actually reached." Rompilla, 545 U.S. at 393 (citations omitted).

Here, the State court considered the relevant Supreme Court decisions of Wiggins and Burger as well as federal circuit decisions on the applicable principles on counsel's obligations for a death sentence hearing. In reviewing the evidence at the resentencing hearing, two experts, Drs. Auble and Charvat, testified as to Petitioner's family history, troubled childhood, his father's abandonment of him, his mother's alcohol problem, Petitioner's abuse of alcohol, glue and gasoline, as well as his self-destructive behavior. Dr. Auble, a clinical psychologist, described Petitioner's paranoid personality disorder and dysthymia, or chronic depression. In Dr. Auble's view, Petitioner suppressed his feelings until those feelings "boiled up" after turbulent visits with his parents and girlfriend shortly before the murder. Dr. Auble opined that Petitioner was under stress when he killed the victim. Dr. Charvat, a sociologist, described the damaging effects of Petitioner's childhood experiences. To be sure, the expert testimony at the post conviction hearing was more extensive, but those opinions were consistent with the expert opinions at the resentencing and post conviction hearings. The Tennessee appellate court affirmed the trial court's findings that "the additional mitigation proof of the Petitioner's family background and abuse, presented at the post-

conviction hearing, was essentially the same as that presented at the resentencing, simply more in-depth. Accordingly, the court determined that even with the additional mitigation proof, the aggravating circumstances would have continued to outweigh the mitigating circumstances." Hines, 2004 WL 1567120 at *31.

Moreover, whatever the deficiencies of counsel at the resentencing hearing, the post conviction hearing present additional expert proof and afforded the state courts yet an additional opportunity to evaluate the appropriateness of Petitioner's death sentence. The state courts deemed the Petitioner's extensive mitigation evidence not to outweigh the State's other proof of aggravating circumstances of the wounds. The victim's wounds, Petitioner's escape and possession of the victim's vehicle and key, Petitioner's explanation of events to his sister and the Petitioner's statements to officers that he could provide all the details of the murder lead this Court to conclude that the state courts' decisions on the adequacy of counsel's performance at sentencing would not have caused a different result and those decisions were reasonable applications of clearly established federal law.

### c. Aggravating Circumstances Claims

In the first of these claims, Petitioner contends that the application of the felony murder as an aggravating circumstance violated his constitutional rights because he was also convicted of felony murder. (Docket Entry No. 23-1 at ¶ 15). In a related claim, Petitioner cites the State's alternative reliance on the "Heinous, Atrocious or Cruel" aggravating factor to uphold his death sentence. Id at ¶ 16. Other related claims are that the Petitioner's prior felony for assault that was used as an aggravating circumstance is based upon an invalid guilty plea and that the jury was improperly instructed that all jurors must agree as to a mitigating circumstance in order to consider

it. Id. at ¶¶ 17,18. Respondent contends that the actual jury instruction does not support this contention, and instead reflects only that aggravating circumstances be found "unanimously."

In Petitioner's direct appeal, the Tennessee Supreme Court reversed and remanded the sentencing issue "for a new trial respecting the imposition of punishment only" citng the lack of proper instructions on the aggravating circumstance under Tennessee law. Hines, 758 S.W.2d at 524. The district court stated:

> It is insisted the death penalty cannot stand because the trial judge failed to fully instruct the jury on the aggravating circumstances of "committing a felony," "torture and depravity of mind" as required by law. In State v. Williams, 690 S.W.2d 517 (Tenn.1985), this Court mandated that at a capital sentencing proceeding a jury must be instructed as to the statutory definition of any felony relied upon by the State as an aggravating circumstance under T.C.A. § 39–2–203(i)(7) FN1 and that a jury must be fully instructed as to the meaning of the terms "heinous," "atrocious," "cruel," "torture," or "depravity of mind" as those words are used in the aggravating circumstance set forth in T.C.A. § 39–2–203(i)(5).FN2 This Court concluded that
>
> > FN1. T.C.A. § 39–2–302(i)(7) reads:
> > The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb;
> >
> > FN2. T.C.A. § 39–2–203(i)(5) reads:
> > The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind;
> >
> > [u]nless a jury is instructed as required ..., its imposition of the death penalty cannot stand.
>
> * * *
>
> > ... Without such instructions we have a "basically uninstructed jury," as stated by the Supreme Court in Godfrey [ v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) ]. Such a jury cannot lawfully impose the death penalty.

690 S.W.2d at 533.FN3

FN3. See also the recent decision of <u>Maynard v. Cartwright</u>, 486 U.S. 356, ——, 108 S.Ct. 1853, 1858, 100 L.Ed.2d 372 (1988), wherein the Court noted that Eighth Amendment claims "characteristically assert that the challenged provision fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion which was held invalid in <u>Furman v. Georgia</u>, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)."

In the present case, which was tried eight months after the decision in <u>Williams</u> was released, the State relied upon four aggravating circumstances and the jury was instructed as follows:

(1) The defendant was previously convicted of one or more felonies, other than the present charge, which involved the use or threat of violence to the person. [§ 39–2–203(i)(2)]

(2) The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. [§ 39–2–203(i)(5)]

(3) The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any rape, robbery or larceny. [§ 39–2–203(i)(7)]

(4) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another. [§ 39–2–203(i)(6)]

The jury returned a verdict unanimously finding the first three listed aggravating circumstances and that the punishment should be death.

It is clear that the trial court's instruction was inadequate under <u>Williams</u>. First of all, the court's instructions did not include any definition of the terms "heinous," "atrocious," "cruel," "torture" or "depravity of mind." Second, the court failed to define at sentencing any of the three felonies relied upon by the State in establishing the third aggravating circumstance.

Such failures have not always proven reversible error in the decisions this Court has rendered after <u>Williams</u>. For example, <u>State v. Claybrook</u>, 736 S.W.2d 95 (Tenn.1987); <u>State v. King</u>, 718 S.W.2d 241 (Tenn.1986); <u>State v. O'Guinn</u>, 709 S.W.2d 561 (Tenn.1986); and <u>State v. Duncan</u>, 698 S.W.2d 63 (1985), were all cases in which the trial court failed to define the terms used in T.C.A. § 39–2–203(i)(5) and

in which this Court found no reversible error since the evidence clearly supported this aggravating circumstance and the other aggravating circumstances found by the jury were correctly charged and supported by the evidence. A crucial factor in all these cases, however, was that in each the trial had occurred before Williams, and this Court had held that the instructional requirement in Williams was not retroactive. State v. O'Guinn, supra, 709 S.W.2d at 568. This was consistent with this Court's prior holding, reiterated in Williams itself, 690 S.W.2d at 533, that the aggravating circumstance set out in T.C.A. § 39–2–203(i)(5) was not unconstitutionally vague and overbroad under Godfrey v. Georgia. See, e.g., State v. Melson, 638 S.W.2d 342, 367 (Tenn.1982); State v. Pritchett, 621 S.W.2d 127, 137–139 (Tenn.1981); State v. Groseclose, 615 S.W.2d 142, 151 (Tenn.1981). In these earlier decisions this Court thoroughly reviewed the evidence to assure that it supported the jury's finding as to this aggravating circumstance. It is also notable that in Claybrook, Duncan and O'Guinn, the defendant had not objected to the pre- Williams instruction and that in King, supra the defendant had only sought an instruction as to the definition of "torture".

In State v. Porterfield, 746 S.W.2d 441, 451 (Tenn.1988), a case, like the present one tried eight months after the Williams decision was released, this Court found that the defendant was not prejudiced by the trial court's failure to give the definitions of the terms "heinous," "atrocious," and "cruel" exactly as set out in Williams or to define "torture" or "depravity of mind" for the jury. After examining the definitions that the trial court had given, this Court stated:

> It would have been better had the trial judge used the definitions set out in State v. Williams, 690 S.W.2d 517, 533 (Tenn.1985), as they have been approved by this court. However, the definitions given were in our opinion adequate. Further, we find no prejudicial error in the trial court's failure to define the terms "torture" or "depravity of mind." The evidence in this case supports the aggravating circumstance, Tenn. Code Ann., § 39–2–203(i)(5), as defined in State v. Williams, supra, as the defendant repeatedly struck the victim with a tire iron, inflicting horrible head wounds. Furthermore, the remaining two aggravating circumstances were correctly charged and are supported by the evidence.

746 S.W.2d at 451.

In State v. Carter, 714 S.W.2d 241 (Tenn.1986), this Court also did not find harmful error in the trial court's failure to instruct the jury properly under Williams on the aggravating circumstance in T.C.A. § 39–2–203(i)(7). The trial in Carter had occurred in November 1984. While this was before Williams was released, it was after this Court's directive in State v. Moore, 614 S.W.2d 348, 350–351 (Tenn. 1981),

that trial judges "should regularly" include in their instructions to the jury the statutory definition of any felony relied on by the State as an aggravating circumstance. The Court noted that

> We recently held in State v. Williams, 690 S.W.2d 517 (Tenn.1985), that it was error to fail to give the statutory definition of the felonies which the jury was asked to consider in determining whether it should find the existence of the aggravating circumstance defined in T.C.A. § 39–2–203(i)(7). The felony involved in Williams was robbery and the opinion is silent as to whether the statutory definition of robbery was given during the guilt phase.
>
> In this case the jury had been given the statutory definition of larceny, robbery and kidnapping the day before they retired at 9:37 a.m. to consider the punishment. We think it is significant that they eliminated robbery from their finding of aggravated circumstances under T.C.A. § 39–2–203(i)(7). The definition of that crime includes the element of forcible taking from the person of the victim. The proof in this case was that the victim's wallet was found on his person with cash undisturbed and in addition cash was found clipped to a clipboard in the seat of the pick-up truck. Price testified that defendant took nothing from the person of Lile after killing him and before throwing him over the cliff. This demonstrates that the jury had clearly in mind the elements necessary to convict of the crime of the felony of robbery and quite properly declined to include it. It was patently obvious that defendant was guilty of the larceny of Lile's truck and kidnapping him from the Interstate 81 rest stop. We find this situation distinguishable from Williams and harmless.

714 S.W.2d at 250.

The present case is distinguishable from these earlier cases. First, and most obviously, the trial occurred several months after the Williams rule was announced. This Court's decisions in Duncan, O'Guinn, King, and Claybrook are thus inapposite in the present case. Unlike in Porterfield and Carter, the trial court here has erred in failing to instruct the jury fully on both the aggravating circumstances involved in Williams. Also unlike Porterfield, where two of the three aggravating circumstances were correctly charged, here there was plain error patently contradictory to this Court's clear mandate in Williams in charging two of the three aggravating circumstances found. Such cumulative error injects an undue degree of unreliability into the sentencing procedure where the jury must weigh all aggravating and mitigating factors. See State v. Pritchett, supra, 621 S.W.2d at 139; State v. Moore, supra, 614 S.W.2d at 352. Compare State v. Laney, 654 S.W.2d 383, 388

(Tenn.1983). In Porterfield the defendant presented no proof as to mitigating circumstances.

In Williams the Court also made it clear that the evil it sought to avoid by mandating these instructions was that of "a basically uninstructed jury" and the attending risk of arbitrary and capricious sentencing. See also State v. Laney, supra, 654 S.W.2d at 388 ("The absence of proper legal guidance [at capital sentencing] invites ... a certain degree of capriciousness in the deliberation.") In Porterfield the trial court had adequately instructed the jury as to the most ambiguous terms in T.C.A. § 39–2–203(i)(5). In Carter the jury had been instructed at the guilt hearing as to the elements of the felonies relied upon by the State; and its verdict, selectively omitting certain of these felonies, revealed that, contrary to being uninstructed, the jury "had clearly in mind the elements necessary to convict" on one of these felonies. In the present case there was neither substantial compliance with Williams nor a verdict clearly showing that the jury understood the elements of the felonies it found supporting T.C.A. § 39–2–203(i)(7). Also, unlike Carter, only one of the felonies found by the jury had been instructed at the guilt hearing. The jury was thus never told the legal definition of larceny and rape, two offenses even those trained in the law may at time have difficulty defining. See, e.g., State v. Brobeck, 751 S.W.2d 828 (Tenn.1988) (addressing the issue of whether a dead person may be raped, a factual issue raised by the proof in the present case).

Again, it may be pointed out that the juries in other cases where the Court has not found reversible error under Williams had also been correctly instructed as to all other aggravating circumstances involved. In the present case the jury was correctly instructed only as to one of the aggravating circumstances it found.

On the other hand, this case is distinguishable from Williams by the fact that the evidence here fully supports the aggravating circumstances found by the jury. In Williams the proof did not support the aggravating circumstance in T.C.A. § 39–2–203(i)(5) and two of the three felonies found by the jury under T.C.A. § 39–2–203(i)(7). Furthermore, there is no mention in Williams of whether the jury was ever instructed at the guilt phase as to the felonies found by the jury at sentencing. The jury in the present case was, as noted earlier, instructed only on the elements of robbery at the guilt phase. In Williams also both aggravating circumstances found by the jury were incorrectly instructed. Here one of the three aggravating circumstances found was correctly instructed. Thus in Williams there was no valid aggravating circumstance upon which a sentence of death could be based.

Although language in Williams at first suggests that any failure to comply with its holding cannot be considered harmless, Porterfield reveals that this Court has not taken this approach. To the extent that the failure to give the instruction mandated by

Williams is constitutional error in that it results in the "standardless and unchanneled imposition of death sentences in the uncontrolled discretion of a basically uninstructed jury," 690 S.W.2d at 532 quoting Godfrey v. Georgia, supra, 100 S.Ct. at 1765, the standard for determining harmless error is whether the error committed is harmless beyond a reasonable doubt. Satterwhite v. Texas, 486 U.S. ——, 108 S.Ct. 1792, 1797, 100 L.Ed.2d 284 (1988); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); see also People v. Odle, 45 Cal.3d 386, 247 Cal.Rptr. 137, 151–155, 754 P.2d 184, 197–201 (1988) (discussing the harmless error doctrine as applied to instructional error in capital sentencing and anticipating the rule that the United States Supreme Court will adopt). Despite the strong proof of the aggravating circumstances shown here, it is difficult to say that this standard has been met. To the extent that the rule in Williams is procedural, mandated by this Court acting in its supervisory capacity to assure objective and reliable sentencing in capital cases, it is difficult to ignore the obvious failure of the trial court to follow the clear commands of this Court; nor can it be said, where as here there was evidence of both aggravating and mitigating circumstances, that the defendant clearly was not prejudiced by leaving the jury uninstructed, particularly as to the felonies of rape and larceny.

> FN4. In the present case the defendant did not object to the trial court's failure to charge as required in Williams and did not call this error to the judge's attention. Such failure may be a factor in considering whether reversible error has occurred but is not always fatal to appellate review in cases where the defendant is under sentence of death. See State v. Duncan, supra, 698 S.W.2d at 67–68.

We are of the opinion that this case should be remanded for two reasons. First, the jury did find two felonies supporting the death penalty, the elements of which it had no way of knowing. This indicates a degree of "sheer speculation" and unguided discretion prohibited by Godfrey v. Georgia, supra, and Eighth Amendment jurisprudence. As the United States Supreme Court has stated in the recent case of Mills v. Maryland, 486 U.S. 367, —— n. 10, 108 S.Ct. 1860, 1867 n. 10, 100 L.Ed.2d 384 (1988), "While juries indeed may be capable of understanding the issues posed in capital-sentencing proceedings, they must first be properly instructed." The jury here was not properly instructed. Second, this case represents a clear and inexcusable violation of Williams. We cannot say that the error committed is harmless beyond a reasonable doubt. Accordingly, the judgment of the trial judge sustaining the defendant's conviction of first degree murder is affirmed but the verdict and sentence imposing the death penalty is set aside and this cause is remanded to the trial court for a new trial respecting the imposition of punishment only.

758 S.W.2d at 521-24.

Felony murder constitutes a "proper and permissible narrowing factor at the eligibility stage." Coe v. Bell, 161 F.3d 320, 350 (6th Cir. 1998) (citing Tison v. Arizona, 481 U.S. 137 (1987)). A narrowing construction need only occur at one of the two stages and there is no double-counting. Bell v. Cone, 543 U.S. 447, 448-49, 455-57 (2005); see also, Blystone v. Pennsylvania, 494 U.S. 299, 306–07 (1990) (where the Supreme Court stated:

> At sentencing, petitioner's jury found one aggravating circumstance present in this case—that petitioner committed a killing while in the perpetration of a robbery. No mitigating circumstances were found. Petitioner contends that the mandatory imposition of death in this situation violates the Eighth Amendment requirement of individualized sentencing since the jury was precluded from considering whether the severity of his aggravating circumstance warranted the death sentence. We reject this argument. The presence of aggravating circumstances serves the purpose of limiting the class of death-eligible defendants, and the Eighth Amendment does not require that these aggravating circumstances be further refined or weighed by a jury. See Lowenfield v. Phelps, 484 U.S. 231, 244 (1988) ("The use of 'aggravating circumstances' is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion") The requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence.

Id. at 306-07 (footnotes omitted).

As the Sixth Circuit stated, citing Supreme Court precedent, "it is acceptable for a first-degree murder conviction to be based on two alternative theories even if there is no basis to conclude which one (if only one) the jury used." Coe, 161 F.3d at 348 (citing Schad v. Arizona, 501 U.S. 624, 636–37 (1991)).

For the Tennessee Supreme Court, the basis for Petitioner's death sentence was "torture" reflected in Petitioner's "willful insertion of a sharp instrument into the vaginal cavity of a dying woman (or a woman who had just died) satisfies the requirements" qualifying as torture or depravity of the mind. Hines, 919 S.W2d at 581. Thus, this Court concludes that Petitioner's aggravating

circumstances claim was reasonably decided by the State courts.

### d. Trial Court's Failure to Recuse

Petitioner's next claim involves an alleged violation of his due process rights when the trial court failed to recuse itself after the trial court's rejection of the State's and Petitioner's plea agreement for a life sentence. (Docket Entry No. 23-2, Second Amended Petition at ¶25 at 9-10). The Tennessee Supreme Court rejected this claim because state law grants the trial judge the discretion to reject a plea agreement:

> In his brief defendant argues that the trial judge should have recused himself from the case, or at least from determining whether the plea bargain was acceptable, because he was not a disinterested and neutral judge since he did not agree with the prior judgment of this Court in this case. He implies the Court's judgment was warped and influenced by the need to demonstrate he had been correct in the first case. He says the judge ignored the fact that the victim's family accepted the agreement, and dismissed defendant's mitigating factors. The argument is that even if actual partiality is not shown, there is an appearance of partiality which violates Supreme Court Rule 10, Canon 3(C)(1) mandating that the trial judge disqualify himself in a proceeding in which his impartiality might reasonably be questioned.
>
> A motion for recusal based upon the alleged bias or prejudice of the trial judge addresses itself to the sound discretion of the trial court and will not be reversed on appeal unless clear abuse appears on the face of the record. State ex rel. Phillips v. Henderson, 220 Tenn. 701, 423 S.W.2d 489, 492 (1968). The general rule is that a trial judge should recuse himself whenever he has any doubt as to his ability to preside impartially in a criminal case or whenever his impartiality can reasonably be questioned. State v. Cash, 867 S.W.2d 741, 749 (Tenn. Crim. App.1993); Lackey v. State, 578 S.W.2d 101, 104 (Tenn. Crim. App.1978). A judge is in no way disqualified because he tried and made certain findings in previous litigation. King v. State, 216 Tenn. 215, 391 S.W.2d 637, 642 (1965). The trial judge in this case stated that he was not prejudiced against the defendant. There is no indication in the record that the reversal of the prior sentencing hearing in any way biased the judge against the defendant or was the reason for rejection of the plea agreement. Furthermore, there is no showing that the judge refused the plea bargain in order to vindicate himself in reference to the prior proceedings. Under this record, it cannot reasonably be questioned that the trial judge was able to render an impartial decision regarding the plea bargain and to preside over this case in a neutral and unbiased manner.

Hines, 919 S.W.2d 578-79.

For this claim, the dispositive issue is the lack of clearly established federal law as determined by the United States Supreme Court to grant relief on this claim. Thus, the Court concludes that this claim fails as a matter of law.

## 2. Procedurally Defaulted Claims

Respondent asserts that most of Petitioner's claims are procedurally defaulted for his failures to present these claims to the state courts and to provide those courts with the opportunity to decide those claims. Respondent also argues that under Tennessee law, these defaulted claims are now time barred and are deemed to be waived for which Petitioner has failed to show cause or prejudice. Specifically, the Respondent identifies the claims in Paragraphs 9, 10, 11(b), (e), (i), (l), (n)-(u), 13(b), (c), (t), (u), (w)-(ee), 14, 17, 19, 21(b), (d)-(f), portions of Paragraph 22, Paragraphs 23-24, 26-31, 33-34, portions of Paragraph 35, and Paragraphs 36-38 and 40 of the Second Amended Petition. (Docket Entry Nos 23, 23-1 and 23-2).[7]

For his procedural defaults, Petitioner cites Martinez and his state post conviction counsel's failures to present certain claims to excuse these defaults. Petitioner also cites violations of Brady and Giglio to excuse his procedural defaults. For the reasons stated earlier on the evidentiary hearing issue, the Court analyzes the particulars of these contentions and thereafter conducts the procedural default analysis.

### a. Martinez Claims

Petitioner's Martinez claims are asserted in the parties' joint statement, (Docket Entry No.

---

[7] Given their length and with exceptions for the defaulted claims analyzed in this section, the remaining defaulted claims are attached in Appendix A to this Memorandum and are reformatted to make them more readable.

109 at 1-43).In sum, these claims are for post conviction counsel's failures:

to timely claim in the amended petition that women were underrepresented in the petit jury venire, particularly that for the relevant time period women in Cheatham County were 50.6-50.7% of the population, but comprised only 10-22% of the Cheatham County jury venire from which Hines' juries were drawn as well as exclusion of women as grand jury forepersons;

to assert claims about trial counsel in ¶¶ 11 b, c, d, e, f, g, h, i, k, l, m, n, o, p, q, r, s, t, u, v and about sentencing counsel's failures detailed in ¶¶ 13b, d, e, f, g, h, I, k ,l, m, n, o, q, s, t, u, v, aa, bb, dd, ee of the amended complaint (Docket Entry No. 23 and 23-1);

to present evidence of Petitioner's childhood traumas, poverty with malnutrition, lack of medical care and exposure to toxins, Petitioner' untreated head injuries and mental illness;

to seek a mistrial after jurors were informed that the case had been reviewed on appeal;

to object to the use of restraints upon Petitioner and to secure proof from any available jurors about seeing Petitioner in shackles and handcuffs;

to timely subpoena Norman Johnson, a counselor at the Comprehensive Care Center where Hines was treated, and Bill Andrews, a Juvenile Court Liaison Specialist with the Bureau of Social Services(¶13cc);

to present any claims of ineffective assistance of appellate counsel, including all claims in this action;

to prove that Petitioner's prior conviction was invalid and unconstitutional, or to present a valid defense of intoxication and self defense;

to object to the instructions identified in Claim 19, that jury instructions lessened the prosecution's burden of proof;

to fail to object to the prosecutor's unconstitutional arguments at sentencing to object to the imposition of death after the trial court's rejection of the agreed-upon offer of life under United States v. Jackson, 390 U.S. 570 (1968); and

to object to the trial judge's denial of a continuance after the prosecution's untimely notice of aggravating circumstances.

(Docket Entry No. 109 at 2, 9, 13, 14, 16, 17, 18, 22, 23, 24, 25, 27, 28, 30, 31, 33, 34, 36, 37, 38

and 39).

As stated earlier, Martinez created an equitable exception to procedural default that "qualifies Coleman **by recognizing a narrow exception**: Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 132 S. Ct. at 1315 (emphasis added). In addition, Martinez applies to "initial-review collateral proceedings," "which provide the first occasion to raise a claim of ineffective assistance at trial." Id. Martinez, expressly recognized that "[d]irect appeals, without evidentiary hearings, may not be as effective as other proceedings for developing the factual basis for the [ineffective assistance of trial counsel] claim." Id. at 1318. Moreover, "[t]o be successful under Trevino, . . . [the habeas petitioner] must show a 'substantial' claim of ineffective assistance, and this requirement applies as well to the prejudice portion of the ineffective assistance claim." McGuire,738 F.3d at 752 (citing Trevino, 133 S.Ct. at 1918).

From the Court's review of the State record and decisions of the Tennessee courts, Petitioner's various counsel in fact presented these claims or a variation thereof. First, the state post conviction trial court made extensive and express findings on the exclusion of women, (Addendum No. 17 at 3216-3224) including the percentages cited by Petitioner. Id. at 3217; see also Hines, 2004 WL 1567120 at * 34-36. The Martinez claims about Petitioner's trial counsel's omissions at trial and sentencing were extensively analyzed in the post conviction appeal. The cited omissions of trial and appellate counsel, who were experienced counsel, were raised as claims in the state post conviction proceedings, and were considered on the merits by the state courts. Hines, 2004 WL 1567120 at *23-34. These rulings include alleged omissions of expert and lay proof on Petitioner's childhood, his experiences as a juvenile and his mental condition as well as the experiences of his

family members. Id. at * 11-18, 31-33. The Tennessee Supreme Court considered the prosecutor's arguments, some of which Petitioner's trial counsel objected and others they did not object, and found those arguments to be justified by proof or harmless without any effect on the jury's verdict. Hines, 758 S.W.2d at 519-21. Petitioner's appellate counsel raised jury instructions and vagueness issues in Petitioner's direct appeal. Id. at 521-24. Petitioner's counsel challenged the trial court's failure to grant a continuance based on the State's late notice of aggravating circumstances that the State intended to rely upon at trial, as well as the trial court's rejection of the plea agreement. Hines, 919 S.W.2d at 577-80.[8]

In sum, the Court concludes that Petitioner's Martinez claims are not substantial and do not qualify for the "narrow" and equitable exception created by Martinez. Petitioner's widespread

---

[8]As to the claim that the trial court erred in denying a continuance after the State failed to provide timely written notice of aggravating circumstances to be presented at sentencing to justify the death penalty under Tenn.R.Crim.P. 12.3(b), absent such notice within 30 days, the trial judge must grant the defendant a reasonable continuance of the trial. The Tennessee appellate court ruled:

> In light of the unique posture of this case, however, as a continuation of an earlier proceeding and not a new proceeding in itself, we conclude that the defendant was on notice sufficient to satisfy the requirements of Rule 12.3(b), cf. State v. Chase, 873 S.W.2d 7, 9 (Tenn.Crim.App.1993), subject to the requirement that absent a new notice the State was limited at the resentencing hearing to the aggravating circumstances set forth in the initial notice. In the present case, the State had filed written notice of intent to seek the death penalty and of the aggravating circumstances on which it intended to rely in October 1985, prior to the original trial. All three of the aggravating circumstances relied upon by the State on resentencing were included in this notice. Under these circumstances, we find that the requirements of Rule 12.3(b) were met and that a continuance was not mandated. Furthermore, there has been no showing that the defendant has suffered prejudice as a result of the State's failure to re-file the notice before the resentencing hearing. Absent a showing of prejudice, the trial court did not abuse its discretion in refusing to grant a continuance. Cf. State v. Stephenson, 752 S.W.2d 80, 81 (Tenn.1988).

Hines, 919 S.W.2d at 579.

challenges to his post conviction counsel's performance would undermine the Martinez exception and create a vehicle for a wholesale de novo review of Petitioner's claims despite the state courts' fora to address any claim about his trial and appellate counsel.

### b. **Brady** and **Gigilio** Claims

For these claims, Petitioner asserts that the State withheld exculpatory evidence and false testimony in violation of Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150, 153-54 (1972).[9] As to the specifics of these claims, Petitioner alleges:

> that Ken Jones and Sheriff Dorris Weakley testified falsely; that the prosecution presented testimony from Dr. Charles Harlan and withheld material exculpatory evidence of his conduct;

> that state prosecutors improperly coached state witnesses who testified about Petitioner with a key with the number "9" on it, Petitioner seeming nervous, there was a stain on the shoulder of Petitioner's shirt, and Petitioner had a silver Volvo (Docket Entry No. 23, at ¶ 10f);

> that the prosecution presented false testimony of Dr. Harlan of no semen on the victim when Dr. Harlan's file reflects semen was found on the victim;

> that post-conviction counsel was unaware of the falsity of Harlan's testimony about time of consciousness and the lack of semen evidence; and

> that petitioner has exculpatory evidence of serology test showing a DNA exclusion from the victim's underwear and fingerprint exclusion.

(Docket Entry No. 109 at 11-12, 13-14).

On Petitioner's post-conviction appeal, the Tennessee appellate court made the following findings of facts about Petitioner's false testimony claims:

> Witnesses testifying at the post-conviction hearings included Ken Jones, who testified at the petitioner's 1986 trial and 1989 resentencing hearing that he had found

---

[9] Petitioner also uses the facts of these claims to assert claims for prosecutorial misconduct and ineffective assistance of counsel. See Docket Entry No. 23-1 at ¶ 12.

the victim's body; Marion Jones, Ken Jones's wife; and Vernedith White, his girlfriend. Neither Mrs. Jones nor Ms. White had testified previously in guilt or sentencing proceedings.

Ken Jones testified via deposition from a nursing home in Hendersonville, Tennessee. In the years following the petitioner's resentencing, Jones suffered a stroke and was confined to a nursing home; therefore, he was unable to testify in person at the post-conviction hearing. He testified that he found the victim's body at the CeBon Motel. He acknowledged that he went to the motel on the day of the victim's murder to rent a room with Vernedith White, with whom he had been having an affair for two years, although at trial he had testified that his reason for being at the motel was to use the restroom. Jones explained that it had been his and Ms. White's custom to rent a room at the CeBon Motel most every Sunday. He usually rented a room from the victim, who was a maid at the motel. He recalled that, on the day in question, he and White had arrived at the motel between 10:00 and 11:00 a.m. Jones could not find anyone at the motel, so he and Ms. White sat in his van and waited for someone to arrive to rent them a room. They subsequently drove to a nearby restaurant and returned to the motel within fifteen minutes. Jones said that he could see the motel parking lot the entire time he was at the restaurant and never got out of his car while at the restaurant. He said that he found the victim's body within one hour of the time they arrived at the motel. Jones further testified he knew that keys were kept in a box outside the office, so after no one showed up to rent them a room, he retrieved a key from the box.

Upon entering the motel room which had a maid's cart sitting outside, Jones saw the victim's body, immediately ran out of the room, drove across the street to a restaurant, and had someone call the sheriff. He could not recall exactly what he told the person at the restaurant about the victim. Thereafter, he drove Ms. White to her home in Dickson and returned to the motel to discuss his discovery with Sheriff Weakley, whom he said was a friend of his. He presumed that the sheriff knew why he was at the motel that day and admitted he told the sheriff that he was concerned about his wife finding out why he had been there. Jones testified that Sheriff Weakley tried to "put [him] at ease about the problem of being at the motel there with Vern[e]dith." When asked further about this issue, Jones said that he understood Sheriff Weakley would not question him about it. He also understood that none of the attorneys would question him about it, but remained nervous about testifying at the trial. He said that Sheriff Weakley called him the evening of the murder and asked him not to discuss it with anyone. Jones said that he was not contacted by any attorney prior to his testimony at trial, and his first contact with any attorney occurred when he was called to testify at the trial. Jones testified that he knew nothing concerning the actual murder itself. He stated that he did not see anyone at the motel that morning other than a woman who pulled into the parking lot in either a brown or maroon car. He could not recall testifying at trial that the woman left her car and

knocked on the door of the room where he later found the victim.

Marion Jones, Ken Jones's wife, testified at the post-conviction hearing as to her husband's longstanding affair with Vernedith White. She did not remember exactly when she learned of the affair but knew of it by the time of the petitioner's trial in 1986. She and Ken Jones had been married since 1956, and he had been involved in several extramarital affairs. She testified that after Jones suffered a stroke and entered the nursing home, she learned that he had given power of attorney to Ms. White. She also discovered that he had given Ms. White approximately $30,000. She did not know that her husband had testified at the 1986 trial until Connie Westfall, an investigator with the post-conviction attorney's office, contacted her years later. She said that her husband had a temper and had been verbally abusive to her but had never hit her.

Vernedith White, Ken Jones's former girlfriend, testified at the post-conviction hearing that she had neither been called to testify at the 1986 trial nor been contacted by anyone for investigative purposes prior to the post-conviction proceedings. She acknowledged at the hearing that she had been involved in an affair with Ken Jones for eleven years and was at the CeBon Motel on the day Jones discovered the victim's body. Each week they rented one of two rooms, normally from the manager or the maid, and were usually at the motel from approximately 9:00 a.m. until 12:00 noon.

According to Ms. White, Ken Jones picked her up around 8:00 a.m. on Sunday, March 3, 1985, as was his custom. She lived in Dickson and estimated that they arrived at the motel around 9:00 a.m. They could not find anyone at the motel and waited in the parking lot. She suggested to Jones that they leave and go home or somewhere else instead of waiting, but he did not take her advice. She remembered a woman pulling into the motel parking lot, but did not recall her leaving her vehicle and knocking on the door, as Jones had testified at the 1986 trial. She said they did not leave the motel parking lot to go to the restaurant as Jones had testified. After they had waited awhile at the motel, Jones told her he was going to get a room key from a dish in the office and they would just use the room and leave. Ms. White said that, after Jones returned to the van with a key to room 21, they drove over and parked in front of that room. Jones told her to wait in the van while he went to check the room. Ms. White testified that the curtains to the room were open, and she could see sheets on top of both beds. Jones walked in the room past the beds, saw the victim's body, and ran out of the room. She could see Jones the entire time he was in the room, which was "[n]ot even a minute." He was very scared when he ran out and told her there was a dead woman in the room. She wanted to go inside, but he would not let her. She said that Jones did not have any blood on him when he came out of the room and returned to the van. She believed that it was approximately 12:00 noon when Jones found the body. They immediately drove to the restaurant and called the sheriff. She was not sure if Jones or a woman at the restaurant actually placed the

call. Informed that the emergency call had been made at 2:36 p.m, she said that she must have had her times wrong. Jones drove her home, which was an approximately forty-five-minute drive from the motel, and then returned to talk to the sheriff.

Ms. White testified that she and Mr. Jones had been together at the CeBon Motel on at least 100 occasions prior to March 3, 1985, but they had never before retrieved a key in the manner they did that day. She could not recall if Jones returned the key to room 21. Although she had seen the victim cleaning rooms at the motel on prior occasions, she did not know her name. She recalled that the day of the murder was a warm day, and she and Mr. Jones sat in the parking lot with the van doors open. They neither saw nor heard any suspicious activity at the motel that day prior to Mr. Jones discovering the victim's body. She believed they would have seen anyone who entered or left either room 21 or room 9.

Ms. White said that she and Mr. Jones were co-owners of a sporting goods store and that Sheriff Weakley was a regular customer. She testified that she never discussed the events of March 3, 1985, with Weakley and understood that he had told Jones that it was all right for him to take White home and then return to discuss the matter. She said that her relationship with Jones had ended about two years after March 3, 1985. According to Ms. White, there was no possibility that Ken Jones had anything to do with the victim's murder.

Sandra Kilgore testified that she served on the jury in the petitioner's 1986 trial. After learning that she had been selected for a jury, she called her pastor from home and asked for biblical scriptures regarding capital punishment. She said that she spoke to her pastor before she was sworn in as a juror in the petitioner's trial. She did not know that the State was seeking the death penalty in the petitioner's case until she came to court for jury service. According to Ms. Kilgore, there was some division among the jurors during deliberation.

Mary Sizemore of the Cheatham County Ambulance Service testified she and her partner went to the CeBon Motel in response to a call from someone at the Donnell Restaurant about a stabbing at the motel. Ms. Sizemore and her partner searched room to room until they came to a room with a maid cart outside. Her partner indicated that the room was open. They entered the room and found the victim lying on her back wrapped in what appeared to be a bedspread up to her neck. The victim's wounds were not readily apparent, and they had to unwrap her and pull up her dress to actually see the wounds. They were not able to find a pulse on the victim. Ms. Sizemore remembered that the man who had reported the stabbing subsequently returned to the scene and talked with the sheriff. She later learned that this man was Ken Jones.

Maxey Jean Kittrell testified that she was working at the CeBon Restaurant on March

3, 1985, when a man came in and reported a stabbing at the CeBon Motel. She called an ambulance service and reported the stabbing.

J. Kenneth Atkins, one of the prosecutors in the petitioner's original trial in 1986, testified that he was involved both in the preparation for trial and the trial itself. He denied that Sheriff Weakley had asked him not to question Ken Jones regarding his reason for being at the CeBon Motel on the day of the murder, but acknowledged knowing that Jones was at the motel with a woman other than his wife and that Sheriff Weakley was concerned about embarrassing Jones. Atkins said that he had known Jones prior to his involvement in the petitioner's case because he had "prosecuted a guy that sold drugs and resulted in [Jones's] son's death." He testified that Jones did not express any reservation about testifying at the petitioner's trial, and Sheriff Weakley never asked him to limit his questioning of Jones. Atkins acknowledged that he did not interview Vernedith White. In his opinion, trial counsel were not deficient in their representation of the petitioner.

James W. Kirby, a former assistant district attorney general and, at the time of the post-conviction hearing, the Executive Director of the Tennessee District Attorneys' General Conference, testified that he was involved in prosecuting the petitioner at the 1986 trial. He said that Atkins was the prosecutor who talked with Ken Jones and examined him on the witness stand. Kirby acknowledged that he was present at the deposition of Jones taken prior to the post-conviction hearing and had briefly discussed it with Atkins. He said that the deposition contained testimony that was not brought out at the 1986 trial. He did not recall having any discussions with Sheriff Weakley prior to the petitioner's trial, but it was his understanding that Atkins recalled discussing Jones's situation with Sheriff Weakley.

Hines, 2004 WL 1567120 at * 4-7

The Tennessee Court of Criminal Appeals ruled that Petitioner's claim about Jones's false testimony about his presence at the hotel was not material under Brady standards and was without a reasonable probability of producing a different result. Id. at *26-28. Under Brady v. Maryland, 373 U.S. 83, 87 (1963), the prosecution's suppression of evidence favorable to an accused violates due process where the evidence is material either to guilt or punishment. Petitioner has not established materiality nor that the evidence was suppressed. Indeed, Petitioner's counsel testified that he knew Jones's testimony as to why he was at the hotel was false at the time it was presented,

but that he did not believe the falsity in that detail was relevant. Hines, 2004 WL 1567120, at *8.

After review of the state record, this Court concludes that Petitioner has not satisfied the materiality element for a "'substantial'" Brady claim. McGuire, 738 F.3d at 752 (quoting Trevino, 133 S.Ct. at 1918). Petitioner's Giglio claims for false testimony fail for the same reasons. "[T]o establish a claim of prosecutorial misconduct or denial of due process, the defendant must show that the statement in question was false, that the prosecution knew it was false, and that it was material." Byrd v. Collins, 209 F.3d 486, 517 (6th Cir. 2000.) As noted, the state courts deemed the Jones's testimony issue not to be material and given the State's proof against Petitioner, including his offer to give the details of the murder and Jones's effort to avoid disclosure of his affair, this Court concludes that these Brady and Giglio claims based upon Jones's testimony do not qualify as "'substantial'" claims to violate Brady or Giglio or justify a Martinez hearing. McGuire, 738 F.3d at 752 (quoting Trevino, 133 S.Ct. at 1918).

As to Petitioner's false testimony concerning Dr. Charles Harlan, Dr. Harlan testified as to the victim's cause and time of death, a showing that an expert's opinion is inaccurate does not violate due process. Fuller v. Johnson, 114 F.3d 491, 496-97 (5th Cir. 1997) (use of incorrect methods by expert does not demonstrate testimony was false). A challenge to the expert's opinions and the methodology implicates the sufficiency of the evidence, not its truth. Id. at 497. Likewise, the burden of proving indisputable falsity is not fulfilled with evidence of a difference of opinion or methodology. Rosencrantz v. Lafler, 568 F.3d 577, 586 (6th Cir. 2009). Despite the Court's authorization of discovery, Petitioner has not shown any Brady evidence concerning Dr. Harlan at the time of Petitioner's trial or his 1989 resentencing. Petitioner's allegations about Dr. Harlan have not been imputed to the State in habeas actions. See Sutton v. Bell, No. 3:06-cv-388, 2011 WL

1225891, *12-15 (E.D. Tenn. Mar. 30, 2011) (civil investigation into Dr. Harlan not imputable to prosecutors uninvolved with said proceeding).

As to Petitioner's cited serology testimony showing a DNA exclusion from the victim's underwear and fingerprint exclusion, as well as the presence of semen in the TBI report, those assertions, if true, would not warrant habeas relief, given the State's proof and the absence of exonerating proof from these cited materials.

> The State introduced proof that the defendant had previously been convicted of assault in the first degree. A detective who had investigated the case testified that the defendant had inflicted serious physical harm to the victim in this prior case. The State also presented proof that the defendant had stabbed the victim in the present case multiple times with a sharp instrument, probably a knife. Three of these wounds were lethal and had penetrated the victim's chest five to six inches. The pathologist who had performed the autopsy of the victim testified that all the lethal wounds were inflicted at about the same time and that death would have occurred within four to six minutes, most of which time the victim would have remained conscious. Defensive wounds were found on the victim's hands. Her clothing had been pulled up and her panties had been cut in half and removed from her body. About the time of death, and shortly after the infliction of the lethal wounds to the chest, the defendant had inserted a flat object through the victim's vaginal orifice into the vaginal pouch until the instrument penetrated the vaginal dome and passed into the abdominal cavity. A twenty dollar bill had been placed under the victim's watchband. No semen or any other evidence of ejaculation was found.

Hines, 919 S.W.2d at 577.

Under the facts of this action, the absence of Petitioner's blood or fingerprint on two evidentiary items alone does not establish material evidence under Brady and Giglio standards. In addition, Petitioner has not demonstrated prejudice due to any omission of Petitioner's trial counsel for not asserting this claim at trial, sentencing, resentencing or the post conviction proceeding. The absence of Petitioner's blood or fingerprint on two evidentiary items alone does not establish material exculpatory proof nor prove Petitioner's actual innocence under the standards of Schlup v.

Delo, 513 U.S. 298, 329 (1995) ("It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.").

Given the State's proof described supra, the Court concludes that neither the DNA nor the finger print proof proves Petitioner's actual innocence nor demonstrates establish prejudice due to any omission of Petitioner's trial counsel for not testing these materials and asserting this claim at trial, sentencing, resentencing or the post conviction proceeding.

### c. Remaining Defaulted Claims

Under the "Procedural Default Doctrine" the general rule is that for federal habeas proceedings, claims that were not fairly presented or were not presented to the State courts are barred as federal habeas claims for relief Coleman v. Thompson, 501 U.S. 722, 729-30 (1992). The exhaustion rule requires that the grounds raised in a petition for the federal writ of habeas corpus must have been "fairly presented" to the state courts. Duncan v. Henry, 513 U.S. 364, 365-66 (1995). A claim supported only by citation to state law is insufficient to present a federal claim, even if the cited state decision restated an analysis of federal law. Anderson v. Harless, 459 U.S. 4, 7-8 n.3 (1982) (per curiam). The federal petitioner must inform the state courts of his federal legal theory or of the issue that arises under federal law. Franklin v. Rose, 811 F.2d 322, 325, 326 (6th Cir. 1987) ("To fairly present his constitutional argument to the state courts required more than the use of a generalized catch-all phrase which merely alleged the deprivation of a fair trial under the

United States Constitution."). Petitioners can cite state law decisions that were based upon federal law grounds in similar factual circumstances. Levine v. Torvick, 986 F.2d 1506, 1516-17 (6th Cir. 1993). Yet, "mere similarity of claims is insufficient to exhaust." Duncan, 513 U.S. at 366.

The rationale for the procedural default doctrine arises out of federal respect for federalism and maintaining comity with state courts. Id. at 730-32. The Supreme Court further recognized that state procedural rules also serve a legitimate state interest in finality of criminal convictions. Francis v. Henderson, 425 U.S. 536, 542 (1976). State procedural rules channel the controversy to the state trial and appellate courts. Murray v. Carrier, 477 U.S. 478, 490-91 (1986). The first step in this analysis is whether Petitioner's claims in this action were fairly presented to the state courts. To fairly present a federal claim to a state court, the habeas petitioner: (1) must rely on federal cases interpreting the federal constitutional provision involved or state cases interpreting the federal constitutional provision involved; (2) identify the specific right guaranteed by the federal constitution; or (3) allege a factual pattern within the mainstream of federal constitutional litigation. Dietz v. Money, 391 F.3d 804, 808 (6th Cir. 2004). Procedural default can be excused where the habeas petitioner proves his actual innocence of the offense based upon the elements of the offense and/or aggravating circumstances, resulting in a fundamental miscarriage of justice. Sawyer v. Whitley, 505 U.S. 333, 344-45 (1992).

Although the Tennessee appellate courts found that some of the Petitioner's claims were defaulted, Hines, 2004 WL 1567120 at * 29, 34, 36, 39, procedural default is inapplicable, if the state court decision "'fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of [the] state law ground is not clear from the face of the opinion.'" Coleman, 501 U.S. at 735 (citation omitted). A state court's actual ruling on

117

a presented claim is not required for federal habeas review. <u>Smith v. Digmon</u>, 434 U.S. 332, 333-34 (1978). Moreover, a petitioner is not required to present to the state court every specific fact in support of his federal claim, and supplemental evidence that was not presented to the state court can be considered if that evidence does not "fundamentally alter the legal claim already considered by the state courts." <u>Vasquez v. Hillery</u>, 474 U.S. 254, 260 (1986).

In the Sixth Circuit, the analysis under the procedural default doctrine was set forth in the often cited decision, <u>Maupin v. Smith</u>, 785 F.2d 135 (6th Cir. 1986):

> When a state argues that a habeas claim is precluded by the petitioner's failure to observe a state procedural rule, the federal court must go through a complicated analysis. First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.
>
> \* \* \*
>
> Second, the court must decide whether the state courts actually enforced the state procedural sanction.
>
> \* \* \*
>
> Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. This question generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims.

<u>Id</u>. at 138 (citations omitted).

## 1. Noncompliance with Applicable State Rules

Under <u>Maupin</u>, the threshold issue is the existence of an applicable state law rule and the petitioner's noncompliance therewith. Here, Tennessee's limitations period in the Tennessee Post-Conviction Act, Tenn. Code Ann. § 40-30-102, was amended in 1995 to provide a one year period of limitation and is now codified at Tenn. Code Ann. § 40-30-202. Tenn. Code Ann. § 40-30-112(a),

118

presumes that any issues not raised in an initial post conviction petition are waived, and Tenn. Code Ann. § 40-30-112(b) provides that any issues raised in a prior proceeding were previously determined and therefore barred from further consideration. These statutes were amended in 1995 and recodified at Tenn. Code Ann. §§ 40-30-201 through 40-30-222. The waiver and previously determined provisions are now in Tenn. Code Ann. § 40-30-106(g), (h). Respondent contends this limitation statute bars Petitioner's remaining defaulted claims. For the remaining procedurally default claims, the Court concludes that the State records and state court opinions demonstrate Petitioner's non-compliance with these Tennessee statutes.

## 2. "Firmly Established" and "Regularly Followed" State Rules

To qualify for the procedural default rule, the cited state law must also be "firmly established and regularly followed" at the time the claim arose. Ford v. Georgia, 498 U.S. 411, 423-24 (1991). As the Sixth Circuit explained, "[c]onsiderations of comity do not require a federal court to abstain from deciding a constitutional claim on grounds of procedural default where the state courts have not enforced a given state procedural rule." Rice v. Marshall, 816 F.2d 1126, 1129 (6th Cir. 1987). Tennessee courts have enforced Tenn. Code Ann. § 40-30- 112(a) and (b) that were established in 1967 and 1971, as part of the Tennessee Post-Conviction Procedure Act. 1967 Tenn. Pub. Acts, 310 and 1971 Tenn. Pub. Acts, 96. The "previously determined" provision of Tenn. Code Ann. § 40-30-112(a), now Tenn. Code Ann. § 40-30-106(h), has been regularly followed. See Harvey v. State, 749 S.W.2d 478, 479 (Tenn. Crim. App. 1987), as reflected in the numerous annotations to former Tenn. Code. Ann. § 40-30-112(a); Simpson v. State, No. E2008-02288-CCA-R3-PC, 2010 WL 323049, at *7 (Tenn. Crim. App. Jan. 28, 2010). Moreover, the waiver rule, Tenn. Code Ann. § 40-30-112(b)(1), now Tenn. Code Ann. § 40-30-106(g), is regularly enforced in state post-conviction

proceedings, Holiday v. State, 512 S.W.2d 953 (Tenn. 1972); Williams v. State, No. W2010-01013-

CCA-R3-PC, 2011 WL 3903224, at *8 (Tenn. Crim App. Sept. 1, 2011), unless the claim was not

cognizable at the time, Pruett v. State, 501 S.W.2d 807, 809 (Tenn. 1973), or the petition is

withdrawn before a decision on the merits. Williams v. State, 831 S.W.2d 281 (Tenn. 1992).

In Coe, the Sixth Circuit held that the Tennessee courts strictly and regularly followed the

waiver rule and ruled that any cited exceptions "are isolated and unpublished, and so are insufficient

to defeat an otherwise 'strict and regular' practice." 161 F.3d at 331. In Cone v. Bell, 243 F.3d 961,

970 (6th Cir. 2001), overruled on other grounds, Bell v. Cone, 535 U.S. 685 (2002), the Sixth Circuit

cited the waiver and previously determined provisions in § 40-30-112(a) and (b) to conclude that

habeas claims were procedurally defaulted because "the state actually enforced the state rule." In

Hutchinson v. Bell, 303 F.3d 720, 738 (6th cir. 2002), the Sixth Circuit found the Tennessee

limitations statute constituted a firmly established and regularly followed state law. Thus, the Court

concludes Tennessee's waiver and limitations statutes are regularly enforced.

### 3. Independent and Adequate State Rule

As to what is an independent and adequate state rule, the Supreme Court recognized the

following state interests as constituting adequate grounds for state procedural rules:

> the possible avoidance of an unnecessary trial or of a retrial, the difficulty of making
> factual determinations concerning grand juries long after the indictment has been
> handed down and the grand jury disbanded, and the potential disruption to numerous
> convictions of finding a defect in a grand jury only after the jury has handed down
> indictments in many cases.

Coleman, 501 U.S. at 745-46.

Another reason to support a finding of adequate state rules was articulated in Francis,

wherein the Supreme Court enforced a state rule that promoted finality, noting a comparable federal

120

rule.

> "Plainly the interest in finality is the same with regard to both federal and state prisoners. ... There is no reason to ... give greater preclusive effect to procedural default by federal defendants than to similar defaults by state defendants. To hold otherwise would reflect an anomalous and erroneous view of federal-state relations."

425 U.S. at 542 (citation omitted). The Sixth Circuit has stated that "whether the state procedural ground is 'independent and adequate' ... turns on the substantiality of the state interest involved." Wesselman v. Seabold, 834 F.2d 99, 101 (6th Cir. 1987). There the court held, "Kentucky's interests in finality of judgments, judicial economy, and permitting defendants just 'one bite at the apple'" were deemed "both obvious and substantial." Id. (citation omitted). An exception to this rule, however, arises "where state collateral review is the first place a prisoner can present a challenge to his conviction." Coleman, 501 U.S. at 755.

As to types of procedural rules which have been found to be independent and adequate, in Coleman, the Supreme Court upheld a procedural rule that bars consideration of a federal claim for failure to meet state law requirements for timely appeals. 501 U.S. at 750-51. "'No procedural principle is more familiar to this court than that a constitutional right may be forfeited in criminal as well as in civil cases by the failure to make timely assertions of the right before a tribunal having jurisdiction to determine it'" . . . and "[n]o less respect should be given to state rules of procedure." Id. at 751 (quoting Yakus v. United States, 321 U.S. 414, 444 (1944); accord Brown v. Allen, 344 U.S. 443, 485-86 (1953) (procedural default rule applied a state rule that placed time limits on appellate rights).

Procedural default also applies if counsel failed to pursue a claim on appeal in which event the claim can be defaulted. Murray, 477 U.S. at 489-92, (noting that in the federal system, counsel's

failure to perfect an appeal precludes review of constitutional claims unless counsel's conduct was constitutionally deficient). Similarly, in Smith v. Murray, 477 U.S. 527 (1986), the petitioner's failure to raise his claim, objecting to a psychiatrist's testimony, in the Virginia Supreme Court on his direct appeal precluded habeas relief. In Cone, the Sixth Circuit found the waiver and previously determined rules in former Tenn. Code Ann. §§ 40-30-112 (a) and (b) to be "independent and adequate" state rules. 243 F.3d at 970.

Based upon Coleman, Cone and Hutchinson, the Court concludes that Tennessee's limitations period for a post-conviction petition as well as its waiver and previously determined statutes are independent and adequate state rules that promote the timely presentation of claims. This Court is bound by Coe on the firmly established and adequacy of these Tennessee statutes.

### 4. The Cause and Prejudice Requirement

#### i. Cause

Once the respondent establishes procedural default, the burden shifts to the petitioner to show cause for the procedural default and actual prejudice or that the failure to consider the claim will result in a miscarriage of justice by the conviction of one who is actually innocent. Schlup, 513 U.S. at 322. Cause for a procedural default must depend on some "'objective factor external to the defense'" that interfered with the petitioner's efforts to comply with the procedural rule. Coleman, 501 U.S. at 752-53 (quoting Murray, 477 U.S. at 488). Under Martinez, inadequate defense counsel can prove cause, but only if counsel's conduct violates Sixth Amendment standards.

As to Petitioner's trial counsel, in Engle v. Isaac, 456 U.S. 107 (1982), the Court ruled that trial counsel's strategic decisions do not establish cause, id. at 133-34, unless the decision is of constitutional significance. Murray, 477 U.S. at 486-88. Procedural defaults attributed to ignorance

122

or the inadvertence of counsel or as a result of a deliberate appellate strategy that fails to raise a

"particular claim" precludes federal habeas review of a claim. Id. at 487, 492. "[T]he mere fact that

counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite

recognizing it, does not constitute cause for procedural default." Id. at 486. As to the failure to raise

a claim on appeal, the Court also observed that "[t]his process of `winnowing out weaker arguments

on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence,

is the hallmark of effective appellate advocacy. Smith, 477 U.S. at 536. (quoting Jones v. Barnes,

463 U.S. 745, 751-52 (1983)).

Given that this Court concluded that the state courts reasonably determined that Petitioner's

trial counsel were effective, the Court also concludes that Petitioner cannot establish cause due to

his appellate counsel's nor post-conviction counsel's performance. Without an extended repetition,

the Court adopts the state court rulings that Petitioner's Brady claims lack materiality and this Court

reaffirms its earlier conclusion that Petitioner's Martinez claims are not substantial to excuse these

remaining defaults. Thus, the Court concludes that Petitioner has not established cause for any of

these procedural defaults.

### ii. Prejudice

Assuming Petitioner established "cause" for these defaults, Petitioner must also prove that

he was "actually prejudiced by the alleged constitutional error," Maupin, 785 F.2d at 138. The

Supreme Court conceded that it has not given "precise content" to the term "prejudice," that has not

been defined, "expressly leaving to future cases further elaboration of the significance of that term."

United States v. Frady, 456 U.S. 152, 168 (1982) (quoting Wainwright v. Sykes, 433 U.S. 72, 91

(1977)). For the reasons stated above and as found by the state courts, the Court concludes that

123

neither Petitioner's ineffective assistance of counsel claims nor his <u>Brady</u> and <u>Giglio</u> claims support a finding of prejudice to excuse his procedural defaults.

### D. CONCLUSION

For the above stated reasons, the Court concludes that the petition for the writ of habeas corpus should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the *16th* day of March, 2015.

WILLIAM J. HAYNES, JR.
Senior United States District Judge

# APPENDIX

# E. DEFAULTED CLAIMS

9.     In violation of the Sixth, Eighth, and Fourteenth Amendments, Darrell Hines was denied his rights to due process, equal protection, and to juries selected free from discrimination and from a fair cross-section of the community, given discrimination against women in the selection of the petit jury, the grand jury, and the grand jury foreperson:

      a.     At the relevant times when the grand jury and petit juries were selected in this matter, the population of Cheatham County was 50.7 percent female.

      b.     Venires were selected by creating a large pool of names from voter registration lists, which was subsequently narrowed through the selection of a "sheriff's venire .. "

      c.     The grand and petit jury venires were then selected from the sheriffs venire, with the grand jury being selected first, after which the remaining persons would constitute the petit jury venire.

      d.     In selecting the sheriff's venire, however, jury commissioners not only would remove persons known to be dead or non-residents, but they also removed women with young children and those who worked as schoolteachers.

      e.     Women constitute a distinctive group for purposes of jury selection, and discrimination against women in the process of jury selection is prohibited. There was, however, unconstitutional discrimination against women in this case.

      f.     Given the process by which women were excluded from the sheriffs venires because they were women, the sheriff's venires severely underrepresented women during the time Darrell Hines was indicted, tried, and sentenced, and throughout the period of 1980 through 1989:

            1) Between 1980 and 1989, women comprised only 816 of 5655 members of the sheriffs venires, or 14.6% of such venires . This constitutes an absolute disparity of 36% and a comparative disparity of 71 %. This is statistically significant: Women were underrepresented by -53 standard deviations during the period.

             2) During 1985, when Darrell Hines was indicted, the sheriff's venires contained 450 persons, only 49 of whom were women. The venires during 1985 thus comprised only 11.1% women. There was an absolute disparity of 40% and a comparative disparity of 78%. This is statistically significant: Women were underrepresented by -16.7 standard deviations in 1985.

             3) During 1986, when Darrell Hines was convicted of first-degree murder, the sheriffs venires contained 375 persons, only 38 of whom -- or 10.2% -- were women.

This constitutes an absolute disparity of 40.5 % and a comparative disparity of 80%. This is statistically significant: Women were underrepresented by -15.7 standard deviations in 1986.

4) During 1989, when Darrell Hines was sentenced to death, the sheriff's venires contained 475 persons, only 78 of whom- or 16.6%- were women. This constitutes an absolute disparity of 34.1% and a comparative disparity of 67%. This is statistically significant: Women were underrepresented by -14.8 standard deviations in 1989.

g.  As a result of this process for jury selection, Darrell Hines was subjected to pervasive, invidious, and unconstitutional discrimination against women in the selection of the grand jury:

1) The grand jury venires in 1985 comprised 185 persons, only 29 of whom- or 10.2%-were women. Women were underrepresented by 40.5% in absolute terms, and 80% in comparative terms.

2) The 12-person June 1985 grand jury which indicted Darrell Hines only contained four (4) women. The percentage of women on the grand jury, therefore, was 33.3%. The absolute disparity between the percentage which should have appeared in the grand jury absent discrimination was 17.4%. The comparative disparity was nearly 50%. Throughout 1985, women were underrepresented by -13.9 standard deviations in the grand jury venires.

3) From 1980 through 1989, of a total of 2525 persons selected for possible service on the grand jury, only 418 persons -- or 16 .6 % of all the venires -- were women. Absent discrimination, one would have expected 1295 women to have been in the venires from 1980 through 1989. Women were thus underrepresented with an absolute disparity of 35.1%, and a comparative disparity of 68%. This is statistically significant: From 1980 through 1989, women were underrepresented by-34.6 standards.

h.  Darrell Hines was also subjected to pervasive, invidious, and unconstitutional discrimination against women in the selection of the petit jury:

1) As with the grand jury venires, as to the petit jury venires from 1980 through 1989, of a total of 2525 persons selected for possible se1vice on the petit jury, only 418 persons -- or 16.6% of all the venires - were women. Absent discrimination, one would have expected 1295 women to have been in the venires from 1980 through 1989. Women were thus underrepresented with an absolute disparity of 35.1%, and a comparative disparity of 68% This is statistically significant: From 1980 through 1989, when it came to the selection of petit juries, women were underrepresented by

127

-34.6 standards.

2) As with the grand jury venires from 1985, the petit jury venires from 1985 comprised 185 persons, only 29 of whom - or 102% - were women. Women were underrepresented by 40 5% in absolute terms, and 80% in comparative terms.

3) The October 1985 petit jury venire -- from which the guilt-phase jury was selected --only comprised 20.8% women. This represents an absolute disparity of 29.9% and a comparative disparity of 59%.

4) The petit jury venires from 1989 comprised 338 persons, only 48 of whom -or 14.2% --were women. This represents an absolute disparity of 36.5%, and a comparative disparity of 72%.

5) The June 1989 petit jury venire - from which the sentencing-phase jury was selected - comprised 42 persons, only 5 of whom -- or 10.6% -- were women. This represents an absolute disparity of 40.1% and a comparative disparity of 79 %.

i.     Darrell Hines was also subjected to invidious, pervasive discrimination against women and minorities in the selection of the grand jury foreperson in violation of the Sixth, Eighth and Fourteenth Amendments:

1) The process for selecting forepersons (who had the same powers as all grand jurors) was susceptible to discrimination or abuse.

2) Tenn R. Crim. P 6(g), governing the appointment of grand jury forepersons gave unfettered discretion to judges to appoint the forepersons of the grand jury.

3) Rule 6(g) provides: "The judge of the court authorized by law to charge the grand jury and to receive the report of that body shall appoint the foreperson of the grand juries in the counties of then respective jurisdictions. If concurrent grand juries are impaneled, a foreperson shall be appointed for each grand jury. Every person appointed as a foreperson shall possess all the qualifications of a juror. The foreperson shall hold office for a term of two (2) years from appointment; however, in the discretion of the presiding judge, the foreperson may be removed, relieved, or excused from office for good cause at any time... The foreperson may vote with the grand jury and this vote shall count toward the twelve necessary for the return of an indictment... ."

4) Throughout the period from 1979 from 1990, there were only two grand jury forepersons, and both were white males. None were female. None were African-American, and Hines is part-African-American.

128

5) Between 1980 and 1989, there were twenty-nine (29) separate grand juries. Not one of the 19 grand juries had a woman or an African-American as a foreperson.

j.    As a result of discrimination against women in the selection of the grand jury, grand jury foreperson, and petit jury, Darrell Hines was denied due process of law, the equal protection of the laws, the right to be free from invidious discrimination in the selection of juries, and the right to a representative jury from a fair cross-section of the community. As a result, the indictment in this matter violated the Fifth, Sixth, Eighth, and Fourteenth Amendments; Darrell Hines's resulting conviction violated the Fifth, Sixth, Eighth, and Fourteenth Amendments; and Darrell Hines's death sentence violated the Fifth, Sixth, Eighth, and Fourteenth Amendments. He is entitled to habeas corpus relief.

10.    In violation of the Sixth, Eighth, and Fourteenth Amendments and Brady v. Maryland, 373 US. 83, 83 S Ct. 1194 (1963), and in order to convict Darrell Hines and sentence him to death, the prosecution knowingly presented false testimony and withheld exculpatory evidence which was material to both the conviction and the imposition of the death sentence.

a.    In order to convict Darrell Hines and sentence him to death, the prosecution knowingly presented false testimony from Ken Jones (who was a friend of the Sheriff) while simultaneously failing to disclose material, exculpatory evidence showing the falsity of Jones' testimony.

1) At the guilt/innocence trial, Jones claimed that he arrived at the CeBon motel at 12:30 p.m., left and went to Stuckey's, returned at 1:20 or 1 :30 pm, left a note at the motel office saying he was using the restroom in Room 21, went to Room 21 to use the restroom, found the victim's body but didn't know anything about what happened to the victim, returned the key to the office, called the Sheriff immediately after finding the body, and waited for the Sheriff. See e.g., 1986 Trial Tanscript 149-155. Jones' story to the jury was false.

2) Evidence known to the prosecution and law enforcement (including Sheriff Weakley, who received information about Jones' activities from Jones himself) confirms the falsity of Jones' testimony. The state knew that, in actuality, Jones arrived at the motel earlier in the morning for a tryst with Vernedith White (and not to use the restroom), the key to Room 21 was never recovered, no alleged note was ever found, Jones didn't call the Sheriff or wait for him after making any such alleged call, but Jones did tell the person who made the call that a woman had been stabbed, a fact which only the killer would have known.

3) While presenting Jones' false testimony, the prosecution also failed to disclose material exculpatory evidence showing the falsity of Jones' testimony, including evidence known to the prosecution and authorities (including Sheriff Weakley) that Jones arrived at the motel earlier in the morning for a tryst with Vernedith White (and

129

not to use the restroom); that the key to Room 21 was never found; that no alleged note from Jones was ever recovered by authorities; and that Jones didn't call the Sheriff or wait for him after making any such alleged call. There is a reasonable probability that, had the prosecution properly complied with its constitutional obligations to disclose material, exculpatory evidence, Darrell Hines would not have been convicted and/or sentenced to death.

b.     The prosecution convicted and sentenced Darrell Hines to death by knowingly presenting false evidence and testimony from Sheriff Dorris Weakley and arguing that false testimony while withholding material exculpatory evidence showing that Weakley's testimony was false.

1) Sheriff Weakley falsely stated in his March 7, 1985 affidavit of complaint that "the only persons at the motel at the time of this homicide were the victim, Catherine Jean Jenkins and the defendant," Darrell Hines. That was a knowingly false statement. Weakley knew full well that at the time of the homicide his friend Ken Jones and Vernedith White were at the motel for a tryst.

2) As with his false affidavit, Sheriff Weakley falsely testified that only Darrell Hines and the victim were at the motel at the time of the offense (Tr 470), while withholding material exculpatory evidence that Ken Jones and his paramour Vernedith White were at the motel at the time of the homicide for a tryst. Weakley and the prosecution knew that Jones was at the motel and that Weakley's testimony was therefore false.

3) The prosecution heavily relied on Sheriff Weakley's false testimony when arguing for conviction by claiming that only Darrell Hines and the victim were at the motel at the time of the homicide (Tr 581), when the prosecution knew that Jones and White were there when the victim was murdered.

4) In addition, Sheriff Weakley falsely testified that a cigarette butt in the victim's room connected Darrell Hines to the homicide (Tr. 469), while withholding material exculpatory evidence that the cigarette butt was not shown to connect Mr. Hines to Room 21.

c.     The prosecution also knowingly presented false testimony from Dr. Charles Harlan and withheld material exculpatory evidence concerning Petitioner's guilt and sentence:

1) At the guilt phase of trial, the prosecution presented the false testimony of Harlan when Harlan claimed that the victim would have survived 4-5 minutes while remaining conscious eighty percent of that interval, while the prosecution simultaneously withheld material and exculpatory evidence that Harlan knew and the proof would show that the victim would have lost consciousness in less than 30

130

seconds.

2) At the sentencing phase of trial, the prosecution knowingly presented false testimony from Dr. Charles Harlan when Harlan claimed that the victim survived up to 6 minutes and would have remained conscious up to 4-5 minutes, where that testimony was inconsistent with Harlan's prior testimony, while the prosecution simultaneously withheld material and exculpatory evidence that Harlan knew and the proof would show that the victim would have lost consciousness in less than 30 seconds.

3) The prosecution also knowingly presented false testimony from Harlan  that there was no evidence of semen and that there was no study performed on any such evidence, and the prosecution withheld evidence which demonstrated the falsity of that testimony and which was otherwise material to the jury's guilt and death verdicts, including proof of the results of any such scientific or laboratory study concerning the existence and nature of any semen.

4) The falsity of Harlan's testimony is confirmed by the fact that Harlan has recently had his medical license stripped by the Board of Medical Examiners, because Harlan has engaged in numerous criminal, unprofessional, and unethical actions. See *In The Matter of Charles Harlan, MD*, No. 17.18-022307A, Before The Board Of Medical Examiners, Tennessee Department Of Health.

d.     The false testimony of Jones, Weakley, and/or Harlan affected the judgment of the jury at both the guilt and sentencing phases of trial.

e.  ,     There is a reasonable probability that had the prosecution not withheld exculpatory evidence concerning the testimony of Jones, Weakley, and/or Harlan, Darrell Hines would not have been convicted of first-degree murder and/or sentenced to death.

f.     In addition, the prosecution improperly coached witnesses concerning their description of events which occurred while with Darrell Hines. In particular, witnesses were improperly influenced to claim at trial that they saw Mr. Hines with a key with the number "9" on it (Tr 120), that Mr. Hines seemed nervous (Tr. 121), that Mr. Hines had a stain on the shoulder of his shirt (Tr. 185), and that Mr. Hines had a silver Volvo (Tr. 225).

g.     As a result, Darrell Hines is entitled to habeas corpus relief.

11.     Counsel was ineffective at the guilt phase of the proceedings, and absent counsel's failures, there is a reasonable probability that Darrell Hines would not have been convicted and/or sentenced to death. Counsel was ineffective for the following reasons, including:

\*\*\*

b.     Counsel failed to properly interview and build a relationship with Darrell Hines.

Counsel met with Mr. Hines only a few times during the course of the guilt-innocence phase of the trial.

***

e.     Counsel failed to competently select the jury for the 1986 guilt/innocence phase of the trial, including but not limited to:

1) Counsel failed to object to Sheriff Weakley's participation in voir dire, where it was likely that the Sheriff would testify for the prosecution and that this premature exposure to the jury would lend the Sheriff a prejudicial aura of credibility.

2) Counsel failed to object to the court's failure to properly sequester the jury panel on the night of January 6, 1986, prior to the conclusion of voir dire on January 7, 1986. As a result, juror Sandra Kilgore was improperly exposed to extraneous information. See ¶ 27b, incorporated by reference.

3) Counsel failed to object to the state's incorrect presentation of the definitions of the elements of the charge, burdens of proof, and definitions of sentencing terms. Specifically, the state incorrectly stated that it was entitled to a fair trial. See Tr. at 15. The state also incorrectly stated on several occasions that in some circumstances the death penalty was required.

4) Counsel failed to object to the court's failure to order a mistrial following prejudicial statements made by potential jurors, including but not limited to juror Anderson's statement that it was a "brutal murder" and juror Winn's statement that it was a "horrendous act." See Tr. at 23-26.

5) Counsel failed to object to the court's failure to strike juror Cothan who was biased against Darrell Hines. See ¶ 27e, incorporated by reference.

6) Counsel failed to conduct adequate voir dire which would have exposed biases prejudicial to Mr. Hines - including jurors who were relatives and close friends of law enforcement, who had been victims of crime or were close to crime victims, and jurors who had strong negative feelings about people who carry knives.

7) Counsel failed to challenge for cause those jurors who held some kind of bias against Mr. Hines, his case, or any class or group to which he belongs.

***

i.     All of counsel's failures regarding Ken Jones' story were especially egregious where counsel put Darrell Hines on the stand to get Mr Hines to say that he and counsel discussed all tactical decisions (Tr. 697), while at the same time counsel misled Darrell Hines about their knowledge of the falsity of Ken Jones' testimony. This further denied Mr. Hines his very right to counsel.

***

132

l.    Counsel failed to investigate potentially illegal activities occurring at the CeBon motel, and whether the victim was engaged in any affairs, and if so, with whom.

***

n.    Counsel was ineffective for allowing the prosecution to present prejudicial and/or inflammatory information which was irrelevant to Darrell Hines' guilt, including but not limited to, allegations that Mr. Hines had blood on his shirt (Tr. 128, 129), and information that Mr. Hines had been on parole at the time of the offense. Tr. 207. See ¶¶ 11m & 20f, incorporated by reference.

o.    Counsel failed to object to the court requiring that Darrell Hines roll up his sleeves to aid the testimony and identification of the witnesses for the prosecution.

p.    Counsel failed to object to the qualifications of medical examiner Dr. Charles Harlan to testify regarding marks found in the wall of the room at the motel where Darrell Hines had stayed. See ¶ 10(c), incorporated by reference.

q.    Counsel failed to adequately object to the prosecution's inappropriate methods of introducing evidence at the 1986 guilt/innocence phase of the trial, including but not limited to the prosecution's extensive practice of leading witnesses on direct examination. See e.g., Tr. at 231, 568. Counsel failed to move for a mistrial on the basis that the prosecution's extensive practice of
leading witnesses rendered the prosecution's evidence unreliable and the entire proceeding fundamentally flawed.

r.    Counsel failed to object to unconstitutional jury instructions given by the Court.

1) The guilt/innocence jury was allowed to convict Darrell Hines of felony-murder without being instructed on, or specifically finding, the element of malice. See ¶19aa, incorporated by reference.

2) The court's instructions regarding "reasonable doubt" were unconstitutional. The court instructed the jury that it could convict Darrell Hines based upon mere "moral certainty" of guilt (Tr. 637, 650) or a "satisfactmy conclusion" of guilt (Tr. 650), while allowing conviction based upon mere ability to let the mind rest easily about guilt (Tr. 637) and excluding "possible" doubts about guilt. Tr. 637.. See ¶19b, incorporated by reference.

3) The trial court improperly instructed the guilt/innocence jury that it was required to presume the truthfulness of witnesses, thereby violating the jury's prerogative to assess the credibility of witnesses and determine facts. Tr 648.

4) The court improperly instructed the jury regarding the definitions of premeditation and the presumption of innocence. Tr. 638-639.

133

5) In addition, counsel failed to request the trial court to instruct the jury on the elements of all lesser included offenses.

s. Counsel did not competently perform during opening and closing arguments during the 1986 guilt/innocence phase of the trial, including but not limited to:

1) Counsel failed to adequately and accurately argue the evidence and law in their opening and closing arguments.

2) Counsel failed to object to the prosecution's improper, inflammatory, prejudicial, inappropriate and misleading or inaccurate statements concerning the law, the evidence and Darrell Hines during opening and closing arguments:

a) In closing arguments, the prosecution falsely told the jury that there was no presumption of innocence anymore because they had proved that Darrell Hines was guilty. Tr. 608. See ¶21(a), incorporated by reference.

b) The prosecution improperly vouched for the credibility of its witnesses, including Vicki Hines (Tr. 579), who later admitted that she was under the influence of alcohol at the time and recanted her testimony; and Sheriff Weakley (Tr. 611, 617), who the prosecution knew was testifying falsely. The prosecution also expressed his personal opinion about their credibility during his closing argument. See ¶21(b), incorporated by reference.

c) The prosecution injected passion and arbitrariness into the proceedings by persuading the jury to protect themselves, the county, and their country by convicting Darrell Hines. See ¶21(c), incorporated by reference.

d) The prosecution belittled Darrell Hines' exercise of his constitutionally guaranteed rights by focusing them on the victim's rights. Tr. 608. See ¶21(d),incorporated by reference.

e) The prosecution boasted to prospective jurors that this case was the most important in the history of the county, emphasizing his lengthy experience and expertise. This type of argument is fundamentally unfair and unconstitutional See ¶21(e), incorporated by reference.

f) The prosecution shifted the burden of proof and encroached on Darrell Hines' right to present a defense and have witnesses testify in his favor when he implied that Darrell Hines must put on proof to secure an acquittal or avoid conviction. This argument violated due process. See ¶21(f), incorporated by reference.

t.     Counsel failed to file proper pre-trial motions on Mr Hines' behalf; including but not limited to:

1) Any motion challenging Mr. Hines' illegal arrest, detention, and interrogation in Kentucky and his subsequent transfer from KY to Tennessee See ¶17, incorporated by reference.

2) Any motion challenging the constitutionality of Tennessee's murder statute, Tenn. Code Ann.§ 39-2-201 to -202 (repealed 1991). See ¶35, incorporated by reference.

3) Any motion requesting a bill of particulars.

4) Any motion seeking the prosecution's compliance with constitutional, statutory, and local rules governing the disclosure of discovery.

5) Any motion seeking preservation of all law enforcement rough notes and a complete copy of the District Attorney General's file.

6) Any motions seeking the resources necessary for competent representation in a capital murder trial, including but not limited to: investigative assistance, jury selection assistance, forensic expert witnesses, forensic evidence testing, and mental health experts.

7) Any motions in limine seeking special voir dire rules, including but not limited to the light to submit a jury questionnaire and the right to conduct individual voir dire.

8) Any adequate motion for judgment of acquittal alleging that the prosecution failed to meet its burden of proving the elements of robbery in order to support the felony murder charge and that Mr.. Hines' prim convictions were not applicable to support that aggravating circumstance .. See ¶¶15, 17, 32, incorporated by reference.

9) Any motion seeking an order which would have requiled the prosecution to elect which of two murder counts would go to the jury. See ¶15, incorporated by reference.

10) Any adequate motion seeking a continuance of the filing of the motion for new trial, and the hearing on the motion for new trial.

11) Any adequate and comprehensive motion for new trial.

12) Any motion to dismiss and/or motion to arrest the judgment on grounds that Tennessee's murder statute was unconstitutional. See ¶35, incorporated by reference.

u. Counsel failed to raise the objections necessary to preserve issues for appellate review.

***

13.    In violation of the Sixth, Eighth, and Fourteenth Amendments, counsel was ineffective at the re-sentencing proceedings, and absent counsel's failures, there is a reasonable probability that Petitioner would not have been sentenced to death. Counsel was ineffective for the following reasons, including:

***

    b.    Counsel was ineffective for failing to competently select the jury in this case, including but not limited to:

        1) Counsel failed to object to the trial court's improper dismissal of jurors who expressed concern about the death penalty. See Witherspoon v. Illinois, 391 U.S 510, 88 S. Ct 1770 (1968); Adams v. Texas, 448 U.S. 38, 110 S.Ct. 2521 (1980), especially juror Citro. See ¶27(g), incorporated by reference.

        2) Counsel failed to conduct a voir dire that would have exposed biases held by some jurors which prejudiced Darrell Hines and to challenge those jurors for cause.

    c.    Counsel failed to develop and pursue a comprehensive mitigation theory for Darrell Hines' re-sentencing trial. Counsel failed to develop a comprehensive social history in order to get a complete picture of Darrell Hines' life. In fact, counsel admitted that at the time of resentencing, he had no idea how to put together a mitigation case. Tr. 587.

***

    t.    Counsel failed to present evidence of false statements of Sheriff Weakley who stated in his March 7, 1985 affidavit of complaint that "the only persons at the motel at the time of this homicide were the victim, Catherine Jean Jenkins and the defendant," Darrell Hines. That was a knowingly false statement. Weakley knew full well that his friend Ken Jones and Vernedith White were at the motel at the time of the homicide for a tryst See ¶10, incorporated by reference.

    u.    As with his false affidavit, counsel failed to present evidence of the false testimony of Sheriff Weakley who claimed that only Darrell Hines and the victim were at the motel at the time of the offense (Ir 4 70), while he withheld material exculpatory evidence that the Sheriffs friend, Ken Jones, and his paramour, Vernedith White, were at the motel at the time of the homicide for a tryst Weakley and the prosecution knew that Jones was at the motel and that Weakley's testimony was therefore false. See ¶10, incorporated by reference.

***

    w.    Counsel was ineffective for failing to object to the prosecution's improper, inappropriate, and inflammatory statements during voir dire. See ¶22, incorporated by reference.

136

x.    Counsel was ineffective for failing to object to the prosecution's improper coaching of witnesses. See ¶22, incorporated by reference.

y.    Counsel was ineffective for failing to object to the prosecution's introduction of the indictment against Mr. Hines which misled jurors into thinking that Mr Hines had been convicted of premeditated murder when, in fact, the guilt phase jury only found Darrell Hines guilty of felony-murder. See if22( d), incorporated by reference.

z.    Counsel was ineffective for failing to properly object to the prosecution's improper and personal comment about Darell Hines' exercise of his right to counsel and to use the assistance of persons who assisted him in preparing his case, including the Capital Case Resource Center. See ¶22(e), incorporated by reference.

aa.    Counsel was ineffective for failing to object to unconstitutional jury instructions and for failing to file proposed jury instructions, including but not limited to:

    1) Counsel failed to object to jury instructions which equated "reasonable doubt" with "moral certainty" and permitted the finding of aggravating circumstances and the imposition of the death penalty based upon a "satisfactory conclusion" of the jury's findings, while also improperly excluding from the jury's consideration "possible" doubts about the existence of a circumstance or the appropriateness of the death sentence. See ¶19(c), incorporated by reference.

    2) Counsel failed to object to a jruy instruction which misstated that law regarding the necessity for a unanimous verdict in order for Darrell Hines to receive a life sentence. R Tr. 63, 588-590. See ¶18, incorporated by reference. Moreover, counsel failed to seek an instruction clarifying that the decision regarding sentence is to be made by individual jurors and does not have to be unanimous.

    3) Counsel failed to seek an instruction clarifying that a life sentence means "life" and that a death sentence means "death" and that these sentences will be carried out.

    4) Counsel failed to seek instructions clarifying the law regarding sentencing factors. Specifically, counsel failed to request:

        a) an instruction clarifying that only statutory aggravating factors are to be considered;

        b) an instruction defining aggravating and mitigating circumstances, including listing all non-statutory mitigating circumstances;

        c) an instruction clarifying how aggravating circumstances are to be weighed;

d) an instruction establishing that the jury must find, unanimously, the existence of aggravating circumstances beyond a reasonable doubt;

e) an instruction clarifying that Darrell Hines began the sentencing phase of the trial under the presumption that no aggravating circumstances existed in his case;

f) an instruction that the first degree murder conviction itself is not an aggravating circumstance;

g) an instruction clarifying that evidence put on to establish mitigating circumstances cannot be used to establish aggravating circumstances.

h) an instruction establishing that lingering doubt regarding Darrell Hines' guilt may serve as a non-statutory mitigating circumstance.

i) an instruction establishing that doubts regarding the appropriate sentence are to be resolved in favor of a life sentence.

j) an instruction establishing that the jury may base its decision on mercy, sympathy, and compassion.

5) Counsel failed to file a proposed verdict form that listed all mitigating circumstances raised by the evidence, statutory and non-statutory, and which required the jury to specifically state what mitigating circumstances were found to exist by any juror, and failed to object to the verdict form used by the court.

bb. Counsel failed to object to the use of physical restraints on Darrell Hines in full view of the jurors. See ¶28, incorporated by reference.

cc. Counsel failed to timely subpoena witnesses or evidence, including witnesses Norman Johnson and Bill Andrews in violation of Mr. Hines' right to compulsory process, due process, and his rights to present any and all available mitigating evidence in support of a sentence less than death. See ¶31, incorporated by reference.

dd. Counsel was ineffective for failing to seek a mistrial once the re-sentencing jury was informed that the case had previously been reviewed by the Tennessee Supreme Court. Resentencing Transcript 215.

ee. Counsel failed to engage in the motions practice necessary to protect Mr. Hines' rights, including but not limited to:

1) Counsel failed to file pre-trial motions challenging the constitutionality of the

138

sentencing provisions of Tennessee's murder statute, which is arbitrary and capricious and violates the Eighth and Fourteenth Amendments. See ¶35 incorporated by reference.

2) Counsel filed inadequate pre-trial motions seeking the state's compliance with constitutional, statutory, and local discovery obligations and also objecting to the state's reciprocal discovery requests.

3) Counsel failed to file pre-trial motions seeking preservation of all law enforcement rough notes and a complete copy of the state's file, both for in camera inspection and later use on post-conviction.

4) Counsel filed inadequate and untimely pre-trial motions seeking expert assistance, including investigative services, mitigation specialist, jury selection assistance, and witnesses able to address forensic sentencing issues in this case, Mr. Hines' life history, and his mental condition.

5) Counsel filed inadequate pre-trial motions seeking timely notice of the state's intent to seek the death penalty and the mandatory continuance awarded upon the untimely filing of notice of intent to seek death. See Tenn. R. Crim. P 12.3(b).

6) Counsel filed inadequate pre-trial motions seeking a continuance of the re-sentencing hearing in order to adequately prepare. Counsel's request for a continuance inadequately addressed the state's failure to serve timely notice of its intent to seek death.

7) Counsel filed inadequate pre-trial motions seeking special voir dire rules, including but not limited to, the right to submit a comprehensive jury questionnaire and the right to conduct individual voir dire as to death qualification of the venire members.

8) Counsel failed to file pre-trial motions charging the prosecution with abuse of discretion in seeking the death penalty, asserting the disproportionate application of the death penalty, and challenging the proportionality of the death sentence in Mr. Hines' case.

10) Counsel failed to file pre-trial motions seeking the right to allocution for Darrell Hines at the re-sentencing trial.

11) Counsel failed to file pre-trial motions seeking to limit the state's proof at the sentencing hearing to specific aggravating circumstances

12) Counsel failed to file pre-trial motions seeking dismissal of the invalid

139

felony-murder aggravating circumstance because it duplicated Mr. Hines' felony-murder conviction and failed to produce the necessary narrowing of death eligible defendants. See ¶15, incorporated by reference.

13) Counsel filed an inadequate post-conviction petition challenging the constitutionality of Darrell Hines' prior felony conviction in Kentucky and then failed to properly challenge the invalid prior felony conviction aggravating circumstance See ¶17, incorporated by reference.

14) Counsel failed to timely file pre-trial motions causing the court to claim that counsel's motions were "dilatory." See R. Tr. 4.

15) Counsel failed to file motions seeking judgment of acquittal with respect to the death sentence based upon the improper application of aggravating circumstances.

\*\*\*

14.    Counsel was ineffective on appeal, and absent counsel's failures, there is a reasonable probability that Darrell Hines would have received relief on direct appeal. Counsel was ineffective for the following reasons, including:

a.     Counsel failed to timely object or otherwise preserve for appeal any or all of the claims presented in this petition for writ of habeas corpus.

b.     Counsel failed to obtain all necessary portions of the transcript and record for appeal, including but not limited to, a transcript of the voir dire, and the transcript of the motions hearings in this case.

c. Counsel failed to adequately research and prepare Mr. Hines' case for appeal.

d.     Counsel failed to raise all available issues in their motion for a new trial and to brief all issues on appeal.

e.     Counsel failed to include in its brief to the Tennessee Supreme Court all issues raised in the Court of Criminal Appeals.

f.     Counsel filed an inadequate petition to rehear following the Tennessee Supreme Court's adverse ruling on Darrell Hines' appeal. Specifically, counsel failed to argue that the Supreme Court erred when it concluded that" in the instant case, a felony not underlying the felony murder conviction [was] used to support the felony murder aggravating circumstance. " State v. Hines, 919 S.W2d 573, 583 (Tenn. 1995). There is no evidence in the record supporting this conclusion

140

g.    On appeal, counsel failed to raise any or all claims raised in this petition for writ of habeas corpus.

***

17.    In violation of the Sixth, Eighth, and Fourteenth Amendments, Darrell Hines' 1989 death sentence was unconstitutional because the 1981 first-degree assault conviction which served as a prior violent felony aggravating circumstance under Tenn. Code Ann.. § 39-2-203(i)(2) was void,invalid, and unconstitutional.

a.    On August 21, 1981, Darrell Hines was involved in a series of escalating verbal assaults upon him by a number of college students.

b.    These college students were attending a party in Bowling Green, Kentucky where Darrell Hines lived.. The students had all been drinking.

c.    Darrell Hines was also intoxicated that night, but was not disturbing the college students. Mr Hines was standing and watching the party in an alley on the perimeter of the yard of the home where the party was being held.

d.    The victim and other eye-witnesses confirm that Darrell did nothing to provoke the students' verbal assaults, which were intended to force Darrell to leave the area and which were accompanied by aggressive body language and implied threats of physical force.

e.    Only after several hours of these verbal assaults, and only after being confronted by four or five individuals "one final time," did Mr Hines arm himself with a lead pipe.

f.    Mr. Hines then swung the pipe at the victim, breaking the victim's arm, because he reasonably believed it was necessary to protect himself against the hostile group of students that were surrounding him.

g.    The victim suffered only a broken arm in the assault.

h.    Mr. Hines was then charged with an offense under Kentucky law. Count I of the indictment as found by the grand jury specifically alleged that he committed an assault upon Stan Williams, and that his actions were "Contrary to 508.020" of the Kentucky Revised Statutes. The indictment did not allege any mental state, and while it identified the use of the pipe, it never alleged that the pipe was a deadly weapon.

i.    Ky. Rev. Stat §508.020 governs the crime of assault in the second-degree and provides that a second-degree assault occurs when a person "intentionally causes serious physical injury to another person" or "intentionally causes physical injury to another person by means of a deadly weapon or a dangerous instrument," or "wantonly causes se1ious

141

physical injury to another person by means of a deadly weapon or a dangerous instrument."

j.      In addition, Ky. Rev. Stat. Ann. § 508.010 dictates that: "A person is guilty of assault in the first degree when: (a) He intentionally causes se1ious physical injury to another person by means of a deadly weapon or a dangerous instrument; or (b) Under circumstances manifesting extreme indifference to the value of human life he wantonly engages in conduct which creates a grave risk of death to another and thereby causes serious physical injury to another person."

k.      On October 10, 1981, Darrell Hines pleaded guilty to a charge of assault in the first-degree and received a sentence often years imprisonment.

l.      However, as noted supra, Count I of the indictment alleged that Hines' actions were "Contrary to 508.020," the statute governing second-degree assault.

m.      Consequently, because Hines pleaded guilty to an offense which was never properly alleged in the indictment, his conviction for the greater offense of first-degree assault is void.

n.      In addition, though Mr.. Hines entered a guilty plea, his attorney had failed to inform him regarding his constitutional rights and the waiver of those rights upon entering a guilty plea.

o.      Moreover, the court failed to sufficiently advise Darrell Hines of his constitutional rights at the time he was entering his guilty plea.

p.      As a result, Darrell Hines was unaware that he was waiving his rights when he entered a guilty plea to this 1981 charge.

q.      Specifically, the court failed to inform Darrell Hines that he had a right to confront those who were accusing him and that he was waiving that right by pleading guilty.

r.      As a result, Darrell Hines did not know that he had a constitutional right to confront his accusers.

> 1) Darrell Hines' knowledge of his constitutional right to confront his accusers and his ability to voluntarily and intelligently waive that right, was substantially impaired by the fact that Mr. Hines suffered from severe addictions, mental illness, and intellectual deficiencies.
>
> 2) At the time Darrell Hines pleaded guilty to this offense, he was an alcoholic and a severe abuser of inhalants and other drugs.

3) These addictions significantly impaired Darrell Hines' ability to know of or voluntarily waive his rights, especially a right of which he had not been advised.

4) Prior to pleading guilty in 1981, Darrell Hines was diagnosed with a number of mental illnesses including adjustment reaction, dysthymia and paranoia.

5) Mr. Hines also suffered from significant intellectual deficiencies-he stopped attending school after he reached the ninth grade, at which time his math and reading skills were determined to be at a third grade level.

6) Mr Hines' IQ has been determined to be in the low average range.

7) Moreover, despite Darrell Hines' previous contact with the judicial system, Mr. Hines had never seen a trial and had never observed a cross-examination conducted on his behalf or for anyone else.

s.   Darrell Hines did not voluntarily and intelligently waive his rights at the time he pleaded guilty. Boykin v. Alabama, 395 U.S. 238, 89 S. Ct 1709 (1969).

t.   In addition, Darrell Hines' court-appointed counsel was ineffective. She failed to conduct any investigation into the factual basis of the crime or into Mr .. Hines' mental health background and also failed to raise important legal claims available to Mr Hines.

1) Counsel failed to know the law regarding assault. Had counsel known the legal definitions related to the assault statute, counsel would have known that Mr. Hines could not be legally convicted of the greater charge of first-degree assault when Count I of the indictment only specifically said that his actions violated §508 .020, the second-degree assault statute.

2) Counsel also would have been able, after investigation, to conclude that Mr. Hines was not guilty of aggravated assault because the victim did not suffer "serious physical injury" which is defined as a "serious and prolonged disfigurement or impairment" See Ky. Rev Stat. Ann.§ 508.010 and 500.080(15). The victim in this case merely had a broken arm.

3) Moreover, counsel failed to challenge the indictment which was insufficient as it did not allege any serious physical injury and only was sufficient to support a charge of the lesser offense of second-degree assault.

4) Counsel failed to challenge the fact that the indictment failed to charge

143

mens rea. Counsel then failed to advance a defense of intoxication for Mr. Hines since he was intoxicated and unable to form any intent at the time of the incident.

5) Counsel failed to investigate Mr. Hines' placement in Green River Boys Camp. Had counsel investigated, counsel would have learned that the abuse the college boys directed at Mr. Hines was virtually identical to the abuse Mr. Hines suffered at Green River which often preceded violence being inflicted on the boy being abused See ¶13(i), incorporated by reference.

6) Counsel failed to investigate and present evidence respecting Darrell Hines' extremely low serotonin level See ¶13(i), incorporated by reference. Had counsel investigated that serotonin level, counsel would have learned that:

   a) Serotonin is a naturally occurring neuromodulator in the brain.

   b) A low serotonin level affects brain functioning by adversely affecting a person's ability to control extreme emotions (such as anger, fear, rage, sadness, etc.); adversely affecting the various systems of inhibition in the brain; and, adversely affecting a person's ability to control impulsive behavior associated with emotions such as anger, fear, rage, and sadness.

   c) Darrell Hines has an extremely low serotonin level which renders him incapable of controlling impulsive behavior associated with emotions such as anger, fear, rage, sadness, etc.

   d) Low serotonin levels have also been associated with Type II alcoholism, which is characterized an inability to abstain from ingesting intoxicants and thus persistent alcohol/drug seeking behavior; and impulsivity, high risk-taking/low harm avoidance, fighting and other violence, and arrests.

   e) Darrell Hines' social history is replete with incidents exhibiting symptoms of having low serotonin level and Type II alcoholism.

7) Counsel failed to conduct an investigation into the facts of the incident or into Mr Hines' background. See ¶¶7(a)-(g), supra. Had counsel investigated, she would have known that Mr. Hines was provoked and was only defending himself and that he had a valid defense of self-defense under Kentucky law. In addition, she would have been aware of Mr. Hines' mental illness and learning deficiencies.

144

8) In addition, counsel only met with Mr. Hines two times during the course of her representation.

u.      Had counsel properly researched the law, reviewed the indictment, and investigated the facts and the victim's background, she would not have advised Darrell Hines to plead guilty and Mr. Hines would not have entered a guilty plea. Instead, Mr Hines would have challenged the insufficiency of the indictment, raised the defenses of self-defense and intoxication, and would have been acquitted.

v.      As a result, the 1981 guilty plea was unconstitutional.

w.      Mr Hines is actually innocent of any offense, because all the evidence(including proof of the taunting and threats made by the students) would establish that he did not commit a first-degree assault and/or that he had, as a matter of fact acted in self-defense and was therefore not guilty of the offense for which he was convicted

x.      Mr. Hines is therefore entitled to habeas corpus relief because the prior felony conviction aggravating circumstance was void and invalid, but the jury relied on that aggravating circumstance when it imposed the death sentence. Mr. Hines is entitled to habeas corpus relief Under the Eighth and Fourteenth Amendment, Mr. Hines is entitled to a new sentencing proceeding free from the taint of this invalid prior conviction.

***

19.    In violation of the Sixth, Eighth, and Fourteenth Amendments, jury instructions lessened the prosecution's burden of proof at the guilt and re-sentencing stages:

a.      The guilt/innocence jury was allowed to convict Darrell Hines of felony murder without being instructed on, or specifically finding, the element of malice. Tr. 640. The Jury was unconstitutionally allowed to convict by merely finding a "killing" in the course of a felony, when all "murder" under Tennessee law required a finding of killing with malice. See Tenn. Code Ann. 39-2-201 (1982).

b.      The jury was instructed at the guilt phase of trial that it could convict
Darrell Hines based upon mere "moral certainty" of guilt (Tr. 637, 650) or a "satisfactory conclusion" of guilt (Tr. 650), while allowing conviction based upon mere ability to let the mind rest easily about guilt (Tr. 637) and excluding "possible" doubts about guilt. Tr. 637. These instructions relieved the prosecution of proving guilt beyond a reasonable doubt of the charges for which Darrell Hines was ultimately convicted.

c.      Similar instructions at the re-sentencing phase (R. Tr. 580) unconstitutionally understated the prosecution's burden of proof; allowing the finding of aggravating circumstances based upon mere "moral certainty" of guilt (R Tr 580), so long as jurors could let the mind rest easily that any such circumstance existed, while also improperly excluding from the jury's consideration "possible" doubts about the existence of a circumstance or the

145

appropriateness of the death sentence

d.    The trial court improperly instructed the guilt/innocence jury that it was required to presume the truthfulness of witnesses, thereby violating the jury's prerogative to assess the credibility of witnesses and determine facts.. Ir 648.

e.    At the guilt/innocence trial, the court improperly instructed the jury regarding the definitions of premeditation and the presumption of innocence. Tr. 638-639.

f.    Because these jury instructions are unconstitutional, Darrell Hines is entitled to habeas corpus relief.

\*\*\*

21.    In violation of the Sixth, Eighth, and Fourteenth Amendments, the prosecution made improper arguments during closing statements at the guilt/innocence trial, including arguments which undermined the presumption of innocence and lessened the prosecution's burden of proof. This misconduct rendered Darrell Hines' trial fundamentally unfair

\*\*\*

b.    The prosecution improperly vouched for the credibility of its witnesses, also expressing his personal opinion about their credibility during his closing argument:

1) The prosecution told the jury that Darrell Hines' sister, Vicki, was telling the truth when she claimed to the jury that she saw on her brother's clothing.

2) The prosecution told the jury: "this is his sister It's not easy for her to get up here and testifying knowing the consequences that might befall her brother She got on the witness stand and took that oath to tell the truth and when she did that she told the truth. It wasn't easy for her. But she wasn't going to get up here and perjure herself" Tr. 579.

3) In fact, Vicki Hines was under the influence of alcohol during her testimony and later recanted her story. This argument violated due process.

4) In addition, the prosecution repeatedly attempted to bolster the credibility of the Sheriff and his performance during this case.

5) First, the prosecution claimed to the jury that: "The Sheriff did one of the best jobs on this case that I've seen in a long time ." Tr. 611.

6) Then, the prosecution told the jury: "I'm kind of glad we've got a sheriff like we've got." Tr. 617.

7) This was improper and also violated due process.

\*\*\*

d.      The prosecution belittled Darrell Hines' exercise of his constitutionally guaranteed rights by focusing them on the victim's rights.

1) The prosecution questioned the jury: "What about the rights of Mrs. Jenkins? What about her rights?" Tr. 608.

2) As a result, jurors were induced to find Mr. Hines guilty for irrelevant and constitutionally impermissible reasons This was highly prejudicial to the jury's decision, as it skewed the jury's decision toward guilt.

e.      The prosecution told prospective jurors that this case was the most important in the history of the county, emphasizing his lengthy experience and expertise.

1) The prosecution boasted: "There's never been a more important case in Cheatham County. There's never been a more atrocious murder in Cheatham County - any individual that went through the suffering that this lady did, and I've never been involved in anything quite like this since I've been District Attorney General, and while I was with General Lockert for several years while he was the District Attorney General." Tr. 606.

2) This type of "prosecutorial expertise" statement or argument is fundamentally unfair, as it unfairly persuades jurors to impose death out of deference to the prosecution's supposed "expertise" in determining the proper outcome for the jury's decision. See Brooks v. Kemp, 762 F.2d 1381, 1410 (11th Cir. 1985) (en banc); Tucker v. Kemp, 762 F2d 1496, 1505 (11th Cir 1985); Hance v. Zant, 696 F2d 940, 953 (11th Cir. 1983).

3) Such a "prosecutorial expertise" argument is unconstitutional, because it "improperly suggest[s] that the prosecutor had canvassed all murder cases and selected this one as particularly deserving of the death penalty, thus infringing upon the jury's decision-making discretion and improperly invoking the prosecutorial mantle of authority. Brooks, 762 F 2d at 1413.

f.      The prosecution shifted the burden of proof and encroached on Darrell Hines' right to present a defense and have witnesses testify in his favor.

1) The prosecution told the jury that "you know if he had any conversation with his grandfather or anybody else - I remember Mr. Wilkinson asking that sheriff about did you talk with that grandfather -and if the grandfather had told him anything about it that would've helped them in their defense the grandfather would've been brought in and put on the witness stand.. If any family member had passed any word on to him, these are good defense lawyers, they would have had them in here to tell you about it." Tr. 627.

2) Because the prosecution was attempting to shift the burden of proof in the jury's mind by implying that Darrell Hines must put on proof to secure an acquittal or avoid conviction, this argument violated due process.

***

22.     In violation of the Sixth, Eighth, and Fourteenth Amendments, at the re-sentencing trial, the prosecution made misleading, unconstitutional, and fundamentally unfair statements to the jury which violated Darrell Hines' constitutional rights.

a.     During voir dire at re-sentencing, the prosecution made various misstatements to jurors indicating, incorrectly, that the death sentence had to be returned merely if aggravating circumstances were found. R. Tr. 18, 19, 40, 41.

b.     During voir dire at re-sentencing, the prosecution made objectionable statements concerning the rights of the victim which denigrated Darrell Hines' constitutional rights and improperly focused jurors on irrelevant factors. R. Tr. 164. This violated due process and led to the arbitrary imposition of the death sentence in violation of the Eighth and Fourteenth Amendments.

c.     During voir dire at re-sentencing, jurors were misled about their responsibility for imposing the death sentence, by being misled into thinking that Darrell Hines' acts relieved them of their individual responsibility for imposing the death sentence, in violation of the Eighth and Fourteenth Amendments. R. Tr. 423.

d.     At re-sentencing, the prosecution misled jurors into thinking that Darrell Hines had been convicted of premeditated murder when the prosecution introduced the indictment against Mr. Hines, when, in fact, the guilt phase jury only found Darrell Hines guilty of felony murder. R. Tr. 130. This prejudiced the jury against Darrell Hines and led jurors to erroneously believe that the offense was more agg[r]avated than it actually was, leading to the arbitrary imposition of the death sentence

e.     At re-sentencing, the prosecution made improper comment and personal comment about Darrell Hines' exercise of his right to counsel and to use the assistance of persons who assisted him in preparing his case, including the Capital Case Resource Center (CCRC).

1) During the cross-examination of two key witnesses and in closing argument, the prosecution, over defense objection, repeatedly referred to the fact that Darrell Hines had used CCRC and attorney Brock Mehlet. The prosecution distorted the role and purpose of the organization in attempt to impeach the witnesses.

a) During the cross-examination of expert witness Pam Auble, the prosecution asked Dr. Auble about her familiarity with CCRC.. R Tr 347. The prosecution asked Dr. Auble if she had worked with CCRC and in how many cases she had consulted with them R. Tr. 347, 348.

148

b) The prosecution characterized CCRC as an organization that "assists in the defense of people charged with capital crimes" whose "primary motivation or primary reason for their existence is to keep somebody from going to the electric chair" R. Tr. 349, 350.

c) The prosecution then asked Dr Auble if she had worked with CCRC during the Darrell Hines' case, indicating that CCRC had done "background investigation" for Dr. Auble and were providing her with information. R. Tr. 349, 350.

d) The prosecution went so far as to imply that CCRC might be paying Dr Auble to testify in the Darrell Hines case. R. Tr. 351.

e) Then, the prosecution asked Dr. Auble to identify Brock Mehler in the courtroom and identify what sort of information Mr. Mehlr1, who was an attorney at CCRC, had given to her. R. Tr. 352.

f) The prosecution also asked Dr. Charvat about her familiarity with CCRC, with Brock Mehler, and with the nature of the assistance that CCRC provided to her. R. Tr. 492, 493.

g) The prosecution asked Dr. Charvat if she had worked with CCRC on other ca ses and if she was opposed to the death penalty. R. Tr. 495, 496.

h) Finally, during closing arguments, the prosecution attempted to impeach Dr Charvat one more time: "Ms Charvat was assisting attorneys in this case. She was assisting the Capital Case Resources Group whose sole function in life is to fight against the death penalty regardless of the circumstances. " R. Tr. 556.

2) The prosecution's comments about the CCRC and attempts to impeach Darrell Hines' expert witnesses penalized Darrell Hines' exercise of his right to counsel.

a) The prosecution is not permitted to use the defendant's choice of defense counsel as a basis for impeachment or rebuttal. Nor is the prosecution permitted to attack the integrity of defense counsel.

b) In this situation, the prosecution's attack on CCRC (a government-funded organization established to assist capital defense attorneys), and the prosecution's attempt to impeach key defense witnesses because they utilized the services of CCRC, is fundamentally fair and contrary to due process

c) The assistance provided by the CCRC is intended to ensure that a capital

149

defendant receives the effective assistance of counsel guaranteed by the Constitution. Prosecutorial comment about CCRC's assistance to defense counsel and their agents penalized Darrell Hines for exercising his right to counsel.

3) The prosecution's comments deprived Darrell Hines of a reliable and individualized sentencing determination.

a) In this case, the testimony of Dr. Auble and Dr. Charvat was at the heart of Darrell Hines' case in mitigation.

b) The prosecution's improper attack on their credibility adversely affected the jury's consideration of mitigating factors and violated the defendant's constitutional right to a reliable and individualized sentencing determination See Lockett v. Ohio, 438 U.S. 586, 98 S. Ct 2965 (1978).

c) The prosecution misstated the role and purpose of CCRC, improperly used the fact that the CCRC had provided assistance to the defense as a basis for impeachment, and then implied to the jury that the testimony of Dr. Auble and Dr. Charvat was biased because of their affiliation with CCRC.

d) In a proceeding where the jury must weigh aggravating and mitigating circumstances and determine whether the defendant shall be sentenced to death, it cannot be said that the prosecution's calculated and repeated efforts did not affect the verdict beyond a reasonable doubt

g. As a result, Darrell Hines is entitled to habeas corpus relief

23. In violation of the Sixth, Eighth, and Fourteenth Amendments, Darrell Hines' death sentence is arbitrary under United States v. Jackson, 390 U.S. 570, 88 S. Ct 1209 (1968), and unconstitutional.

a. Prior to re-sentencing, Mr Hines and the prosecution agreed that Mr. Hines should enter a plea of guilty and be sentenced to two consecutive life sentences in order to avoid proceeding with the re-sentencing trial.

b. The prosecution's sentencing offer establishes that it has no compelling interest in executing Mr. Hines and that a lesser sentence is appropriate under the circumstances. There are less restrictive means of punishing Darrell Hines than imposing the death sentence.

c. Moreover, the prosecution's sentencing offer demonstrates that it does not believe that Mr. Hines's case merited the death penalty.

d. However, because the trial court believed that Darrell Hines should get the death

150

penalty, he forced both the prosecution and Mr. Hines to re-sentencing.

e. As a result, the death sentence infringes upon Mr. Hines' fundamental right to life and is arbitrary. Darrell Hines is entitled to habeas corpus relief

24. In violation of the Sixth, Eighth, and Fourteenth Amendments, the trial court's rejection of the prosecution's offer to sentence Darrell Hines to consecutive sentences of life imprisonment was unconstitutional.

a. Prior to re-sentencing, Mr. Hines and the prosecution agreed that Mr. Hines should enter a plea of guilty and be sentenced to two consecutive life sentences in order to avoid proceeding with the re-sentencing trial.

b. Upon presenting this agreement to the trial court on June 20, 1989, the trial court refused to accept two consecutive life sentences for Mr Hines and insisted that the parties proceed to the re-sentencing hearing.

c. Regarding its decision, the trial court stated, "I think [Mr. Hines' case] is a case that requires, if the jury so finds, the ultimate punishment. I think it's just the plain justice of it." R. Tr. at 3. "I think justice requires the court to reject the proffered plea agreement as to sentencing and we will allow the jury to decide this issue." R. Tr. at 4.

d. The court's rejection of the sentencing offer revealed that the court was indeed biased against Mr. Hines and believed that he should have the death penalty. Because of this bias, the trial court should have been recused.

e. Moreover, the court's rejection of the sentencing offer improperly interfered with the district attorney general's discretion regarding sentencing.

1) Specifically, the district attorney is solely vested with the discretion whether or not to seek the death penalty.

2) Darrell Hines was denied due process and equal protection when the court stripped the district attorney general of his sentencing disc1etion in this case.

3) The district attorney general had exercised his discretion not to seek the death penalty in this case, as evidenced by the prosecution's offer to sentence Mr. Hines to consecutive life sentences and by the fact that the district attorney general had not filed notice of the prosecution's intent to seek the death penalty, as required by Tenn. R. Crim. P. 12.3(b).

f. As a result, Darrell Hines is entitled to habeas corpus relief.

151

**\*\*\***

26.    In violation of the Sixth, Eighth, and Fourteenth Amendments, prior to the resentencing trial, the court failed to grant a continuance when the prosecution failed to provide timely notice of aggravating circumstances, and where Darrell Hines was prevented from seeming attendance of necessary out of state witnesses.

      a.    Prior to the re-sentencing trial, Darrell Hines filed two motions to require the prosecution to provide written notice of aggravating circumstances pursuant to Tenn R Crim. P. 12.3(b).

      b.    The prosecution failed to respond to these motions until just one week before trial.

      c.    Darrell Hines filed a motion for a continuance on June 20, 1989 based on the prosecution's failure to give notice of the aggravating circumstances and difficulties in obtaining the cooperation and attendance of out-of-state witnesses. (Obtaining the necessary court orders and subpoenas could not be accomplished unless the trial court granted Mr.. Hines' motion for a continuance.)

      d.    Rule 12.3(b) contains mandatory language - written notice of aggravating circumstance must be filed not later than 30 days p1ior to trial and the court must grant the defendant a reasonable continuance of his trial if the notice is not timely

      e.    The trial court denied Mr Hines' motion for a continuance claiming that "You wouldn't be in any better shape four months from now than you would be now."

      f. .    The trial court's failure to grant the continuance was in error and prejudiced Mr. Hines. Mr. Hines had a due process liberty interest established by Tenn. R. Crim. P 12.3(b) which was violated by the trial court. As a result, Mr. Hines is entitled to habeas corpus relief.

27.    In violation of the Sixth, Eighth, and Fourteenth Amendments, Darrell Hines' conviction and death sentence is unconstitutional because the empaneling of the jury at both the guilt/innocence trial and at the re-sentencing trial was improper.

      a.    During voir dire at the guilt/innocence trial, the court failed to properly prohibit the participation of Sheriff Weakley in the selection of the jury where it was likely that the Sheriff would testify for the prosecution and that this premature exposure to the jury would lend the Sheriff a prejudicial aura of credibility.

      b.    During voir dire at the guilt/innocence trial, the court failed to properly sequester the jury panel on the night of January 6, 1986, prior to the conclusion of voir dire on January 7, 1986. As a result, juror Sandra Kilgore improperly exposed the jury to extraneous

information See ¶¶27(b), 29, incorporated by reference .

c. During voir dire, the cout failed to order a mistrial or to seek to correct the state's incorrect presentation of the definitions of the elements of the charge, burdens of proof, and definitions of sentencing terms. Specifically, the state incorrectly stated that it was entitled to a fair trial. See Tr. at 15. The state also incorrectly stated on several occasions that in some circumstances the death penalty was required.

d. During voir dire at the guilt/innocence trial, the court failed to order a mistrial following prejudicial statements made by potential jurors, including but not limited to juror Anderson's statement that it was a "brutal murder" and juror Winn's statement that it was a "horrendous act" See Tr. At 23-26.

e. During voir dire at the guilt/innocence trial, the court failed to strike juror Cothan who was biased against Darrell Hines.

    1) Cothan was related to the victim in this case - the victim was married to juror Cothan's second cousin. Tr. 171.

    2) Cothan claimed that he could tell whether a person was lying if he could look in their eyes as he spoke. For this reason, Cothan wanted the witnesses to look at the jury as they testified. Tr. 146-147.

    3) In addition, Cothan had served together with another juror as a magistrate on the "county court".. See Tr. 1.

f. At the re-sentencing trial, the prosecution impermissibly struck jurors in violation of Batson v. Kentucky, 476 U.S. 79, 106 S Ct. 1712 (1989).

g. At the re-sentencing trial, the trial court impermissibly struck jurors who expressed concern about the death penalty. See Witherspoon v. Illinois, 391 U.S. 510, 88 S. Ct 1770 (1968); Adams v. Texas, 448 U.S. 38, 110 S.Ct. 2521 (1980).

    1) During voir dire at the re-sentencing trial, Juror Citro was questioned about his thoughts on the death penalty. Citro indicated that he was not sure about the death penalty. R. Tr. 18-36.

    2) The trial court asked juror Citro if, in regard to imposing the death penalty, there was "a reasonable possibility that your personal beliefs might affect or will affect your decision" R. Tr. 27. Juror Citro responded that he believed that his personal beliefs might affect his decision. Id.

    3) However, juror Citro also indicated that he would not automatically vote against

the death penalty and that he believed that there were circumstances where the death penalty would be proper R Tr. 29-31.

4) The trial court then struck juror Citro for cause because the court believed that "[his] personal opinions may get in the way of following the law." R Tr. 36.

5) Because juror Citro stated that he could impose the death penalty and merely indicated that his personal beliefs might affect his decision, juror Citro should not have been excused for cause. See Adams v. Texas, 448 US 38, 110 S .Ct 2521 (1980) (it is unconstitutional to strike jurors who honestly concede that their personal opinions about the death penalty might affect their decision at sentencing).

h.    At the guilt/innocence and re-sentencing trials, the trial court failed to conduct voir dire to expose biases of jurors which prejudiced Darrell Hines, including jurors who were relatives and/or close friends of law enforcement; jurors who had been victims of crime and/or were close to crime victims; and, jurors who had strong negative feelings about drug and alcohol abuse.

i.    At the guilt/innocence and re-sentencing trials, the trial court failed to strike, for cause, those jurors who held some kind of bias against Darrell Hines, his case, or any class or group to which Darrell Hines belongs.

j.    As a result, Darrell Hines is entitled to habeas corpus relief.

28.    In violation of the Sixth, Eighth, and Fourteenth Amendments and Deck v. Missouri, 544 U.S. __ (May 23, 2005), the jurors were permitted to observe Darrell Hines in handcuffs and shackles prior to rendering a verdict at the re-sentencing hearing.

a.    Mr Hines was restrained with handcuffs and shackles in full view of the jury.

b.    Prior to allowing jurors to observe Mr. Hines in handcuffs and shackles, the trial court had made no determination that restraints were justified by a state interest See Deck v. Missouri, supra

c.    Displaying Mr. Hines to the jury in physical restraints created an impression that Mr Hines posed a present and future danger.

1) This impression permitted juror's to consider future dangerousness as a non-statutory aggravating circumstance, which is not permissible under Tennessee law.

2) Mr. Hines was unable to rebut the impression of future dangerousness created by the physical restraints.

154

d.     Displaying Mr. Hines to the jurors in physical restraints, created an inference that Mr Hines deserved the death sentence.

e.     The use of physical restraints lessened the prosecution's burden of proof.

f.     The use of physical restraints shifted the burden of proof to Mr. Hines.

g.     The use of physical restraints denied Mr. Hines the opportunity to rebut damaging inferences against him.

h.     The use of physical restraints lead to an arbitrary sentencing determination at Mr . Hines' re-sentencing trial.

i.     As a result, Darrell Hines is entitled to habeas corpus relief.

29.     In violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, the conviction in this matter is unconstitutional because jurors considered and/or were exposed to extraneous and prejudicial information.

a.     At the 1986 guilt/innocence phase, juror Sandra Kilgore contacted her pastor to find out whether the Bible said capital punishment was right or wrong. P. Tr. 66.

1) Juror Kilgore contacted her pastor from home after the jury had been selected. It was "after they said I was going to be on a jury, that we were supposed to be back here at a certain time and in between that time I called and asked him about the scriptures on it" P. Tr 74, 78, 79.

2) The call was made when the jurors "were told to go home and get your things and come   back to begin your jury service and that is the period of time which you made your call." P. Tr. 80.

3) Juror Kilgore's pastor gave her scripture verses that supported capital punishment, including the verse that says, "An eye for an eye .. " P Tr. 67.

4) Such extraneous contact tainted the jury and their deliberations. As a result, Darrell Hines was denied his light to a fair trial He is entitled to habeas corpus relief.

30.     In violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments and Miranda v. Arizona, 384 US 436, 86 S. Ct 1602 (1966), the introduction of Darrell Hines' post-arrest statements at the 1986 guilt/innocence trial and the 1989 re-sentencing trial was unconstitutional.

a.     On June 11, 1985, Darell Hines surrendered to Barren County, Kentucky law enforcement officers who had been searching for Mr. Hines in connection with the murder

of the victim at the CeBon motel.

b.     Upon his surrender, Mr. Hines was not advised of his Miranda rights by Barren County officials. He was not informed regarding his rights to remain silent or to have an attorney to represent him. Tr. 248.

c.     Despite the fact that Kentucky officials did not advise Mr Hines of his rights, they talked to him about the murder and the circumstances surrounding the incident. Tr. 248, 281.

d.     As a result of their questions, Mr. Hines told the Sheriff of Barren County that "he took the automobile but he didn't murder the woman." Tr 248, 252.

e.     Subsequently, Mr. Hines was transported to Cheatham County, Tennessee.

f.     On June 12, 1985, Mr Hines was interrogated by TBI Agent Sherman McGill.

g.     Agent McGill did not advise Mr. Hines of his Miranda rights prior to interrogating him, although he asserted that Mr Hines had previously been read and waived his rights. Tr. 371.

h.     Agent McGill then took a statement from Mr. Hines regarding his involvement in the murder at the CeBon motel.

i.     As a result, the statements obtained by Barren County Officials and TBI Agent McGill were taken in violation of Darrell Hines' right to remain silent and his right to counsel.

j.     Because the prosecution did not prove that Darrell Hines knowingly, intelligently, and voluntarily waived these rights, Darrell Hines is entitled to habeas corpus relief

31.     In violation of the Sixth, Eighth, and Fourteenth Amendments, Darrell Hines was denied his right to compulsory process and due process by the trial court's failure to have witnesses Norman Johnson and Bill Andrews produced to testify at the re-sentencing hearing. This likewise violated Darrell Hines' rights to present any and all available mitigating evidence in support of a sentence less than death.

\*\*\*

33.     In violation of the Fifth, Sixth, Eighth and Fourteenth Amendments, and International Law, the death penalty is unconstitutional.

a.     The death penalty is unconstitutional because the discretion to impose death is not closely confined in order to avoid arbitrariness. See Furman v. Georgia, 408 U.S 238, 92 S.

Ct. 2726 (1972).

b.    The death penalty is unconstitutional because the sentencer does not have unlimited discretion not to impose death. See Lockett v. Ohio, 438 U.S. 586, 98 S .Ct. 2954 (1978).

c.    The death penalty is unconstitutional because the death penalty, which is not imposed "fairly, with reasonable consistency." Callins v. Collins, 510 U.S 1141, 1144, 114 S.Ct 1127, 1129 (1994) (Blackmun, J, dissenting from the denial of cert.), quoting Eddings v. Oklahoma, 455 U.S 104, 112, 102 S.Ct. 869, 875 (1982).

d.    As a result, because the death penalty has proven impossible to administer in practice, there is no way to constitutionally administer the death penalty and it should not be imposed "at all" Callins, supra

e.    In addition, the death penalty violates International Law.

1) Article 6 of the International Covenant on Civil and Political Rights (ICCPR), GA. res 2200A (XXI), 21 UN. GAOR Supp (No. 16) at 52, UN. Doc. A/6316 (1966), 999 U.N.T.S. 171, entered into force on March 23, 1976, provides that "Every human being has the inherent right to life... sentence of death may only be imposed for the most serious of crimes. "

2) Article 7 states that "No one shall be subjected to torture or to cruel, inhuman, or degrading treatment or punishment."

3) At least one Justice on the United States Supreme Court has suggested that the long delays inherent in the review of death sentences violate this provision of the ICCPR. See Knight v. Florida, 528 U.S. 990, 120 S.Ct. 459 (1999) (Breyer, J, dissenting from the denial of cert).

f.    As a result, Darrell Hines is entitled to habeas corpus relief.

34.    In violation of the Eighth and Fourteenth Amendments, execution by lethal injection constitutes cruel and unusual punishment, is tortuous, and violates contemporary standards of decency, as it involves unnecessary, conscious suffering:

a.    In Tennessee, the lethal injection protocol involves the use of three separate chemicals: sodium thiopental, pancuronium bromide (pavulon), and potassium chloride.

b.    The sodium thiopental used in the process does not adequately anaesthetize an individual prior to the injection of pavulon and potassium chloride, which, absent anesthesia, cause a gruesome and horrifying death of which the individual is conscious

1) Researchers have made clear that the amount of sodium thiopental used in lethal injection is inadequate to produce anesthesia, which requires blood levels of at least 63 mg/L. Almost all lethal injections studied by researchers in a recent study have failed to provide that amount of anesthesia. See Leonidas Koniaris et al, Inadequate Anaesthesia In Lethal Injection For Execution, Lancet 2005; 365:1412-1414.

2) In the only modem-day execution in Tennessee, thiopental blood levels in Robert Coe were only approximately 10 mg/L, which clearly indicates that Robert Coe was not anesthetized when he was executed.

c. Pancuronium bromide is prohibited for euthanizing animals in Tennessee, notably because it is a paralyzing agent which stops breathing. A person who is not anesthetized, however, would be fully conscious of the extreme pain caused by pancuronium bromide. Pancuronium bromide also serves no legitimate state interest, and it violates due process and the equal protection of the laws for the state to use pancuronium bromide in lethal injections, especially when its use on animals is categorically prohibited.

d. Further, the amount of potassium chloride used in lethal injection is inadequate to stop the heart. The amount of potassium used in the execution of Robert Coe was also inadequate to stop the heart. As a result, any individual lethally injected in Tennessee actually dies from the pancrnonium bromide, while at the same time being conscious, given the lack of anesthesia from the sodium thiopental.

e. Consequently, it violates the Eighth and Fourteenth Amendments for Respondent to seek to execute Darrell Hines using sodium thiopental, pancuronium bromide, and potassium chloride. Such a process is cruel and unusual; inflicts and creates the risk of imposing excessive, wanton, and gratuitous suffering; and violates contemporary standards of decency. See Brown v. Crawford, _ F.3d _, 2005 US. App. Lexis 8813 (8th Cir. 2005)(Bye, J, dissenting) (detailing Eighth Amendment violation arising from execution protocol involving sodium thiopental, pancuronium bromide, and potassium chloride); See also Brown v. Crawford, 544 US _ (2005) (Stevens, J, dissenting).

f. Likewise, the use of pancuronium bromide violates the Eighth and Fourteenth Amendments, including Darrell Hines' entitlement to due process of law and to the equal protection of the laws, and the First Amendment as the use of pancuronium bromide precludes access to the courts.

g. As a result, Darrell Hines is entitled to habeas corpus relief.

***

35. In violation of the Sixth, Eighth, and Fourteenth Amendments, Darrell Hines' 1986 first-degree murder conviction and 1989 death sentence are unconstitutional because Tennessee's model

and death penalty statutes (Tenn. Code Ann. § 39-2-202 through § 39-2-205) are constitutionally defective. The constitutional defects include, but are not limited to:

a.    Tennessee's model statue is vague and failed to fulfill the requirements of Article II, § 17 which prohibits the enactment of any bill that embraces more than one subject expressed in the title of the bill. Tenn. Code Ann. § 39-2-202 (repealed 1991) contains more than one subject and the title of the statute gives no notice of some of the subjects addressed by the statute. As a matter of due process under the Fourteenth Amendment, Mr. Hines had a protected liberty interest under § 17 which has been violated here.

b.    Tennessee's death penalty statute violates the Eighth and Fourteenth Amendments because it provides for the sentence of death by electrocution, which is cruel and unusual.

c.    Tennessee's death penalty statute provides insufficient guidance to the jury concerning what standard of proof the jury should use in making the determination that the aggravating circumstances outweigh the mitigating circumstances.

d.    Tennessee's death penalty statute does not sufficiently limit the exercise of the jury's discretion, because once the jury finds the existence of one aggravating factor, it can impose a sentence of death no matter what evidence of mitigation is shown.

e.    Tennessee's death penalty statute limits the jury's discretion to exercise mercy by requiring the jury to impose a sentence of death if it finds that the aggravating factors outweigh the mitigating factors.

f.    Tennessee's death penalty statute fails to ensure that non-statutory mitigating factors are given the same weight as statutory mitigating factors by failing to require that the jury be given written instructions on the equal weight of non-statutoly mitigating factors.

g.    Tennessee's death penalty statue does not require the jury to make the ultimate determination that the appropriate punishment is a death sentence.

h.    Tennessee's death penalty statute does not require that the jury be instructed in writing that it may impose a life sentence on the basis of mercy alone.

i.    Tennessee's death penalty statute does not provide a way to correct, by written instructions or the presentation of evidence, jurors' common misperceptions regarding the actual terms of life sentences and death sentences, the cost of incarceration, the cost of execution, the death penalty's deterrent effect, and the painful nature of death by electrocution.

j.    Tennessee's death penalty statute prevents effective review on appeal because it does not require the jury to make specific findings with respect to the presence or absence of

mitigating factors.

k.     Tennessee's death penalty statute provides for a punishment (death), which is cruel and unusual.

l.     Tennessee's death penalty statute is applied in a discriminatory manner- unfairly affecting racial, gender, geographic, economic, and political classes.

m.     Tennessee's death penalty statute does not provide an adequate method for proportionality and arbitrariness review by the Tennessee Supreme Court.

n.     Tennessee's death penalty statute has been applied by prosecutors in a manner that abuses their discretion because the statutes do not provide uniform standards for application of the death sentence.

o.     Tennessee's death penalty statute violates equal protection because it does not provide uniform standards for qualifying jurors for service on capital juries.

p.     Tennessee's death penalty statute permits the introduction of unreliable evidence in support of aggravating factors and in rebuttal of mitigating factors.

q.     Tennessee's death penalty statute allows the prosecution to make closing arguments to the jury in the penalty phase.

r.     Tennessee's death penalty statute does not require that the jury be instructed regarding the consequences of its failure to reach a unanimous verdict in the penalty phase.

s.     Tennessee's death penalty statute requires the jury to agree to an unanimous verdict in order to impose a life sentence.

t. Tennessee's death penalty statute violates international law.

> 1) Article 6 of the International Covenant on Civil and Political Rights (ICCPR), G.A. res 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, UN. Doc. A/6316 (1966), 999 U.N.T.S. 171, entered into force on March 23, 1976, provides that "Every human being has the inherent right to life . . . sentence of death may only be imposed for the most serious of crimes . . ."

> 2) Article 7 states that "No one shall be subjected to torture or to cruel, inhuman, or degrading treatment or punishment." At least one Justice on the United States SupremeCourt has suggested that the long delays inherent in the review of death sentences violate this provision of the ICCPR. See Knight v. Florida, 528 U.S. 990, 120 S. Ct. 459 (1999) (Breyer, J., dissenting from

160

the denial of cert.).

u.     Tennessee's death penalty statute imposes a penalty, death, that is unconstitutional because it affects the right to life and doesn't promote a compelling state interest

v.     Tennessee's death penalty statute does not require that aggravating circumstances be found by a grand jury and included in the indictment.

w.     As a result, Darrell Hines is entitled to habeas corpus relief.

36.     In violation of the Sixth, Eighth, and Fourteenth Amendments, the proportionality review conducted by the Tennessee Supreme Court was unconstitutional.

a.     In reviewing a sentence of death, Tennessee appellate courts are charged with determining whether "[t]he sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant." T..C.A. § 39-13- 206(c)(l)(D)(Supp. 1994); Tennessee Supreme Court Rule 12.

b.     At the time of the Tennessee Supreme Court's proportionality review in Mr. Hines' case, Rule 12 provided that a specified Rule 12 form "shall be completed in its entirety" by the trial court and "included in the technical record" in every case where a defendant has been convicted of first-degree murder. The Tennessee Supreme Court relies on information found in the Rule 12 form as a starting point for its comparative review.

c.     The Rule 12 proportionality review form is not part of the 1986 or 1989 technical records in Darrell Hines' case.

d.     The Rule 12 forms from other first-degree murder convictions, which were to serve as the baseline for the Tennessee Supreme Court's proportionality review for Mr Hines' case, had not been completed in their entirety at the time of Mr Hines' proportionality review, as required by Tenn. Sup Ct. R. 12.

e.     In fact, the Tennessee Supreme Court had access to fewer than 20% of the Rule 12 forms "from similar cases," which were to provide the baseline for the Court's proportionality review in Mr. Hines' case.

f.     As a result, the proportionality review process in Darrell Hine" case denied him due process because the material facts used for the determination of proportionality, including his own Rule 12 forms and the Rule 12 forms of other defendants, were non-existent.

g.     Therefore, Darrell Hines was denied a meaningful opportunity for proportionality review.

h.    As a result, Darrell Hines is entitled to habeas corpus relief.

37.    In violation of due process and equal protection under the Eighth and Fourteenth Amendments, the death sentence is unconstitutional because there were no standards for the decision to choose to seek (or impose) the death sentence (both within Cheatham County, and throughout the entire state of Tennessee), nor are there any consistent and objective standards for proportionality review. As a result of these failings, especially in a case where the prosecution has recognized that Darrell Hines ought to be sentenced to life in prison, the death sentence in this case (which impinges upon the fundamental right to life) violates rudimentary notions of due process and equal protection. See Bush v. Gore, 531 U.S 98, 121 S. Ct. 525 (2000).

38.    In violation of the Eighth and Fourteenth Amendments, Darrell Hines' death sentence is unconstitutional, as a result of the length of time (20 years) he has been incarcerated under sentence of death following the offense for which he was convicted. The death sentence is therefore unconstitutionally cruel and unusual. See Lackey v. Texas, 514 U.S. 1045, 115 S. Ct. 1421 (1995)(Stevens, J., respecting denial of certiorari).

***

40.    The cumulative effect of the errors at trial and sentencing, including all errors cited in this petition, denied Darrell Hines due process of law under the Fourteenth Amendment.

(Docket Entry Nos. 23, 23-1 and 23-2).